IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROMAN CATHOLIC ARCHBISHOP OF WASHINGTON, a corporation sole, 5001 Eastern Avenue Hyattsville, MD 20782 | |
| Plaintiff, | Civil Action No. 1:20-cv-3625 |
| v. | |
| MURIEL BOWSER, in her official capacity as Mayor of the District of Columbia, John A. Wilson Building 1350 Pennsylvania Avenue, NW Washington, DC 20004 | |
| DISTRICT OF COLUMBIA, c/o Karl A. Racine, Attorney General 400 6th Street, NW Washington, DC 20001 | |
| Defendants. | |

## COMPLAINT

1.  From the start of the pandemic, the Roman Catholic Archbishop of Washington ("Archdiocese of Washington") has worked with the District of Columbia to protect public health, including by voluntarily suspending public Masses in March. Since Mass resumed in June, the Archdiocese has demonstrated that people can worship God in a safe, responsible, and cooperative way. This has led to an exemplary safety record: thousands of Masses, with zero known COVID outbreaks linked to the Mass.

2.   Yet as Christmas fast approaches, the District has imposed arbitrary 50-person caps on Mass attendance—even for masked, socially-distant services, and even when those services are held in churches that can in normal times host over a thousand people.

3.   These restrictions are unscientific, in that they bear no relation to either the size of the building or the safety of the activity.

4.   These restrictions are discriminatory, in that they single out religious worship as a disfavored activity, even though it has been proven safer than many other activities the District favors.

5.   Indeed, if the Archdiocese were to fill its churches with library books, washing machines, exercise bikes, restaurant tables, or shopping stalls instead of pews, the District would allow many more people to enter and remain for an unlimited amount of time. That is because for public libraries, laundromats, retail stores, restaurants, tattoo parlors, nail salons, fitness centers, and many other establishments, the District imposes capacity-based limits, rather than hard caps. For example, there is no hard cap on the number of people who can dine indoors in restaurants, where alcohol is commonly served and patrons do not wear masks during meals.

6.   Half of the Archdiocese's churches in the District can accommodate 500 or more worshippers. St. Matthew's Cathedral can accommodate 1,000 worshippers. And the Basilica of the National Shrine of the Immaculate Conception—the largest Catholic Church in the United States—could accommodate thousands of worshippers. Indeed, the Statue of Liberty would fit inside with room to spare. Yet under the Mayor's orders, all of these churches are subject to the same cap of 50 people.

7.  These arbitrary restrictions violate the rights of more than 650,000 D.C.-area Catholics, who—at the end of this most difficult year—now face the chilling prospect of being told that there is no room for them at the Church this Christmas.

8.  But the Supreme Court recently ruled that in-person worship must be given equal treatment. In *Roman Catholic Diocese of Brooklyn v. Cuomo*, No. 20A87, 2020 WL 6948354 (Nov. 25, 2020), the Court explained that hard caps on the number of worshippers "effectively bar[] many from attending religious services" and that "many other less restrictive rules . . . could be adopted," including the percentage-based limits the District uses elsewhere. *Id.* at *2, *3.

9.  That should have been reason enough for the District to abandon its illegal treatment of safe and responsible worship. But since the District has refused and Christmas is coming, the Archdiocese now has no choice but to seek judicial relief.

10. Under both the First Amendment and the Religious Freedom Restoration Act, the District's arbitrary, unscientific, and discriminatory treatment of religious worship is illegal. Particularly after *Diocese of Brooklyn* identified occupancy-based limits as a less restrictive means of protecting public health than numeric caps, the District's hard caps on numbers of worshippers cannot withstand scrutiny.

11. The Archdiocese therefore seeks an injunction that allows them sufficient time before Christmas Eve to allow the Archdiocese to plan and celebrate Mass in accordance with percentage-based limits rather than a 50-person cap. The Constitution, federal law, and common sense require no less.

12. Christmas should be a time for reconciliation and joy, and the Archdiocese simply wants to welcome its flock home. It respectfully requests that it be allowed to do so.

## I.   Parties

13. The Roman Catholic Archbishop of Washington, a corporation sole ("the Archdiocese") exists to serve the approximately 655,000 Catholics in the District and five surrounding Maryland counties by providing them with opportunities to engage in religious worship, and to serve the entire D.C. region through acts of mercy, including education, social services, and health care. The Archdiocese's legal name is "Roman Catholic Archbishop of Washington, and his successors in office, in accordance with the discipline and government of the Roman Catholic Church, a corporation sole." It is a corporation created by an Act of Congress in 1948, with a principal place of business in Hyattsville, Maryland and 38 parishes located in the District of Columbia and 101 parishes in Maryland. The current Archbishop is Cardinal Wilton D. Gregory. The Cathedral of St. Matthew the Apostle in downtown Washington is the seat of the Archbishop.

