# EXHIBIT A



1200 New Hampshire Ave. NW, Suite 400
Washington, D.C. 20006
202-955-0095 / @BecketLaw
www.becketlaw.org

December 7, 2020

*VIA U.S. MAIL AND EMAIL*

The Honorable Muriel Bowser
Office of the Mayor
District of Columbia
1350 Pennsylvania Avenue, NW
Washington, D.C. 20004
eom@dc.gov

**Re:   Removing illegal restrictions on religious worship**

Dear Mayor Bowser,

 We represent the Archdiocese of Washington in connection with the District of Columbia's restrictions on in-person worship services. As you know, on November 23, 2020, the District reduced the limits on religious worship services in the Archdiocese's churches to 50 people, regardless of occupancy limit.[1] Other indoor activities where workers or patrons can and do spend much longer amounts of time together—including restaurants, stores, offices, and train stations—are not subject to this arbitrary numerical cap, but are instead restricted based on a percentage of their respective occupancy limits.

 The 50-person numerical cap on indoor worship is discriminatory and doesn't follow the science. It's also illegal. Just last week, in a case brought by the Becket Fund, the Supreme Court explained that such restrictions "effectively bar[] many from attending religious services," and that "many other less restrictive rules . . . could be adopted." *Roman Catholic Diocese of Brooklyn v. Cuomo*, No. 20A87, 2020 WL 6948354, at *2, *3 (Nov. 25, 2020); *see also Agudath Israel of Am. v. Cuomo*, No. 20A90, 2020 WL 6954120 (Nov. 25, 2020). Under *Diocese of Brooklyn* and *Capitol Hill Baptist Church v. Bowser*, No. 20-CV-02710, 2020 WL 5995126 (D.D.C. Oct. 9, 2020), the District's 50-person cap is a clear violation of both the First Amendment and the Religious Freedom Restoration Act ("RFRA"). It cannot remain.

 We respectfully request that the District immediately follow the Supreme Court's decision and lift the discriminatory numerical cap. Instead, the District should allow

---

[1]  The new restriction limits houses of worship gatherings to 50% of occupancy or 50 people, and "[t]he lower of these two numbers is the maximum capacity at any one time." Mayor Muriel Bowser, *Coronavirus (COVID-19) Situational Update*, Office of the Mayor, 13 (Nov. 23, 2020), https://perma.cc/XMQ7-8LVU. Because the lower number always controls, the 50-person cap is, in effect, the operative restriction.



worship services to resume subject to a percentage based on a church's occupancy limit. Neither science nor the law requires the Archdiocese to tell its parishioners, at Christmas no less, that there is no room for them at the church. This is particularly true when the Archdiocese has adopted evidence-based social distancing and hygiene protocols that have resulted in not a single case of COVID-19 attributable to attending Mass. If the District will not voluntarily make this change by the close of business on Thursday, December 10, we will have no choice but to obtain protection in court.

### The Archdiocese of Washington's COVID record to date.

This extraordinary pandemic has accompanied worship restrictions that are unrivaled in United States history—but the Archdiocese has complied with them all. On its own initiative, the Archdiocese suspended public worship in the District in March, at the high cost of preventing its parishioners—hundreds of thousands of people—from obtaining the sacraments for months on end. It shut down in-person education in its religious schools, even as they are central to both its religious mission and thousands of the District's vulnerable children. The Archdiocese resumed public Masses only after the District entered "Phase 2" in June. Since that time, the Archdiocese has consistently abided by "Phase 2" restrictions (50% of occupancy or 100 persons, whichever is fewer). It has done so even though a 100-person cap, like the 50-person cap, bears no relationship to what would constitute safe distancing within the Archdiocese's churches, many of which are among the largest buildings in the District. And the Archdiocese has done so even as these restrictions discriminate against the Archdiocese's parishioners attending Mass in the District, while Catholics attending Mass in neighboring Maryland jurisdictions that are also part of the Archdiocese did not experience such constraints, and also did not experience a single COVID-19 outbreak.

