**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ROMAN CATHOLIC ARCHBISHOP OF WASHINGTON,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 20-3625 (TNM)** |
| **MURIEL E. BOWSER,** *et al.*, | |
| **Defendants.** | |

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# Table of Contents

Introduction ................................................................................................................................ 1

Legal Standard ........................................................................................................................... 3

Argument .................................................................................................................................... 4

    I.     Plaintiff Has Not Demonstrated a Likelihood of Success on the Merits. ..................... 4

        A.    Plaintiff Has Failed To Justify The Application Of Strict Scrutiny Because It Has Not Shown That The District's Restrictions "Substantially Burden" Religious Exercise Or "Interfere With Worship." ............................................................... 5

            1.    Plaintiff Has Failed To Demonstrate That Strict Scrutiny Is Warranted By Showing That The District's Restrictions "Substantially Burden" Or Interfere With Its Religious Exercise, Or That The District Has Treated Religious Institutions More Harshly Than Secular Facilities. ......................................... 6

                a.    Plaintiff Continues To Hold Daily, In-Person Masses ................... 6

                b.    Plaintiff Has Not Shown That It Would Exceed the 50-Person Cap But For the Challenged Restriction. ................................................. 9

                c.    This Action Differs Too Much from Other Cases To Establish An Adequate Likelihood of Success. .................................................. 10

            2.    Plaintiff Has Not Justified Strict Scrutiny Under the First Or Fifth Amendments Because It Has Not Shown The 250-Person Cap Is Stricter Than the Restrictions Imposed On Other Institutions. ........................................... 12

        B.    Alternatively, Even If Strict Scrutiny Applies, Plaintiff's Claims All Fail Because the District's Science-Based Restrictions Further A Compelling Interest and Are Narrowly Tailored. .............................................................................................. 16

    II.    Plaintiff Does Not Adequately Allege It Will Suffer Irreparable Harm if a Temporary Restraining Order and Preliminary Injunction is Denied. ......................................... 19

    III.    The Balance of Equities and Public Interest Weigh Against Granting Plaintiff's Motion for Injunctive Relief. ...................................................................................... 20

Conclusion ............................................................................................................................... 22

# Table of Authorities

## Cases

*Am. Jewish Cong. v. Chicago*, 827 F.2d 120 (7th Cir. 1987) ........................................................ 9

*Amoco Prod. Co. v. Gambell*, 480 U.S. 531 (1987) ................................................................... 21

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314 (D.C. Cir. 2018)
(*Archdiocese II*) ............................................................................................................. 4, 20

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 910 F.3d 1248 (D.C. Cir. 2018)
(*Archdiocese III*) ................................................................................................................... 4

*Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656 (2004) ...................................................... 18

*Bill Barrett Corp. v. U.S. Dep't of Interior*, 601 F. Supp. 2d 331 (D.D.C. 2009) ....................... 19

*Calvary Chapel Dayton Valley* v. *Sisolak*, 140 S. Ct. 2603 (2020) .................................. 11, 17, 22

*Capitol Hill Baptist Church*, 2020 U.S. Dist. LEXIS 188324 (D.D.C. Oct. 9, 2020) .......... passim

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ....................... 19

*Chapman v. Heath*, 288 F. Supp. 3d 215 (D.D.C. 2018) ............................................................... 3

*Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993) ..................................... 16

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ............................................................................. 5

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995) ...................... 20

*Deglace v. DEA*, Civil Action No. 07-5073, 2007 U.S. App. LEXIS 27972 (D.C. Cir. Nov. 30,
2007) ............................................................................................................................... 13

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ................. 16

*High Plains Harvest Church v. Polis*, 592 U. S. ____ (2020) ....................................................... 4

*In re Navy Chaplaincy*, 738 F.3d 425 (D.C. Cir. 2013) ................................................................ 4

*Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008) .............................................................. 8

*McCullen v. Coakley*, 573 U.S. 464 (2014) ................................................................................. 8

*Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34 (D.D.C. 2011) ................................................ 19

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................................................... 21

*Open Tech. Fund v. Pack*, 2020 U.S. Dist. LEXIS 116376 (D.D.C. July 2, 2020) ..................... 21

*Potter v. Dist. of Columbia*, 558 F.3d 542 (D.C. Cir. 2009) ............................................................ 5

*Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190 (D.D.C. 2005) ......................................... 20

*Roman Catholic Diocese v. Cuomo*, 208 L.Ed.2d 206 (U.S. 2020) ...................................... passim

*S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring) ....................................................................................................................................... 19

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ...................................................................... 4

*Smith v. Henderson*, 944 F. Supp. 2d 89 (D.D.C. 2013) ............................................................... 4

*Thomas v. Review Bd.*, 450 U.S. 707 (1981) ................................................................................. 8

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ......................................................... 9

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...................................................... 4, 20

## Other Authorities

Catechism of the Catholic Church ................................................................................................ 11

*DC Health Requirements For Restaurants* ................................................................................... 13

Matthew 18:20 .............................................................................................................................. 11

Philip B. Kurland, *The Origins of the Religion Clauses of the Constitution*, 27 Wm. & Mary L. Rev. 839 (1986) ........................................................................................................................ 9

The Hamilton, *Private Events* ...................................................................................................... 13

The Hamilton's Certificate of Occupancy .................................................................................... 13

## Regulations

12-A D.C.M.R. § 1004.................................................................................................................... 15

22-C D.C.M.R. § 5705.................................................................................................................... 15

25 D.C.M.R. § 112.......................................................................................................................... 15

25 D.C.M.R. § 113.......................................................................................................................... 15

## Constitutional Provisions

Fifth Amendment to the Constitution of the United States....................................................... 5, 12

First Amendment to the Constitution of the United States ........................................... 5, 12, 17, 20