14. Defendant Muriel Bowser is the Mayor of the District of Columbia. On March 24, June 22, and November 23, Mayor Bowser issued the executive orders that established fixed caps on the number of people who can gather to worship in a house of worship. She is sued here in both her official and individual capacities.

15. Defendant the District of Columbia is a municipal corporation and is responsible for the policies implemented through its officials and agents, including the Mayor's Orders.

## II. Jurisdiction and Venue

16. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983 because the Archdiocese alleges an ongoing violation of its rights under the Constitution of the United States and RFRA.

17. This Court may declare the legal rights and obligations of the parties in this action pursuant to 28 U.S.C. § 2201 because the action presents an actual controversy within the Court's jurisdiction.

18. This Court has general personal jurisdiction over Defendants because they are domiciled in the District of Columbia. This Court also has specific personal jurisdiction over Defendants because this case arises from their deliberate, continuous, and substantial contacts within the District of Columbia.

19. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b). All Defendants are residents of and/or perform their official duties in this district. Additionally, a substantial part of the events or omissions giving rise to the claims occurred in this district. *Id.* § 1391(b)(2).

## III.   Factual Allegations

20. In 1634, the first Catholic settlers landed on Saint Clement's Island, Maryland, and celebrated the first Catholic Mass in the D.C. region. Formally established as its own diocese in 1939, the Archdiocese serves the spiritual needs of over 655,000 D.C.-area Catholics in the District of Columbia and five surrounding Maryland counties.

21. Catholics are among the largest religious groups in the District, and D.C. Catholics reflect the District's diversity. They are led by Cardinal Wilton Gregory, the nation's first African-American cardinal. Today, over 40% of the Catholics in the

Archdiocese are of Latino descent, and 15% are of African and Caribbean descent. Each week, Mass is offered in more than 20 languages.

22.   The Archdiocese and members of the Catholic faithful have long been involved in corporal and spiritual works of mercy in the D.C. area. In addition to offering public Mass and the sacraments every day of the year, Archdiocesan ministries serve hundreds of thousands of people from every background, and regardless of their religion.

23.   For example, Saint Augustine's School, located in the U Street neighborhood, was founded by free Blacks and former slaves in 1858, and it began educating Black students four years before the District started providing public education for Black children. Today, the Archdiocese includes 91 Catholic schools serving 24,000 students and awarding $6 million in tuition assistance each year to ensure that Catholic education is available to as many of the District's children as possible.

24.   The oldest Catholic Church in the District, Saint Patrick's, was founded in 1794 to meet the spiritual needs of immigrants who helped build the emerging federal city. Today, that same parish hosts the annual "Blue Mass," dedicated to the city's police, firefighters, and other first responders.

25.   The Archdiocese, through its many ministries, has also been on the front lines of responding to the COVID crisis.

26.   Catholic Charities D.C., an affiliated corporation and ministry of the Archdiocese and the largest non-governmental social service provider in the District, has served over 1 million meals since the start of the pandemic. As the need has increased, so have its efforts: Catholic Charities' food pantry in Columbia Heights now serves

650 people a week instead of the 40 people a week who sought their help before the COVID crisis began.

27. Victory Housing, Inc., an affiliated corporation and ministry of the Archdiocese, operates 32 properties including six assisted living residences for the elderly, 22 apartment communities for independent seniors, and four apartment communities for low and moderate-income families. These properties located throughout the D.C. area include 2,352 units.

## The Significance of Celebrating Mass

28. For Catholics, "[t]he Sunday celebration of the Lord's Day and his Eucharist is at the heart of the Church's life." Catechism of the Catholic Church § 2177. "This practice of the Christian assembly dates from the beginnings of the apostolic age" and is reflected in the *Letter to the Hebrews*, which instructs the faithful "not to neglect to meet together." Catechism of the Catholic Church § 2178 (quoting *Hebrews* 10:25).

29. For Catholics, the Mass is not only a gathering of people, but an action of the gathered people together with Christ. "The celebration of Mass … is the center of the whole of Christian life for the Church both universal and local, as well as for each of the faithful individually.  For in it is found the high point both of the action by which God sanctifies the world in Christ and of the worship that the human race offers to the Father, adoring him through Christ, the Son of God, in the Holy Spirit." General Instruction of the Roman Missal at 16.

30. As a result, Sunday Mass is "the foremost holy day of obligation in the universal Church." Catechism of the Catholic Church § 2177. In addition to the Sunday Masses which occur every week, the Catholic Church offers Mass every day of the

year.  U.S. Catholics also attend Mass on certain holy days of obligation, including Christmas. Code of Canon Law, Canon 1246, §2.

### The Archdiocese's Response to COVID

31.  In light of these ancient and significant religious obligations, cancelling public Mass is an extraordinary step undertaken only for the gravest of reasons. Yet in the early days of the pandemic, the Archdiocese took this step on its own initiative out of concern for its flock and love for its neighbors. The Archdiocese temporarily suspended the religious obligation to attend Mass in person on March 12, and on March 14, it cancelled all public Masses scheduled to be said in the District.