The Archdiocese has been—and remains—a leader in protecting public health. It has instituted rigorous social distancing and hygiene measures for all in-person worship services based on current guidance from the World Health Organization, the U.S. Centers for Disease Control and Prevention, and other public health authorities. Your Office received the details of those plans in early June (in preparation for the District's entry into Phase 2) and again with the Archdiocese's October 22, 2020 letter. They are also accessible in two documents on the Archdiocese's website, https://adw.org/coronavirus. These documents are entitled *Public Celebration of Mass and Holy Communion Outside of Mass*, and *What to Expect When Public Masses Start to Resume*. They detail the Archdiocese's safe, responsible, and cooperative worship practices.

2



The Archdiocese's commitment to safe spiritual nourishment reflects what it has learned from extensive analysis by public health experts nationwide. For example, doctors at the nation's top research hospitals and universities made a "road map" for safe church re-openings. *See, e.g.*, Ad Hoc Committee of Catholic Doctors, *Road Map to Re-Opening Our Catholic Churches Safely*, Catholic Medical Association (May 14, 2020), https://perma.cc/8NHF-2XLF. This "road map" was submitted to the Catholic Bishops in the United States. As one of the "road map's" authors—a nephrologist at Yale University's School of Medicine, who has treated coronavirus patients since March—put it, "churches can be just as safe, if not at times safer than so-called 'essential businesses,' provided they take the precautions that are recommended in this document."[2]

The Archdiocese's safety plans have succeeded. Over the past five months in which *thousands* of public Masses have been celebrated, the Archdiocese is not aware of a single instance of COVID-19 transmission occurring as a result of one of its services. At the one parish where a clergy member tested positive, the Archdiocese cooperated fully with public health officials and Health Department guidance. This included repeated communications, through multiple means, to notify possibly exposed Mass attendees, and suspending Masses and activities at that parish for two weeks.[3] There were no reports of COVID-19 transmission following this incident. The parish remains safely opened.

Indeed, three infectious disease experts reviewed more than one million public Masses nationwide since Catholic Churches reopened, most without the kind of 50-person numerical cap imposed in the District. They concluded that, wherever the aforementioned protocols were followed, there was not a single documented outbreak of COVID-19 linked to church attendance. *See* Dr. Thomas W. McGovern, Dr. Timothy Flanigan & Dr. Paul Cieslak, *Evidence-Based Guidelines to Celebrate Mass Safely Are Working*, Real Clear Science (Aug. 19, 2020), https://perma.cc/SUN7-8SCX. Moreover, recent contact tracing data from other jurisdictions indicates that other venues are in fact a greater source of transmission. *See* CBS News, *Transcript: Mayor Dee Margo on "Face the Nation,"* Face the Nation (Nov. 29, 2020, 11:32 AM),

---

[2] Pablo Kay, *Catholic doctors say churches essential, offer 'road map' to safely reopen*, Crux (May 20, 2020), https://perma.cc/89DQ-8756.

[3] The U.S. Centers for Disease Control and Prevention recently announced a change to its quarantine recommendations. A quarantine need last only 10 days "without testing and if no symptoms have been reported." *See* Centers for Disease Control and Prevention, *Options to Reduce Quarantine for Contacts of Persons with SARS-CoV-2 Infection Using Symptom Monitoring and Diagnostic Testing*, Coronavirus Disease 2019 (Dec. 2, 2020), https://perma.cc/7E6Z-C25Z. By contrast, when "a diagnostic specimen tests negative and if no symptoms were reported during daily monitoring," quarantining can end at 7 days. *Id.*



https://perma.cc/L52M-JTWQ (contact tracing data from El Paso show that 55% of COVID-19 transmission occurred at "large retailers").

**The 50-person numerical cap is an unscientific, discriminatory outlier.**

Rather than take an evidence-based approach, the District has now banned all in-person worship gatherings exceeding 50 people. The number bears no relationship to what constitutes safe social distancing inside a church.

As the Archdiocese has previously explained to your Office, many of its parishes can safely accommodate well over 100 worshippers—to say nothing of 50. In fact, every single parish but one in the Archdiocese of Washington can hold 200 or more people. Half can accommodate 500 or more worshippers, with the largest accommodating at least 1,000. It therefore belies both science and common sense to conclude that, for example, the Cathedral of St. Matthew (which can accommodate 1,000 worshippers) is safe only at 50 people—especially when it operated at *double* that amount for months in Phase 2 with not a single COVID-19 case attributed to Mass attendance.