### News Reports

*Archdiocese of Washington Announcement Regarding Coronavirus*, (Mar. 12, 2020) ................ 6

*D.C. restaurants: The biggest of the bunch*, WASH. POST (Apr. 26, 2013) ................................. 13

Jenna Portnoy, Fenit Nirappil and Antonio Olivo, *Three coronavirus cases linked to D.C. church; Colleges cancel in-person classes*, WASH. POST (Mar. 10, 2020) ............................ 21

*Mayor Bowser Issues Mayor's Order on Phase Two Adjustments to Constitutionally Protected, Recreational, and Commercial Activity* (Dec. 16, 2020) ............................................................ 1

Nicole Winfield, *Pope book backs George Floyd protests, blasts virus skeptic*, ASSOC. Press (Dec. 1, 2020) ....................................................................................................................... 7

*Pope cancels traditional pre-Christmas ceremony due to COVID-19*, REUTERS.COM (Nov. 30, 2020) ....................................................................................................................................... 6

Pope Francis, *A Crisis Reveals What Is in Our Hearts*, NEW YORK TIMES (Nov. 26, 2020) ..... 1, 7

*Public Celebration of Mass and Holy Communion Outside of Mass*, ARCHDIOCESE OF WASHINGTON (May 14, 2020, rev. Oct. 15, 2020) ............................................................ 6, 9

*Returning to the Library*, D.C. PUBLIC LIBRARY ......................................................... 15

*Welcome Back to Mass*, HOLY COMFORTER-SAINT CYPRIAN ROMAN CATHOLIC CHURCH (Nov. 13, 2020) ............................................................................................................................... 11

### Mayor's Orders

Mayor's Order 2020-119 ..................................................................................... 2, 8, 14

Mayor's Order 2020-126 ..................................................................................... 2, 12

"[M]ost governments [have] acted responsibly, imposing strict measures to contain the outbreak.

"Yet some groups protested, refusing to keep their distance, marching against travel restrictions — as if measures that governments must impose for the good of their people constitute some kind of political assault on autonomy or personal freedom!"

-- Pope Francis (Nov. 26, 2020)

## INTRODUCTION

Over the past nine months, the District of Columbia (the District) has implemented a series of measures in an attempt to contain the spread of the deadly COVID-19 pandemic. The restrictions have changed over time, as more has been learned about the spread of COVID-19, as the District has striven to balance this undeniable and unprecedented threat to the health and well-being of Washingtonians with their rights and desires to live their lives. The Roman Catholic Archbishop of Washington (the Archdiocese) brought this action to challenge one such restriction which, until recently, restricted attendance at indoor services at Houses of Worship to the lesser of 50% of their occupational capacity or 50 persons. On December 16, 2020, the Mayor issued Order 2020-126, modifying the District's Phase II limits on large gatherings to the lesser of 25% of occupational capacity or 250 people. *Mayor Bowser Issues Mayor's Order on Phase Two Adjustments to Constitutionally Protected, Recreational, and Commercial Activity* (Dec. 16, 2020) (Phase II Adjustments), available at https://coronavirus.dc.gov/release/mayor-bowser-issues-mayor%E2%80%99s-order-phase-two-adjustments-constitutionally-protected. The same restriction applies to houses of worship, as to any secular facility that could draw large numbers of people, including restaurants, recreational and fitness facilities, museums, auditoriums, libraries, grocery stores, and any other essential or nonessential retail businesses. *Id.*

Even if the Archdiocese can ultimately prevail on its claims, it has not met the high burden for preliminary, injunctive relief. The Archdiocese has not alleged facts, much less offered

evidence, showing that it is likely to prevail on the merits of its claim that this restriction is unconstitutional or violates Federal statute. The restrictions under Mayor's Order 2020-126, and even those under Mayor's Order 2020-119, do not substantially burden or interfere with plaintiff's ability to conduct its religious activities.[1] Plaintiff admits this when it points to the numerous Masses it has conducted under current and similar restrictions over several months. The restriction does not discriminate against religious institutions because it applies the same restrictions to any facility capable of hosting large gatherings. And even under the previous order, which treated those secular facilities differently, plaintiff has failed to allege that those facilities are comparable—the restaurants to which it points are not as large as it contends, spread across multiple rooms and even floors unlike its churches' sanctuaries, and face additional restrictions that likely brought their allowed occupancies below the 50-person limit.

Moreover, even if plaintiff could establish a substantial burden on its religious practices, it is not likely to prevail on its claim that the limitation on large gatherings is unlawful. The District plainly has a compelling government interest in preventing the spread of COVID-19, which has taken the lives of hundreds of District residents, compromised the health of thousands more, and brought many sectors of its economy to a standstill. And the District has offered considerable evidence, even at this early stage of litigation, that its restriction is narrowly tailored to meet that interest. Even when all of the reasonable precautions are taken, large indoor gatherings greatly increase the risk that someone attending will contract or spread COVID-19. By raising the total

---

[1]   Mayor's Order 2020-126 moots plaintiff's arguments that the previous restrictions warrant injunctive relief. The District's substantive argument defending the previous restrictions are offered in the alternative and should not be construed as a concession that the previous restrictions have any bearing on this proceeding.

2

cap on attendance to 250 people, the District has tailored the limitation as narrowly as it can to accommodate the needs of affected institutions.

This same evidence demonstrates the irreparable harm the District—in the public interest it represents—will suffer if this Court issues an injunction precluding it from enforcing its restrictions. Allowing gatherings larger than 250 people poses a grave risk to the lives and livelihoods of District residents, and that risk bears the potential of exponential growth. Any person who contracts COVID-19 can then spread the disease to family members, front-line health care providers, and other District residents.