32.  The Archdiocese also shut down in-person education in its religious schools, even as they are central to both its religious mission and thousands of the District's vulnerable children.

33.  At the same time, the Archdiocese amplified its efforts to serve the District's most vulnerable residents, particularly through Catholic Charities and the Archdiocese's many parish ministries.

34.  The Archdiocese resumed public Masses only after the District entered "Phase Two" in June.

35.  Since that time, the Archdiocese has consistently abided by "Phase Two" restrictions, including the 50% of occupancy, or 100-person cap, whichever is fewer, imposed in the Mayor's original Phase 2 order (which was later reduced to 50 persons). It has done so even though a 100-person cap—and now the 50-person cap—bears no relationship to what would constitute safe distancing within the Archdiocese's churches, many of which are among the largest buildings in the District.

36. For example, the Cathedral of St. Matthew can accommodate 1,000 worshipers.

37. The Basilica of the National Shrine of the Immaculate Conception, located within the District of Columbia, is the largest Catholic Church in the United States, with a gross floor area of 129,912 square feet and ceilings over 100 feet high. It could fit the Statue of Liberty inside its walls with room to spare.

38. In fact, every single church but one in the Archdiocese of Washington can hold 200 or more people.

39. Half can accommodate 500 or more worshippers.

40. Yet the Archdiocese has voluntarily complied with the District's fixed caps for houses of worship, which have limited in-person worshippers to 100 from June to November, and 50 from November 25 until today.

41. In order to protect public health, the Archdiocese has instituted rigorous social distancing and hygiene measures for all in-person worship services based on current guidance from the World Health Organization and the U.S. Centers for Disease Control and Prevention and reflected in two documents entitled *Public Celebration of Mass and Holy Communion Outside of Mass*,[1] and *What to Expect When Public Masses Start to Resume*.[2] These measures include, but are not limited to:

---

[1] Archdiocese of Washington, *Public Celebration of Mass and Holy Communion Outside of Mass* (May 14, 2020), available at https://perma.cc/GQ8A-4PZV (last accessed Dec. 10, 2020).

[2] Archdiocese of Washington, *What to Expect When Public Masses Start to Resume* (May 14, 2020), available at https://perma.cc/X9WW-6K8P (last accessed Dec. 10, 2020).

- Reconfiguring worship spaces to use every other pew and requiring 6 feet of space between individuals or groups who did not arrive together;

- Creating indoor traffic plans and entry/exit plans to maintain social distancing before, during, and after Mass, including during the distribution of Holy Communion;

- Requiring the use of masks or face coverings;

- Discontinuing the use of choirs;

- Changing the Mass schedule to accommodate government size restrictions to the extent possible;

- Encouraging the use of reservation systems for scheduling attendance at each Mass;

- Sanitizing and disinfecting worship space after each liturgy;

- Instructing people not to attend if they have any COVID symptoms, feel sick, or may have been exposed; and

- Enhancing live-stream Mass availability for those who are unable or uncomfortable with attending in-person Mass.

42. These modifications have required the Archdiocese to incur additional expenses for, among other things, additional cleaning supplies, janitorial services, staff costs, equipment, and even physical modification of its churches. The Archdiocese also incurred additional administrative costs related to scheduling attendance for the thousands of Masses in the District in the past five months.

43. The Archdiocese's public worship guidelines reflect what it has learned from extensive analysis by public health experts nationwide. Among other things, the

Archdiocese has relied on the *Road Map to Re-Opening Our Catholic Churches Safely*, created by doctors at some of the nation's top research hospitals and universities and submitted to the U.S. Conference of Catholic Bishops.[3]

44. As one of the *Road Map to Re-Opening* authors—a nephrologist at Yale University's School of Medicine, who has treated COVID patients since March—put it, "churches can be just as safe, if not at times safer than so-called 'essential businesses,' provided they take the precautions that are recommended in this document."[4]

45. The Archdiocese's safety plans have succeeded. Over the past five months in which *thousands* of public Masses have been celebrated, the Archdiocese is not aware of any COVID outbreaks linked to the celebration of public Mass in one of its Catholic churches in the District.

46. At the one parish where a clergy member tested positive, the Archdiocese cooperated fully with public health officials and D.C. Department of Health guidance. This included repeated communications, through multiple means, to notify possibly exposed Mass attendees, and suspending Masses and activities at that parish for two weeks. There were no reports of COVID transmission following this incident. The parish remains safely opened.

---

[3] Ad Hoc Committee of Catholic Doctors, *Road Map to Re-Opening Our Catholic Churches Safely*, Catholic Medical Association (May 14, 2020), https://perma.cc/8NHF-2XLF.

[4] Pablo Kay, *Catholic doctors say churches essential, offer 'road map' to safely reopen*, Crux (May 20, 2020), https://perma.cc/89DQ-8756.