The insistence on a 50-person cap fails the straight-face test when the Basilica of the National Shrine of the Immaculate Conception is considered. It is the largest Catholic Church in the United States, with a gross floor area of 129,912 square feet and ceilings over 100 feet high.[4] It could fit the Statue of Liberty inside its walls with room to spare. There is no plausible, science-based argument that public health is endangered if more than 50 masked, socially-distant people worship there.

The District's arbitrary approach is also out of step with most jurisdictions nationwide. As of last week, 32 states had *no capacity limit* on indoor, in-person worship. Even among the minority of states in which the District finds itself, most of them do not use numerical caps, and in the few that do, almost none are as low as the District's 50-person cap.

Finally, the District's arbitrary 50-person cap reveals religious discrimination. Your November 23 Order expressly singles out religious gatherings for disparate treatment. They are subjected to a 50-person cap, which is far stricter than the rules governing indoor dining establishments in the District. Restaurants can operate at 50% of occupancy. Even when that is reduced to 25% on December 14, that will still provide restaurants with a percentage limit that accounts for what their facilities can accommodate—not an arbitrary number applied without any regard to a location's

---

[4] Joe Dorish, *20 Largest Churches in the World* (Wander 2020), https://perma.cc/5GLS-X4W5; Basilica of the National Shrine of the Immaculate Conception, *Architectural Details* (Nov. 2018), https://perma.cc/G787-R5L5.

4



size or efforts to craft safety protocols. *See Mayor's Order 2020-119, Modified Requirements to Combat Escalation of COVID-19 Pandemic During Phase Two,* (Nov. 23, 2020), https://perma.cc/ETW3-A6WB. And many other entities—including offices, train and metro stations, and stores—are also allowed to operate with percentage-based limits, even though their patrons and certainly their employees spend hours there. If the Shrine were converted into a fitness center, the District's rules would permit *more than 600 people* to exercise there.

### The 50-person cap is illegal.

Restrictions like the District's 50-person cap on indoor worship, which "effectively bar[] many from attending religious services, strike at the very heart of the First Amendment's guarantee of religious liberty." *Diocese of Brooklyn*, 2020 WL 6948354, at *3. As such, the cap violates both the U.S. Constitution's Free Exercise Clause (as confirmed by *Diocese of Brooklyn*) and the Religious Freedom Restoration Act (as confirmed by *Capitol Hill Baptist Church*).

**The Free Exercise Clause**. Because the 50-person cap "single[s] out houses of worship for especially harsh treatment," it "cannot be viewed as neutral" and thereby violates the Free Exercise Clause. *Diocese of Brooklyn*, 2020 WL 6948354, at *1. As discussed above, the 50-person cap applies only to houses of worship. Indoor dining, offices, train stations, and various stores are instead subjected to restraints that reflect their occupancy limitations. The Archdiocese's churches, in contrast, are subjected to a blunt, arbitrary cap regardless of what their facilities can safely hold—despite their "admirable safety records." *Id*. at *2. This lack of neutrality requires the District to satisfy strict scrutiny.

**RFRA**. The 50-person cap separately violates RFRA. As *Capitol Hill Baptist* just confirmed, RFRA applies to the District and subjects the District's burdensome worship restrictions to strict scrutiny. *See Capitol Hill Baptist*, 2020 WL 5995126, at *4. That is to say, the District must "demonstrate that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id*. This test is "exceptionally demanding," and the District's 100-person cap on outdoor religious worship has already failed it. *Id* at *6.

**Strict scrutiny**. Under either the Free Exercise Clause or RFRA, the District's 50-person cap fails strict scrutiny. There can be no question that the District's hard numerical cap on in-person worship substantially burdens the Archdiocese's religious beliefs, as well as those of its many worshippers who will not be able to attend Mass. For nine months, the District's changing regulations have substantially pressured the Archdiocese to modify its behavior and to violate its beliefs. *See id*. The District's new 50-person cap—imposed weeks before Christmas, when more of the District's



Catholics than usual will be seeking the sacraments at the Archdiocese's churches—makes an already burdensome restraint intolerable.