In contrast, plaintiff has not provided the Court with evidence that even the significantly smaller, 50-person cap has actually or likely would prevent anyone from attending services at one of its churches. Because plaintiff has been and can continue conducting its services, and doing so at the times and in the places and—with this one, non-fundamental exception—in the manner in which it chooses, it has not adequately alleged that it suffered an irreparable injury to merit preliminary, injunctive relief. The public interest in limiting the spread of COVID-19 thus weighs more heavily in the balance of equities than plaintiff's interest in potentially welcoming more of its parishioners into each of the many services it has and will be conducting irrespective of the District's restrictions.

Therefore, plaintiff has not adequately established a likelihood of success on the merits to warrant preliminary injunctive relief, nor has it demonstrated that the balance of equities favors such extraordinary relief.

## LEGAL STANDARD

"The same standard applies to both temporary restraining orders and to preliminary injunctions." *Chapman v. Heath*, 288 F. Supp. 3d 215, 217 (D.D.C. 2018) (citation omitted). Each is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is

entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "The moving party must make a clear showing that four factors, taken together, warrant relief:  likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.* (*Archdiocese II*), 897 F.3d 314, 321 (D.C. Cir. 2018) (quotation omitted), *reh'g denied* 910 F.3d 1248 (D.C. Cir. 2018). Because injunctive relief is such an extraordinary remedy, a plaintiff seeking such relief must prove all four prongs of the standard before relief can be granted. *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013); *Winter*, 555 U.S. at 22.

## ARGUMENT

### I.   Plaintiff Has Not Demonstrated a Likelihood of Success on the Merits.

Demonstrating a likelihood of success on the merits is a free-standing requirement for a preliminary injunction, *Sherley*, 644 F.3d at 393 (quotation omitted), and "a failure to show a likelihood of success on the merits is alone sufficient to defeat a preliminary-injunction motion." *Smith v. Henderson*, 944 F. Supp. 2d 89, 96 (D.D.C. 2013). More importantly, the Court need not conclude that plaintiff will lose on the merits, only that it has not met the extraordinary burden of showing that success is not just a "possibility" but that it is "*likely*." *Winter*, 555 U.S. at 20-22 (emphasis original); *accord Sweis*, 950 F. Supp. 2d at 48. The Supreme Court has recently emphasized this position in cases similar to this one by remanding them to allow the district courts to engage in more fulsome fact-finding rather than simply granting the requested injunctions. *See*, *e.g.*, *High Plains Harvest Church v. Polis*, 592 U. S. ____ (2020).

Here, plaintiff has not demonstrated that the District's restrictions "substantially burden" religious exercise and therefore it cannot succeed on its claim under the Religious Freedom Restoration Act (RFRA). Even if plaintiff could make such a showing, both its RFRA and Free

Exercise claim fail because the Mayor's Orders further a compelling government interest while using the least restrictive means to do so in the context of the ongoing public health emergency.

**A.** **Plaintiff Has Failed To Justify The Application Of Strict Scrutiny Because It Has Not Shown That The District's Restrictions "Substantially Burden" Religious Exercise Or "Interfere With Worship."**

RFRA provides that government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless it can demonstrate the application of the burden: "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b).[2] But plaintiff does not show that the Mayor's Orders substantially burdened its exercise of religion and, even if plaintiff could, the Mayor's Orders further a compelling government interest while using the least restrictive means to do so in the context of the ongoing public health emergency.

Nor does plaintiff show that the Mayor's Orders are non-neutral, content-based restrictions that would warrant strict scrutiny under the First Amendment's Free Exercise Clause, Freedom of Assembly Clause, Freedom of Association Clause, Freedom of Speech Clause, or the Fifth Amendment's guarantee of equal protection under the law. The restrictions are content-neutral, applying equally to secular institutions that have the potential of drawing large numbers of people. Moreover, even the former restrictions—which treated houses of worship differently from secular institutions—did not discriminate against religious institutions, because secular facilities were subject to additional, operational restrictions that further limited their capacity and provided different protections against the spread of COVID-19.

---

[2] Although the Supreme Court struck down the portion of the RFRA regulating state and local governments, *City of Boerne v. Flores*, 521 U.S. 507 (1997), the RFRA remains applicable to the District as a "covered" federal entity. *See* 42 U.S.C. § 2000bb-2(1)-(2); *Potter v. Dist. of Columbia*, 558 F.3d 542, 546 (D.C. Cir. 2009).

      **1.**      **Plaintiff Has Failed To Demonstrate That Strict Scrutiny Is Warranted By Showing That The District's Restrictions "Substantially Burden" Or Interfere With Its Religious Exercise, Or That The District Has Treated Religious Institutions More Harshly Than Secular Facilities.**

      **a.**      **Plaintiff Continues To Hold Daily, In-Person Masses.**

Plaintiff has not demonstrated that the necessary restrictions on attendance at plaintiff's services has substantially burdened its exercise of religion. The District does not dispute that "Mass is among the most important aspects" of religious practice for Catholics, but the Mayor's Orders have not significantly hindered that practice. To be sure, COVID-19 has required everyone to be flexible. Recently, "Pope Francis has cancelled a ceremony that traditionally begins Rome's Christmas season … which popes have been carrying out on the feast of the Immaculate Conception since 1953, 'in order to avoid any risk of contagion caused by gatherings of people.'" Philip Pullella, *Pope cancels traditional pre-Christmas ceremony due to COVID-19*, REUTERS.COM (Nov. 30, 2020), available at https://www.reuters.com/article/us-health-coronavirus-pope-idUSKBN28A1X6.