47. The Archdiocese's experience safely resuming public worship is not unique. Three infectious disease experts reviewed more than one million public Masses nationwide since Catholic Churches reopened during the pandemic, most without the kind of 50-person numerical cap imposed in the District. They concluded that, wherever the protocols described in the *Road Map to Re-Opening* were followed, there was not a single documented outbreak of COVID linked to church attendance.[5]

48. Similarly, recent contact tracing data from other jurisdictions indicates that venues that the District does not restrict at all – including large retailers that sell groceries as well as other goods – are in fact a greater source of COVID transmission.[6]

### D.C.'s Restrictions on Houses of Worship

49. On March 11, 2020 Mayor Bowser issued Mayor's Order 2020-045[7] declaring a public emergency and Mayor's Order 2020-046[8] declaring a public health emergency due to COVID. Two days later, the Archdiocese voluntarily suspended all public Masses in the District.

---

[5] *See* Dr. Thomas W. McGovern, Dr. Timothy Flanigan & Dr. Paul Cieslak, *Evidence-Based Guidelines to Celebrate Mass Safely Are Working*, Real Clear Science (Aug. 19, 2020), https://perma.cc/SUN7-8SCX.

[6] *See* CBS News, *Transcript: Mayor Dee Margo on "Face the Nation,"* Face the Nation (Nov. 29, 2020, 11:32 AM), available at https://perma.cc/L52M-JTWQ (contact tracing data from El Paso show that 55% of COVID transmission occurred at "large retailers").

[7] Government of the District of Columbia, *Mayor's Order 2020-045* (Mar. 11, 2020), available at https://perma.cc/8Q27-E3XU.

[8] Government of the District of Columbia, *Mayor's Order 2020-046* (Mar. 11, 2020), available at https://perma.cc/8DN5-SRF5.

50. On March 24, 2020 Mayor Bowser issued Mayor's Order 2020-053 ("March 24 Order"),[9] closing all non-essential businesses and forbidding all gatherings of 10 or more people in a single confined or outdoor space. The Mayor's March 24 Order does not discuss houses of worship, but a section entitled "Additional Questions" posted on the same webpage as the March 24 Order states that "large gatherings of ten or more people are prohibited, so as a practical matter, most churches are not holding services." https://perma.cc/7HWX-Z6GM.

51. The Mayor's March 24 Order also states that "[a]ll Essential Businesses are strongly encouraged to remain open."

52. The March 24 Order did not establish any occupancy limits on "Essential Businesses," apart from encouraging them to implement social distancing and staggered shifts for their employees. March 24 Order at 3-4.

53. "Essential Businesses" is a defined term in the Mayor's March 24 Order, and includes medical marijuana "dispensaries" and "cultivation centers," "liquor stores," "laundromats," "grocery stores," and "stores that sell products necessary to maintain the safety, sanitation, and operation of residences." March 24 Order at 4-5.

54. In "Additional Questions," posted below the Mayor's March 24 Order, the webpage states, "Q: Big box stores are allowed under the Mayor's Order, but more than ten people are in them at once. Is DCRA going to close them? A: Big box stores should make efforts to preserve a safe distance between customers." https://perma.cc/7HWX-Z6GM.

---

[9] Government of the District of Columbia, *Mayor's Order 2020-053* (Mar. 24, 2020), available at https://perma.cc/8FGF-KKMV.

55. In other words, Defendants allowed an unlimited number of people to gather for shopping in "big box stores" while limiting the number of people allowed in houses of worship to ten, regardless of their capacity.

56. On March 30, 2020, Mayor Bowser issued a Stay at Home Order (Mayor's Order 2020-054).[10] The Order "require[d] all individuals anywhere in Washington, D.C., to stay in their residences" except for certain defined reasons. Essential travel was exempted, including "travel required to visit a house of worship."

*Phase One Reopening: Houses of Worship Limited to Ten People*

57. On May 27, 2020 the Mayor declared that the District was ready to enter Phase One reopening.[11] The Stay At Home Order's restriction on nonessential travel was lifted, but gatherings of 10 or more remained illegal, including in houses of worship.

58. "Amid COVID-19's arrival and the District's associated restrictions, a wave of protests swept the country." *Capitol Hill Baptist Church v. Bowser*, No. 20-cv-02710, 2020 WL 5995126, at *2 (D.D.C. Oct. 9, 2020).

59. In the District, the protests "included thousands of citizens marching through the streets of the city, including along streets that the District closed specifically for that purpose." *Id.* at *8.

---

[10] Government of the District of Columbia, *Mayor's Order 2020-054* (Mar. 30, 2020), available at https://perma.cc/W8AD-3ZNA.

[11] Government of the District of Columbia, *Coronavirus (COVID-19) Situational Update: Wednesday, May 27, 2020* (May 27, 2020), available at https://perma.cc/R7QV-N2KZ.