Strict scrutiny requires the District to demonstrate, *with evidence*, that its restrictions are necessary to further a compelling government interest. *Id.* "The District cannot rely on its generalized interests in protecting public health or combating the COVID-19 pandemic, critical though they may be." *Id.* at *8. Instead, it must show that it has a compelling interest in applying its fixed numerical caps to the Archdiocese, and that these rules will "actually further[]" its claimed compelling interest. *Holt v. Hobbs*, 574 U.S. 352, 364 (2015).

The Archdiocese has been assiduously following health guidance and its churches have experienced no COVID-19 outbreak. The District has offered no reason, much less any evidence, to support further drastically limiting the Archdiocese's religious worship services as it prepares to celebrate Christmas. Indeed, any supposedly compelling interest in barring 51 people from gathering in a masked, socially-distant manner in the Archdiocese's churches is undermined by the District allowing more than 51 persons to interact in restaurants, stores, offices, and train stations.

Finally, "[e]ven if the District met its burden to show a compelling interest, it would also need to establish that there are no less restrictive means to further that interest." *Capitol Hill Baptist*, 2020 WL 5995126 at *9. When "many" other jurisdictions offer a particular religious accommodation, the Government "must, at a minimum, offer persuasive reasons why it believes that it must take a different course." *Holt*, 574 U.S. at 369. This "least-restrictive-means standard is exceptionally demanding," as it mandates that if "a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Capitol Hill Baptist*, 2020 WL 5995126 at *9.

The District's new 50-person cap fails this test in three separate ways. First, its restrictions are "much tighter than those adopted by many other jurisdictions." *Diocese of Brooklyn*, 2020 WL 6948354, at *2; *accord Capitol Hill Baptist*, 2020 WL 5995126, at *9 (most states "either contain no capacity limitations for outdoor gatherings or explicitly exempt religious gatherings from capacity limitations otherwise in effect.").

Second, the restrictions are "far more severe than has been shown to be required to prevent the spread of the virus." Services held in the Archdiocese's Maryland parishes are not subjected to the District's numerical caps. *See Diocese of Brooklyn*, 2020 WL 6948354, at *2; *accord Capitol Hill Baptist*, 2020 WL 5995126, at *9 ("[T]hat the Church has been congregating across the river in Northern Virginia, where there



are no capacity limitations on worship services, casts doubt on the need for the District's chosen policy.").

Third, and most important, the Supreme Court has *already found* that using percentage-based limits rather than numerical caps is a less restrictive means. As the Court explained in *Diocese of Brooklyn*, "there are many other less restrictive rules" than numerical caps. "Among other things, the maximum attendance at a religious service could be tied to the size of the church or synagogue." 2020 WL 6948354, at *2. The same is true here, which means the District fails the least restrictive means test.

### The way forward

For months, the Archdiocese—and indeed, churches throughout the United States—have embraced extraordinary restrictions on their religious freedom. They have done so because, for Christians, loving their neighbors as themselves is part of the great commandment. *See Gospel of St. Mark* 12:30-31. But an arbitrary, unscientific 50-person cap on in-person worship is no basis to "forsak[e] the assembling of ourselves together." *Hebrews* 10:25.

As always, the Archdiocese seeks a constructive relationship with your Office. With Advent already upon us and the holy season of Christmas coming soon, we hope that you will agree there is no point in having a legal fight over an issue the Supreme Court just addressed. Rather, Christmas should be a time for a reconciliation and joy, and the Archdiocese simply wants to welcome its flock home. The Archdiocese appreciates the challenging work that you are doing and remains happy to work with you and your Office to ensure religion's non-discriminatory treatment. We look forward to your prompt response to our urgent concerns.

Very truly yours,

Mark L. Rienzi
President
The Becket Fund for Religious Liberty


cc:   Christopher Rodriguez, Director of Homeland Security, Washington, D.C.
      The Rev. Thomas Bowen, Director of Religious Affairs, Office of the Mayor
      Cardinal Wilton Gregory, Archbishop, Archdiocese of Washington
      Very Reverend Daniel B. Carson, Vicar General and Moderator of the Curia,
         Archdiocese of Washington
      Christopher Anzidei, Esq., General Counsel, Archdiocese of Washington