Archbishop Gregory said of the COVID threat, "[m]y number one priority as your Archbishop is to ensure the safety and health of all who attend our Masses." *Archdiocese of Washington Announcement Regarding Coronavirus*, (Mar. 12, 2020), https://adw.org/news/archdiocese-of-washington-announcement-regarding-coronavirus/. The Archdiocese has expressed that priority in different ways, including the dispensation from the obligation to attend Mass that remains in effect. *Public Celebration of Mass and Holy Communion Outside of Mass*, ARCHDIOCESE OF WASHINGTON (May 14, 2020, rev. Oct. 15, 2020), at 3 https://adw.org/wp-content/uploads/sites/2/2020/10/ADW-Worship-Reopening-Plan-Master-WITH-REVISIONS-2020-OCTOBER.pdf (Mass Guidance). The Archdiocese has cautioned its

parishioners from returning to services if they risk spreading, or are more vulnerable to, COVID-19. Mass Guidance at 3.

Plaintiff admits that it has not been prevented from "holding and attending Mass in person" on a regular basis and it does not allege that its restricted-capacity in-person services have failed to satisfy its members' right to exercise their religious beliefs. Mem. [11-2] at 12. This is in line with sentiments the Pope has repeatedly expressed. *See*, *e.g.*, Nicole Winfield, *Pope book backs George Floyd protests, blasts virus skeptic*, Assoc. Press (Dec. 1, 2020) ("Turning to the pandemic, Francis blasted people who protested anti-virus restrictions 'as if measures that governments must impose for the good of their people constitute some kind of political assault on autonomy or personal freedom!'"), available at https://apnews.com/article/race-and-ethnicity-pope-francis-coronavirus-pandemic-racial-injustice-8e6f5fb54479069f2604426b8a37a194; Pope Francis, *A Crisis Reveals What Is in Our Hearts*, New York Times (Nov. 26, 2020), available at https://www.nytimes.com/2020/11/26/opinion/pope-francis-covid.html. Thus, unlike Capitol Hill Baptist Church, which alleged that a central tenet of its religion required a gathering of the entire congregation at one time, plaintiff does not allege that the District's restrictions have stopped or would prevent it from conducting any of its religious rites. Plaintiff admits that it has celebrated mass every Sunday for months, conducting "thousands of public Masses … in the District" "[o]ver the past five months" alone. Mem. at 11.[3] Not only does this fact hinder plaintiff's claim under RFRA, it is fatal to plaintiff's Freedom of Speech claim and severely undermines its Free Exercise claims.

---

[3]    Plaintiff bases its claim of urgency on the nearness of the arrival of Christmas, *see*, *e.g.*, Compl. at 2, 9; Mem. at 7, 30, but notes that Christmas Mass—which would occur on Thursday and Friday this year—is less important than Sunday Mass. Mem. at 9.

Also unlike Capitol Hill Baptist Church, which arguably had associational standing to assert the rights of its parishioners, plaintiff is "a corporation sole" and asserts only its own rights. Compl. ¶ 13. Thus, plaintiff cannot allege that *it* "cannot receive communion." *Roman Catholic Diocese v. Cuomo* (*Diocese of Brooklyn*), 208 L.Ed.2d 206, 210 (U.S. 2020). Plaintiff alleges only that it is unable to conduct mass at the specific times, in the specific places, and in one of the specific but non-foundational manners it would like, with greater than 50 people in one room. But the Supreme Court has long upheld "reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech" and are narrowly tailored. *McCullen v. Coakley*, 573 U.S. 464, 477 (2014). Plaintiff makes no allegation that the District has attempted to "regulate, or in any manner control sermons delivered at religious meetings," Mem. at 23, or discriminated against any speech based on its content.

Plaintiff alleges the District has "favored other gatherings, to promote other ideas and beliefs, including political protests." Compl. ¶ 159. But the only support for this idea comes from discussion of outdoor protests, *id.* ¶¶ 58-62, and the Mayor's Orders are explicit that "houses of worship are not subject to numeric caps on the numbers of persons at an outdoor service." Mayor's Order 2020-119, Sec. V.1. There is no allegation that the District has ever attempted to "ban particular activities undertaken for worship purposes" or "to dictate matters of worship to the church." Mem. at 23. "A substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981)). "Thus, RFRA decisions turn on an element of compulsion." *Archdiocese of Washington I*, 281 F. Supp. 3d at 114. The compulsion required to establish a substantial burden under the RFRA is not

present here, where plaintiff has voluntarily modified its practices, *see*, *e.g.*, Mass Guidance *generally*, but the District has not required plaintiff to alter any aspect of the Mass. There is nothing in the Mayor's Order that presents a limit to the content of speech or "interference [in] how to commune with [plaintiff's] god." *Am. Jewish Cong. v. Chicago*, 827 F.2d 120, 138, 128 (7th Cir. 1987) (Easterbrook, J., dissenting against holding that "displaying a creche in City Hall during the Christmas season" violated the Establishment Clause) (quoting Philip B. Kurland, *The Origins of the Religion Clauses of the Constitution*, 27 Wm. & Mary L. Rev. 839, 860 (1986), quoting from *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). Plaintiff makes no allegation of such interference, nor can it.[4]

### b.   Plaintiff Has Not Shown That It Would Exceed the 50-Person Cap But For the Challenged Restriction.

Plaintiff has not adequately alleged that its parishioners would have attended, or imminently would attend, services with more than 50 people, let alone 250 people, if the District's restrictions were relaxed. This is a burden of proof that plaintiff, as the movant, bears and one it has not met. Plaintiff has not adequately alleged that even *one* of its Masses would exceed the 250-person capacity in the absence of the Mayor's Order. Plaintiff alleges "half of the Archdiocesan churches in the District can accommodate 500 or more" and "the Basilica of the National Shrine of the Immaculate Conception, can seat thousands," Mem. at 13, but plaintiff does not say how often, if ever, any of its churches is full. Further, these numbers were set under ordinary operation and plaintiff concedes it is not operating normally. "Among other protocols, the Archdiocese [has] reconfigured worship spaces to use every other pew and required 6 feet of space between individuals or groups who did not arrive together … ." *Id.* at 10. Plaintiff contends its churches

---

[4]   Plaintiff insists that remote Masses would be an inadequate substitute, Mem. at 9, 17, 30, but that argument is irrelevant given plaintiff's concession that it can hold in-person services.