60. On June 6, 2020, "the Mayor appeared at one of the mass gatherings, 'welcom[ing]' hundreds if not thousands of protestors tightly packed into Black Lives Matter Plaza and announcing that it was 'so wonderful to see everybody peacefully protesting, wearing [their] mask[s].'" *Id.*

61. The Mayor "christened 'Black Lives Matter Plaza' when 'she directed the D.C. Department of Public Works to create a mural on 16th Street N.W., near the White House, to 'honor the peaceful protesters from June 1, 2020 and send a message that District streets are a safe space for peaceful protestors.'" *Id.* (quoting *Penkoski v. Bowser*, No. 20-cv-01519, 2020 WL 4923620, at *2 (D.D.C. Aug. 21, 2020)).

62. According to the District, "the protests did not trigger any spike in COVID-19 'outbreaks.'" *Id.* at *9.

*Phase Two Reopening: Houses of Worship Limited to 100 People*

63. On June 22, 2020, the Mayor issued Mayor's Order 2020-075[12] and announced that the District was entering Phase Two reopening. Under Phase Two, religious gatherings at houses of worship were capped at 100 people or limited to 50% capacity (whichever was fewer). These restrictions applied whether the gatherings took place indoors or outdoors. After these changes, the Archdiocese resumed public Masses in the District.

64. Under Phase Two, "Essential Businesses" continued to operate without any capacity restrictions. Colleges and universities were allowed to reopen "in accordance with plans and processes accepted by the Office of Planning." Non-essential retail

---

[12] Government of the District of Columbia, *Mayor's Order 2020-075* (June 19, 2020), available at https://perma.cc/B5GP-A8BJ.

businesses, personal service businesses (including tattoo parlors, nail salons, and tanning facilities), restaurants, and public libraries were allowed to open subject to limits based on their capacity, without any fixed numerical caps. Mayor's Order 2020-075 at 4.

65. Mayor's Order 2020-075 also provided that those who "knowingly violate[]" the District's restrictions "may be subject to civil and administrative penalties authorized by law . . . including civil fines or summary suspension or revocation of licenses." Mayor's Order 2020-075 at 11.

66. On October 9, 2020 the District was ordered to allow Capitol Hill Baptist Church to hold masked, socially-distanced religious services outdoors without a numerical cap. *Capitol Hill Baptist*, 2020 WL 5995126 at *1. The District subsequently updated its Phase Two guidance for houses of worship to reflect that the 100-person cap would not be enforced on outdoor gatherings held by houses of worship.

67. On October 22, 2020, the Archdiocese sent a letter to Mayor Bowser requesting permission for parishes to operate at 50% capacity without the 100-person maximum capacity limit set forth in the Phase Two Order.

68. District officials spoke to the Archdiocese in late October, acknowledged that they had received the letter and pledged to respond quickly.

69. However, the District did not follow through on this pledge and never provided a formal response to the Archdiocese's request.

*November Order: Houses of Worship Limited to 50 People*

70. On November 23, 2020, Mayor Bowser issued a new order that targeted a few activities, including houses of worship, and reduced the cap on religious worship in

the District from 100 people to 50 people or 50% of capacity (whichever is fewer).[13]
The new restrictions went into effect on Wednesday, November 25.

71. On December 7, 2020, the Archdiocese sent a second letter to Mayor Bowser
renewing its request that she remove the fixed cap on houses of worship.

72. In its letter, the Archdiocese pointed out that the District's approach is "out of
step with most jurisdictions nationwide." As of the last week in November, "32 states
had *no capacity limit* on indoor, in-person worship. Even among the minority of states
in which the District finds itself, most of them do not use numerical caps, and in the
few that do, almost none are as low as the District's 50-person cap." Exhibit A.

73. The Archdiocese also observed in the letter that the District's approach is un-
fair. Under the Mayor's orders, many other entities, including public libraries, laun-
dromats, restaurants, tattoo parlors, nail salons, offices, bus, train and metro sta-
tions, and big box retail stores are allowed to operate with percentage-based limits or
no limits at all—even though their patrons and certainly their employees spend hours
there.

74. Even fitness centers are allowed to operate based on their capacity and without
fixed caps; the Archdiocese pointed out that, "[i]f the Shrine were converted into a
fitness center, the District's rules would permit *more than 600 people* to exercise
there." Ex. A.

---

[13] Government of the District of Columbia, *Mayor's Order 2020-119* (Nov. 23, 2020), available at https://perma.cc/B3MU-XP5K; Government of the District of Columbia, *Phase Two Guidance Coronavirus 2019 (COVID-19): Guidance for Places of Worship* (Nov. 25, 2020), available at https://perma.cc/JCF4-QMXG%20.

75. The Archdiocese observed that there had been no known COVID outbreaks associated with public Masses in its churches, where the Archdiocese had been celebrating Mass publicly without fixed numerical caps for months. Ex. A.