"ordinarily serve hundreds or thousands at once," *id.* at 18, but makes no factual allegation about how many people actually attended any one of the "thousands of public Masses [that] have been celebrated" in the District in recent months. *Id.* at 11, 18 (citing "Carson Decl. ¶¶ 12, 34," which state Mass is important and has been safe but nothing about attendance rates). Plaintiff also does not address how COVID-19 itself has affected the thinking, desires, intentions, or actions of its parishioners, many of whom may well prefer to participate in services with fewer numbers and attendance, even if that requires greater flexibility in when those services are held.

        **c.**    **This Action Differs Too Much from Other Cases To Establish An Adequate Likelihood of Success.**

Plaintiff also is mistaken in its contention that the circumstances here directly parallel those in *Capitol Hill Baptist Church* and *Diocese of Brooklyn*. Capitol Hill Baptist Church offered evidence that it "believes that its [entire] congregation must meet in person each Sunday to worship together." *Capitol Hill Baptist Church*, 2020 U.S. Dist. LEXIS 188324, at *14 (D.D.C. Oct. 9, 2020). *See also* above at 11 (discussing similar requirements in *Diocese of Brooklyn*). For that reason, "the Church resisted holding multiple worship services on Sundays, even as attendance approached 1,000 congregants." *Id.* at *15. This was a "particular activit[y] undertaken for worship purposes" of Capitol Hill Baptist Church. Mem. at 23. In *Capitol Hill Baptist Church*, therefore, any restriction smaller than 1,000 people presented a complete bar to a fundamental part of its religious practice:  meeting as one congregation. Recognizing that this was unusual, Capitol Hill Baptist Church sought reasonable accommodation with the District, offering to conduct its services outside where the risk, although great, is significantly less than for indoor worship. *Id.* at *29 (describing "other policies, such as holding services outside with mandatory social distancing and mask-wearing").

The Archdiocese alleges none of these distinguishing characteristics. Each parish is of a different size and members attend services at different churches, most obviously those who sometimes worship at the Basilica. Indeed, one the foundations of the Roman Catholic Church is that its adherents make up "one, holy, catholic and apostolic Church," rather than multiple, separate ones. Catechism of the Catholic Church 750, available at http://www.vatican.va/archive/ccc_css/archive/catechism/p1s2c3a9.htm. The Archdiocese's many churches have always held multiple Masses and it alleges no minimum participation requirement. *Compare*, *e.g.*, *Welcome Back to Mass*, HOLY COMFORTER-SAINT CYPRIAN ROMAN CATHOLIC CHURCH (Nov. 13, 2020) ("For where two or three gather in my name, there am I with them.") (quoting Matthew 18:20), available at https://hcscchurch.org/parish-communications/ *and* Mem. at 9 (quoting Catechism authorizing prayer at home) *with Diocese of Brooklyn,*, 208 L.Ed.2d at 210 (discussing "important religious traditions in the Orthodox Jewish faith that require personal attendance"). Because its Masses typically take "less than thirty minutes," and because many if not all of plaintiff's churches have multiple sanctuaries and chapels, each church can hold many Masses in a day at each location. The sheer number of those churches is adequate to distinguish this case from *Capitol Hill Baptist Church*; plaintiff asks the Court to weigh the proper treatment not of one church that would be meeting outside but of the distinct interior structure of each of the 38 churches the Archdiocese has in the District of Columbia. *See* https://adw.org/parishes-masses/parish-mass-finder/.

Rather than being "far more restrictive than any COVID–related regulations that have previously come before the Court," *Diocese of Brooklyn*, 208 L.Ed.2d at 209, the regulation plaintiff challenges is similar or even identical to ones the Supreme Court has suggested may be proper. *See Calvary Chapel Dayton Valley* v. *Sisolak*, 140 S. Ct. 2603 (2020). The lesson of the

Supreme Court's related cases over the past few months, including those of the past three weeks, is that courts should generally create a full record before upholding or enjoining a COVID-19 restriction. This Court should follow the path laid out in these recent decisions and generate a greater record before it decides whether the District's restrictions are proper.

        **2.**        **Plaintiff Has Not Justified Strict Scrutiny Under the First Or Fifth Amendments Because It Has Not Shown The 250-Person Cap Is Stricter Than the Restrictions Imposed On Other Institutions.**

Plaintiff has also failed to meet its burden of showing that it faces stricter restrictions than any other institution. Plaintiff makes no allegation that the District has discriminated against the Roman Catholic faith as opposed to other faiths, and its comparisons to secular institutions are deficient. Virtually every indoor facility that can accommodate large numbers of people—even those that cannot reasonably be described as a "gathering"—is subjected to the same restrictions, generally in addition to restrictions that do not apply to the Archdiocese. On December 16, 2020, the Mayor issued Order 2020-126, modifying the District's "Phase II" limits on large gatherings to the lesser of 25% of occupational capacity or 250 people. Phase II Adjustments. This restriction applies not only to houses of worship, but to any secular facility that could draw large numbers of people, including restaurants, recreational and fitness facilities, museums, auditoriums, libraries, grocery stores, and any other essential or nonessential retail businesses. Mayor's Order 2020-126, Sec. III.