76. Finally, the Archdiocese noted that, in light of the Supreme Court's decision in *Roman Catholic Diocese of Brooklyn*, and in light of the District Court's decision in *Capitol Hill Baptist Church*, the District's continued imposition of numerical caps on worship violated the First Amendment and RFRA. Ex. A.

77. On a call held December 10, 2020, District officials spoke with the Archdiocese about its request, but the call did not result in any resolution. The fixed numerical caps on religious worship remain in place.

### IV. Claims for Relief

### Count I
### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Free Exercise Clause: Not Neutral

78.  Plaintiff incorporates by reference all preceding paragraphs.

79.  The First Amendment states that Congress shall make no law prohibiting the free exercise of religion.

80.  The First Amendment applies to the District of Columbia.

81.  A law that is not neutral or generally applicable must satisfy strict scrutiny.

82.  Because the District's 50-person cap "single[s] out houses of worship for especially harsh treatment," it "cannot be viewed as neutral" and thereby violates the Free Exercise Clause. *Diocese of Brooklyn*, 2020 WL 6948354, at *1.

83.  Defendants have "single[d] out houses of worship" in many ways.

84.   For example, Defendants have subjected religious activity to additional re-
strictions, while permitting—and even encouraging—other First Amendment-pro-
tected activity, such as mass protests on political subjects, to proceed. *See Capitol
Hill Baptist*, 2020 WL 5995126 at *8-9; *Penkoski*, 2020 WL 4923620 at *2.

85.   Under Defendants' policies, mass gatherings to engage in religious speech on
political subjects have been permitted, but gatherings to engage in religious speech
that is part of religious worship have not.

86.   Defendants' 50-person cap for houses of worship is stricter than its capacity-
based restrictions on public libraries, personal service businesses, and indoor dining
establishments, which can operate at a percentage of their occupancy. It is also
stricter than its restrictions on gyms and fitness centers, which can operate based on
square footage. And it is far stricter than its guidance for "Essential Businesses,"
including many big box stores, liquor stores, laundromats, and medical cannabis dis-
pensaries, which have no occupancy cap and which the Mayor has "encouraged" to
stay open throughout the pandemic. Mayor's Order 2020-053 at 3.

87.   By adopting policies that facially discriminate against houses of worship, De-
fendants have targeted Plaintiff's religious activities for discrimination and chilled
the free exercise of religion.

88.   Defendants' actions demonstrate that Defendants targeted religious activity
for differential treatment.

89.   Defendants do not have a compelling reason for their actions, and Defendants
have not selected the means least restrictive of religious exercise in order to further
a governmental interest.

90.   For example, "[a]mong other things, the maximum attendance at a religious service could be tied to the size of the church or synagogue." *Diocese of Brooklyn*, 2020 WL 6948354 at *2.

91.   Absent injunctive and declaratory relief against Defendants, Plaintiff will suffer imminent and irreparable harm.

92.   As a result of Defendants' actions, Plaintiff has also suffered, and will continue to incur, actual damages.

## Count II
### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Free Exercise Clause: Not Generally Applicable

93.   Plaintiff incorporates by reference all preceding paragraphs.

94.   The District's 50-person cap on worship is not generally applicable.

95.   As the Supreme Court recently held, laws permitting businesses such as "acupuncture facilities, camp grounds, [and] garages" to operate without numerical caps—while simultaneously imposing fixed numerical caps on religious houses of worship—"single out houses of worship for especially harsh treatment" and must satisfy strict scrutiny. *Diocese of Brooklyn*, 2020 WL 6948354, at *1-2.

96.   As discussed above, Defendants have not restricted analogous activities that pose the same or greater risks than Plaintiff's religious activities. Therefore, Defendants' restrictions are not generally applicable and must satisfy strict scrutiny.

97.   Plaintiff has fully complied with government-mandated protocols and even exceeded the recommendations of government entities with respect to COVID precautions.

98.   In fact, the Archdiocese's evidence-based social distancing and hygiene protocols have resulted in no known COVID outbreaks linked to the celebration of Mass in the District.

99.   Defendants do not have a compelling reason for their distinction between Plaintiff's religious activity and other similar activity.

100. Defendants have not selected the means least restrictive of religious exercise in order to further their interests.

101. "Among other things, the maximum attendance at a religious service could be tied to the size of the church or synagogue." *Diocese of Brooklyn*, 2020 WL 6948354, at *2.

102. Absent injunctive and declaratory relief against Defendants, Plaintiff will be irreparably harmed.

103. As a result of Defendants' actions, Plaintiff has suffered actual damages.

**Count III**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause: Interference with Worship**

104. Plaintiff incorporates by reference all preceding paragraphs.

105. The District's 50-person cap on worship constitutes interference with worship.

106. Worship is a core religious exercise that stands "at the very heart of the First Amendment's guarantee of religious liberty." *Diocese of Brooklyn*, 2020 WL 6948354, at *3.