Moreover, even the former order, which did distinguish between houses of worship and secular facilities, did not *discriminate* against the former because houses of worship are not comparable to any of the secular facilities highlighted by plaintiff. For example, plaintiff alleges that restaurants represent "perhaps the most glaring example of the District's discrimination against religious exercise." Mem. at 21. But rather than "discrimination against religion, even more

blatant than in *Diocese of Brooklyn*," *id.* at 21, plaintiff alleges no discrimination at all; rather, plaintiff misunderstands the facts and law.

Plaintiff has not named a single restaurant for which 25% of its capacity is more than 50 people or 50% of the capacity of any church in the archdiocese. Plaintiff's best example is a claim that The Hamilton "ordinarily seats 1,000." *Id.* But a cursory examination of The Hamilton's website shows that this number includes at least three separate rooms that accommodate 572 seated guests, the largest of which accommodates 300 seated guests. *See* https://media-cdn.getbento.com/accounts/055a133ed1e893bc25e59b30185d190e/media/MoA0vInQyGwWoP XVtzMo_HamiltonDC-Private-Events.pdf at 3. The Hamilton's Certificate of Occupancy only authorizes "848 seats" spread over three floors of separate rooms. Ex. F. The District is unaware of any support in any of The Hamilton's materials for plaintiff's contention, and the contentions of an unsigned newspaper article from 2013[5] are not something of which the Court should take judicial notice. *Deglace v. DEA*, Civ. Action No. 07-5073, 2007 U.S. App. LEXIS 27972, at *1 (D.C. Cir. Nov. 30, 2007) (denying "motion for judicial notice [because the] substance of the newspaper article submitted by appellant is subject to 'reasonable dispute.' *See* Fed. R. Evid. 201(b)."). And even if those numbers were accurate in 2013, there is no evidence they remain accurate today.

Moreover, restaurants in the District of Columbia face additional restrictions on their operation that do not apply to houses of worship. These further constrain how many people they can serve and provide additional, different protections against the spread of COVID-19. *See DC Health    Requirements    For    Restaurants,*    available    at

---

[5]    *See D.C. restaurants: The biggest of the bunch*, WASH. POST (Apr. 26, 2013), available at https://www.washingtonpost.com/goingoutguide/dc-restaurants-the-biggest-of-the-bunch/2013/04/25/0b4b93a6-a6da-11e2-b029-8fb7e977ef71_story.html.

https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/page_content/attachments/COVID19%20Restaurant-Bars%20Requirements-v5.pdf. For example, "[t]ables and chairs must be placed at least 6 feet apart" and "[t]ables are limited to 6 persons or fewer – no exceptions." *Id.* As such, even if The Hamilton Live room was able to seat 300 guests before COVID-19 restrictions were imposed, they were undoubtedly at tables of at least 10 people located less than 6 feet apart. The additional restrictions imposed on restaurants, not applicable to houses of worship, would easily bring the maximum number of people in The Hamilton Live room from 75 to below 50 people. What is more, alcohol sales must end before 10:00 p.m., a significant reduction and burden on restaurants, because of concerns that sales at later hours might lead to less compliance with other COVID-19 regulations. Mayor's Order 2020-119, Sec. III.1. Even if plaintiff can ultimately convince the Court that there is a restaurant in the District capable of serving more than 50 people at this time, it is unclear that one or two exceptions would support a finding of disparate treatment, let alone "discrimination against religious exercise."

This is still more true for the host of other establishments the plaintiff proffers for comparison: "public libraries, big-box retail stores, train and metro stations, … offices, tattoo parlors, nail salons, laundromats, liquor stores, and marijuana dispensaries." Mem. at 1, 12, 13, 25.[6] Plaintiff does not even attempt to provide the Court with numbers on the capacity of any of these establishments. The Complaint and plaintiff's brief include no allegations about the actual capacity of any store, only conclusory allegations that they do exceed 50 people at a time. Plaintiff offers no support for its contention that "employees and patrons spend hours" in these places or about how many employees are in any store at one time. Mem. at 25. Similarly, plaintiff repeatedly

---

[6]     Plaintiff's citation of a letter from its counsel, Pl.'s Ex. B-9 [11-14], is immaterial and inadmissible; it is both hearsay and a self-serving declaration.

contends patrons currently spend "hours" in restaurants, Mem. at 6, 21, 25, but the only citation it offers is to a paragraph discussing the length of Masses. Mem. at 21 (citing Carson Decl. ¶ 19). Liquor stores and marijuana dispensaries all prohibit consumption on the premises, 22-C D.C.M.R. § 5705, 25 D.C.M.R. §§ 112, 113, discouraging any lingering.

Plaintiff also cites the restrictions on "public libraries." Mem. at, *e.g.*, 13, 20, 25, but all D.C. Public Library branches were initially closed entirely and the select few that have since been able to partially open—to provide a vital link to the world for people who depend on libraries for Internet access and the like—still prohibit *any* mass gathering and forbid entrance for most activities. *See Returning to the Library*, D.C. PUBLIC LIBRARY, https://www.dclibrary.org/reopen. Plaintiff alleges no public library that can or has allowed more than 50 people inside it since the pandemic began.

Where plaintiff attempts to be specific about the restrictions on stores, it says that, under the Mayor's Orders, "big box stores were permitted to have more than ten people … in them at once." Mem. at 12 (quotation omitted). Of course, plaintiff is also permitted to "have more than ten people" in each of its churches at once. Further, like restaurants, *additional* operational restrictions apply to retail establishments. These facilities must conform to the Maximum Floor Area Allowances Per Occupant set out in Section 1004 of the D.C. Building Code. 12-A D.C.M.R. § 1004. Under these provisions, stores must allow 60 square feet per person, whereas areas with fixed seating—like the pews in plaintiff's churches—can have "one person for each 18 inches" of space. Fitness centers must provide at least 50 square feet of gross space and libraries must provide 50 square feet of net space (excluding the stacks and other fixtures) per person. *Id.* Plaintiff's arguments do not address how any of these restrictions affect the capacity of the businesses to which it asks the Court to compare its dozens of churches. This oversight may be based, in part,

on the fact that plaintiff, like all places of worship in the District, is subject to only the restriction on indoor mass gatherings, whereas every retail or commercial establishment is subject to multiple, far more direct forms of regulatory interference with its operations.