107. Interference with worship must satisfy strict scrutiny.

108. Plaintiff has fully complied with government-mandated protocols and even exceeded the recommendations of government entities with respect to COVID precautions.

109. In fact, the Archdiocese's evidence-based social distancing and hygiene protocols have resulted in no known COVID outbreaks linked to the celebration of Mass in the District.

110. Defendants do not have a compelling reason for their distinction between Plaintiff's religious activity and other similar activity.

111. Defendants have not selected the means least restrictive of religious exercise in order to further their interests.

112. "Among other things, the maximum attendance at a religious service could be tied to the size of the church or synagogue." *Diocese of Brooklyn*, 2020 WL 6948354, at *2.

113. Absent injunctive and declaratory relief against Defendants, Plaintiff will be irreparably harmed.

114. As a result of Defendants' actions, Plaintiff has suffered actual damages.

## Count IV
### 42 U.S.C. § 2000bb-1
### Violation of the Religious Freedom Restoration Act

115. Plaintiff incorporates by reference all preceding paragraphs.

116. The Religious Freedom Restoration Act ("RFRA") provides "very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014).

117. The District of Columbia, as an enclave of the federal government, is a "covered entity" under RFRA. 42 U.S.C. § 2000bb-2(2).

118. Under RFRA, "Government shall not substantially burden a person's exercise of religion" unless "it demonstrates that application of the burden to the person" "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b).

119. Under RFRA, the "exercise of religion" is broadly defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb–2(4). The exercise of religion involves "not only belief and profession but the performance of (or abstention from) physical acts that are engaged in for religious reason." *Hobby Lobby*, 573 U.S. at 710.

120. Plaintiff holds sincere religious beliefs that in-person assembly is at the core of the Catholic faith and that participation in religious services, Mass, and the sacraments cannot be adequately replicated by remote means.

121. By capping in-person religious services to at most 50 people regardless of capacity or occupancy limits, Defendants substantially burden Plaintiff's exercise of religion.

122. Under Defendants' restrictive 50-person cap, Plaintiff cannot hold adequate services to minister to its congregants as dictated by its religious beliefs, particularly at Christmastime.

123. Should Plaintiff violate Defendants' Order, Plaintiff risks incurring civil and administrative penalties, including fines of $1,000 per violation. Mayor's Order 2020-075; D.C. Code § 7-2307.

124. If the government's application of a law substantially burdens a plaintiff's exercise of religion, and the government cannot satisfy the compelling interest and least restrictive means test, that law cannot be applied to a plaintiff under RFRA.

125. "RFRA requires the District to 'demonstrate that the compelling interest test is satisfied through application of the challenged law "to the person"—the particular claimant whose sincere exercise of religion is being substantially burdened.'" *Capitol Hill Baptist*, 2020 WL 5995126, at *8 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006)).

126. Defendants do not have a compelling reason for their actions, and Defendants have not selected the means least restrictive of religious exercise in order to further a governmental interest.

127. "Among other things, the maximum attendance at a religious service could be tied to the size of the church or synagogue." *Diocese of Brooklyn*, 2020 WL 6948354, at *2.

128. Absent injunctive and declaratory relief against Defendants, Plaintiff will suffer imminent and irreparable harm.

129. As a result of Defendants' actions, Plaintiff has suffered actual damages. *Tanzin v. Tanvir*, No. 19-71, 2020 WL 7250100 (Dec. 10, 2020).

**Count V**
**42 U.S.C. § 1983**
**Violation of the Fifth Amendment to the U.S. Constitution**
**Equal Protection: Discrimination Based on Religion**

130. Plaintiff incorporates by reference all preceding paragraphs.

131. The Fifth Amendment to the Constitution prohibits governmental deprivation of "life, liberty, or property, without due process of law."

132. The Fifth Amendment applies to the District of Columbia. *Bolling v. Sharpe*, 347 U.S. 497 (1954).

133. Defendants' decision to place greater, more onerous restrictions on religious houses of worship violates the fundamental right to the free exercise of religion and discriminates against Plaintiff based on its religious exercise and status.

134. Other similarly situated people and organizations that do not espouse religious beliefs are permitted to operate outside Defendants' new, more onerous restrictions.

135. Defendants' decision to penalize Plaintiff based on its religious exercise and status violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

136. Defendants do not have a compelling reason for their actions, and Defendants have not selected the means least restrictive of religious exercise in order to further a governmental interest.

137. "Among other things, the maximum attendance at a religious service could be tied to the size of the church or synagogue." *Diocese of Brooklyn*, 2020 WL 6948354, at *2.

138. Absent injunctive and declaratory relief against Defendants, Plaintiff will suffer imminent and irreparable harm.

139. As a result of Defendants' actions, Plaintiff has suffered actual damages.

**Count VI**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Freedom of Assembly**

140. Plaintiff incorporates by reference all preceding paragraphs.

141. The First Amendment to the U.S. Constitution protects the "right of the people peaceably to assemble."

142. Defendants do not have a compelling interest in restricting Plaintiff's assembly for religious activities while allowing other similar activities.