Plaintiff has not presented nearly enough evidence to support the Court's application of strict scrutiny to the Mayor's Orders.

**B.     Alternatively, Even If Strict Scrutiny Applies, Plaintiff's Claims All Fail Because the District's Science-Based Restrictions Further A Compelling Interest and Are Narrowly Tailored.**

Even assuming strict scrutiny applies—a point the District does not concede—plaintiff's claims fail because the District's actions are "justified by a compelling governmental interest and … narrowly tailored to advance that interest." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531-32 (1993). "Stemming the spread of COVID-19 is unquestionably a compelling interest." *Diocese of Brooklyn*, 208 L.Ed.2d at 209. And the District has offered considerable evidence that its science-based restrictions on houses of worship are narrowly tailored to meet that goal and therefore withstand strict scrutiny. As such, unlike in *Capitol Hill Baptist Church*, the District has "demonstrate[d] that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." Mem. Op. at 17 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006)).

Although science has not firmly established differences between outdoor services and outdoor protests, it has long been clear that indoor worship presents unique and particular risks of the spread of COVID-19 and respiratory illnesses in general. Ex. E, Declaration of LaQuandra S. Nesbitt, (Nesbitt Decl.) ¶¶ 8-12. Here, plaintiff challenges a restriction that would prevent more than 250 people from being seated in one room for an extended period of time, producing clouds of aerosol particulates as they participate in Mass. Nesbitt Decl. ¶¶ 15, 26. Speaking is not an

essential part of the activities conducted at "laundromats, retail stores, restaurants, tattoo parlors, nail salons, fitness centers" or liquor stores, grocery stores or "big box stores." Compl. ¶¶ 5, 53-55, 73. Indeed, for many people, these are solitary activities involving little or no communication with anyone else in the facility. And people shopping for groceries or other retail items do not tend to linger in any particular location; they spend most of their time walking to and from the places where they will purchase their items.

The opinion in *Diocese of Brooklyn* does not support a contrary result in light of the particular features of the District's restrictions and current surge in COVID-19 cases. Unlike in *Diocese of Brooklyn*, there is no allegation here that "that the [Mayor] specifically targeted the" the Catholic community in enacting the restrictions on houses of worship. *See Diocese of Brooklyn*, 208 L.Ed.2d at 208. Further, the restrictions here are not "more restrictive than [the] COVID-related regulations that [had] previously" been analyzed by the Supreme Court, *id.* at 209, *See also id.* at 215 (Kavanaugh, J. concurring) (finding New York's caps on attendance likely violate the First Amendment, in part, because they were "much more severe than" the limits at issue in the previous cases considered).

In fact, whereas New York imposed capacity restrictions of 10 or 25 persons, the District imposed the same 50-person cap on religious ceremonies that the Court considered—and did not enjoin—in *Calvary Chapel Dayton Valley* v. *Sisolak*, 140 S. Ct. 2603 (2020). The Ninth Circuit's recent decision [15] is not contrary. Based on the record, the Ninth Circuit concluded that a purely percentage-based cap would be an adequate alternative. ECF No. 15 at 14-15. But Dr. Nesbitt explains that the District *did* consider using only a percentage-based cap and rejected that option as inadequate. Nesbitt Decl. ¶ 19. Although plaintiff may be able to convince the Court that an

alternative is more narrowly tailored, it has not done so and the record is inadequate to support a conclusion that plaintiff is "substantially likely" to prevail in making that argument.

In the absence of evidence to the contrary, the Court in *Diocese of Brooklyn* concluded that "less restrictive rules could be adopted to minimize the risk to those attending religious services" including the possibility that "the maximum attendance at a religious service could be tied to the size of the church or synagogue." *Diocese of Brooklyn*, 208 L.Ed.2d at 209; *see also id. at* 212 (Gorsuch, J. concurring) ("No apparent reason exists why people may not gather, subject to identical restrictions [on essential businesses], in churches"), *id.* at 216 (Kavanaugh, J. concurring) ("New York has not sufficiently justified treating houses of worship more severely than secular businesses"). The District, however, is not required to accept "proposed alternatives" that "will not be as effective" as the challenged action in achieving "the legitimate purpose the [order] was enacted to serve," *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 665 (2004), and here, the current 250-person limit on attendance is "required to prevent the spread of the virus at [plaintiff's] services." *Diocese of Brooklyn*, 208 L.Ed.2d at 209. Indeed, as Dr. Nesbitt explains, even increasing an attendance cap from 25 to 50 greatly increases the risk of COVID-19 transmission. Nesbitt Decl. ¶ 17 ("The risk that someone in a gathering of 50 people is infected with COVID-19 has been shown to be 80% greater than in a gathering of 25 people."). District's decision to allow five times that many, capping attendance at 250, demonstrates that the restriction has been tailored as narrowly as is reasonably possible. Allowing more than that simply poses an unacceptable risk of COVID-19 spread.