143. Restricting Plaintiff from peaceably assembling is not the least restrictive means of furthering Defendants' interests.

144. "Among other things, the maximum attendance at a religious service could be tied to the size of the church or synagogue." *Diocese of Brooklyn*, 2020 WL 6948354, at *2.

145. Absent injunctive and declaratory relief against Defendants, Plaintiff will suffer imminent and irreparable harm.

146. As a result of Defendants' actions, Plaintiff has suffered actual damages.

## Count VII
## 42 U.S.C. § 1983
## Violation of the First Amendment to the U.S. Constitution
## Freedom of Association

147. Plaintiff incorporates by reference all preceding paragraphs.

148. The freedom to associate "for the advancement of beliefs . . . is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment." *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958). The right to associate for "the exercise of religion" is one of the "indispensable means of preserving other individual liberties." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).

149. Abridgements of the freedom to associate are subject to strict scrutiny.

150. Defendants' discriminatory policies are a prior restraint of Plaintiff's right to associate for the exercise of religion.

151. Defendants do not have a compelling interest in restricting Plaintiff's religious activities while allowing other similar activities.

152. Defendants' discriminatory policies are not the least restrictive means of furthering Defendants' interests.

153. "Among other things, the maximum attendance at a religious service could be tied to the size of the church or synagogue." *Diocese of Brooklyn*, 2020 WL 6948354, at *2.

154. Absent injunctive and declaratory relief against Defendants, Plaintiff will suffer imminent and irreparable harm.

155. As a result of Defendants' actions, Plaintiff has suffered actual damages.

Count VIII
42 U.S.C. § 1983
Violation of the First Amendment to the U.S. Constitution
Freedom of Speech

156. Plaintiff incorporates by reference all preceding paragraphs.

157. The First Amendment prohibits governmental action "abridging the freedom of speech."

158. Defendants' discriminatory policies restrict Plaintiff's ability to discuss and promote its religious beliefs based on the speech's religious content and purpose.

159. Defendants have favored other gatherings, to promote other ideas and beliefs, including political protests.

160. Defendants do not have a compelling interest in restricting Plaintiff's religious speech and worship while allowing other similar activities.

161. Defendants' discriminatory policies are not the least restrictive means of furthering Defendants' interests.

162. "Among other things, the maximum attendance at a religious service could be tied to the size of the church or synagogue." *Diocese of Brooklyn*, 2020 WL 6948354, at *2.

163. Absent injunctive and declaratory relief against Defendants, Plaintiff will suffer imminent and irreparable harm.

164. As a result of Defendants' actions, Plaintiff has suffered actual damages.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

a.   Declare that Defendants' 50-person cap on religious gatherings violates the Religious Freedom Restoration Act; the First Amendment's Free Exercise Clause; the

First Amendment's protections for free speech, freedom of assembly, and freedom of association; and the Fifth Amendment's Due Process Clause.

b.  Issue temporary, preliminary, and permanent injunctive relief (1) prohibiting Defendants from enforcing their unlawful policies against Plaintiff's religious beliefs and activities; (2) prohibiting Defendants from discriminating against Plaintiff's religious beliefs and activities; and (3) prohibiting Defendants from practices or engaging in any other conduct that chills Plaintiff's free exercise of religion, rights under RFRA, First Amendment rights, and rights under the Fifth Amendment's Due Process Clause.

c.  Award actual damages to Plaintiff.

d.  Award nominal damages to Plaintiff.

e.  Award Plaintiff the costs of this action and reasonable attorney's fees; and

f.  Award such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable.

Dated: December 11, 2020          Respectfully submitted,

*/S/ Anthony J. Dick*
Anthony J. Dick (D.C. Bar No. 1015585)
Donald F. McGahn (D.C. Bar No. 449987)
John M. Gore (D.C. Bar No. 502057)
Sherif Girgis (D.C. Bar No. 1048921)
Joseph P. Falvey (D.C. Bar No. 241247)
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
Telephone: (202) 879-7679
Facsimile: (202) 626-1700

John D. Goetz
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone: (412) 391-3939
Facsimile: (412) 394-7959

Mark L. Rienzi (D.C. Bar No. 494336)
Eric C. Rassbach (D.C. Bar No. 493739)
Adèle A. Keim (D.C. Bar No. 989528)
William J. Haun (D.C. Bar No. 1024405)
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

## CERTIFICATE OF SERVICE

I hereby certify that, on December 11, 2020, I electronically filed the foregoing documents with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I further certify that, on December 11, 2020, I caused the foregoing document to be sent via certified mail to:

MURIEL BOWSER, in her official
capacity as Mayor of the District
of Columbia,
John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, DC 20004

DISTRICT OF COLUMBIA,
c/o Karl A. Racine, Attorney General
400 6th Street, NW
Washington, DC 20001