The risk of COVID-19 spread is elevated in indoor congregate activities, including in-person worship services. Nesbitt Decl. ¶ 8. The risk of transmission is greatly increased when large numbers of different households gather together in close proximity for extended periods of time.

to Nesbitt Decl. ¶¶ 8-12. Although the judicial branch should not blindly defer to the expert judgments of local officials or abdicate its responsibility to evaluate constitutional challenges to public health policies, "the Constitution 'principally entrusts the safety and the health of the people to the politically accountable officials of the States.'" *Diocese of Brooklyn*, 208 L.Ed.2d at 216 (Kavanaugh, J. concurring) (quoting *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020)); *see also id.* at 210 ("Members of this Court are not public health experts, and we should respect the judgment of those with special expertise and responsibility in this area."). When, as here, restrictions on the free exercise of religion are narrowly tailored to protect public health against the surge in spread of a deadly virus, the Court "must afford substantial deference to state and local authorities about how to best balance competing policy considerations during the pandemic." *Id.* For the reasons above, the District's 250-person limit on houses of worship survives strict scrutiny.

## II.   Plaintiff Does Not Adequately Allege It Will Suffer Irreparable Harm if a Temporary Restraining Order and Preliminary Injunction is Denied.

The D.C. Circuit has held that "failure to demonstrate irreparable harm is 'grounds for refusing to issue a preliminary injunction, even if the other three factors entering the [preliminary injunction] calculus merit such relief.'" *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (observing that there is "a high standard for irreparable injury")). Although the factors relevant to a preliminary injunction "interrelate on a sliding scale … the movant must, at a minimum, demonstrate that irreparable injury is *likely* in the absence of an injunction." *Bill Barrett Corp. v. U.S. Dep't of Interior*, 601 F. Supp. 2d 331, 334-35 (D.D.C. 2009) (internal quotation

19

marks and citations omitted) (emphasis in original).[7] "[P]roving irreparable injury is a considerable burden, requiring proof that the movant's injury is certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (internal citations and quotation marks omitted). If a party fails to make a sufficient showing of irreparable injury, a court may deny a motion for preliminary relief without considering the other factors. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Plaintiff notes that "[w]hen First Amendment rights are at stake, the likelihood of success will often be the determinative factor." Mem. at 10 (quotations omitted). But this is because the other three factors are usually satisfied in such a circumstance, not because they are irrelevant. Here, plaintiff has not satisfied those three elements.

As discussed in detail above, on the record now before the Court, plaintiff has been fully engaged in its religious practices for months. *See* Section I.A.1.a. And plaintiff has not demonstrated that the restriction it challenges has prevented it from conducting the services it would if the restriction were removed. *See* Section I.A.1.b. Plaintiff has not provided the Court with evidence of discriminatory intent or effect in the District's restrictions. *See* Section 0. Plaintiff's conclusory allegations that its Freedom to Exercise its religion has been infringed upon is not adequately pled to support its motion for preliminary, injunctive relief.

### III.    The Balance of Equities and Public Interest Weigh Against Granting Plaintiff's Motion for Injunctive Relief.

Even if a movant demonstrates a likelihood of success *and* irreparable injury, the court still "must balance the competing claims of injury and must consider the effect on each party of the

---

[7]    The D.C. Circuit has not "decide[d] whether the 'sliding scale' approach remains valid after *Winter*." *Archdiocese II*, 897 F.3d at 334.

granting or withholding of the requested relief." *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542

(1987). In addition to considering the merits of plaintiff's argument and its alleged injury, the

Court must also balance the equities between the parties and consider the public interest. *Open*

*Tech. Fund v. Pack*, 2020 U.S. Dist. LEXIS 116376, *45 (D.D.C. July 2, 2020) (Howell, C.J.).

Those two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S.

418, 435 (2009).

> As plaintiff states in its motion:
>
> In *Diocese of Brooklyn*, the Supreme Court found that these factors favored the
> houses of worship because "the State has not claimed that attendance at the
> applicants' services has resulted in the spread of the disease," and "the State has
> not shown that public health would be imperiled if less restrictive measures were
> imposed." *Diocese of Brooklyn*, 2020 WL 6948354, at *3.

But the same is not so here. The District's first COVID-19 case was the rector of Christ Church

Georgetown, whose attendance at Mass was connected to multiple other cases. Jenna Portnoy,

Fenit Nirappil and Antonio Olivo, *Three coronavirus cases linked to D.C. church; Colleges cancel*

*in-person classes*, Wash. Post (Mar. 10, 2020), https://www.washingtonpost.com/local/dc-

maryland-virginia-coronavirus-latest-news/2020/03/10/88eb6de4-62d6-11ea-acca-80c22bbee96f

_story.html. If Monsignor Pope's infection did not lead to spread of COVID-19, it was only

because stricter provisions were imposed to prevent it. Nesbitt Decl. ¶¶ 22-23. Further, Dr. Nesbitt

is quite clear that attendance at services under less restrictive measures poses a distinct and real

peril to the health of Washingtonians. Nesbitt Decl. ¶ 26.

The District is undergoing a surge in the spread of COVID-19 cases to levels it has not

seen before. Each person infected increases the risk that others will be infected, causing

exponential growth of a disease that has killed more than already killed more than 700

Washingtonians and 300,000 Americans, forced the District to close public schools and shutter

much of its private sector, and endangered the health and well-being of its entire citizenry. And

the District has imposed looser restrictions than those the Supreme Court rejected in *Diocese of Brooklyn*—restrictions quite similar to those the Supreme Court implicitly endorsed in *Calvary Chapel*. *See* above at 17. Even if plaintiff can ultimately prevail, the balance of equities and public interest weigh against granting plaintiff's motion for preliminary, injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.

Dated:  December 17, 2020.                    Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Chief, Equity Section

*/s/ Conrad Z. Risher*
CONRAD Z. RISHER [1044678]
HONEY MORTON [1019878]
Assistant Attorneys General
400 Sixth Street, N.W., Suite 10100
Washington, D.C. 20001
(202) 442-5868
conrad.risher@dc.gov

*Counsel for the District of Columbia*