**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **ROMAN CATHOLIC ARCHBISHOP OF WASHINGTON**, a corporation sole, <br><br> Plaintiff, <br><br> v. <br><br> **MURIEL BOWSER**, et al., <br><br> Defendants. | Civil Action No. 20-3625 (TNM) <br><br><br> ELECTRONICALLY FILED |

<u>**REPLY IN SUPPORT OF
PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**</u>

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

I.   THE CHALLENGE TO THE 50-PERSON CAP IS NOT MOOT ...................................... 1

II.   THE ARCHDIOCESE IS LIKELY TO SUCCEED ON THE MERITS ............................ 3

A.   Both RFRA and the Free Exercise Clause require strict scrutiny ............................... 4

1.   RFRA requires strict scrutiny because the Order substantially burdens
religious exercise .................................................................................................. 4

2.   The Free Exercise Clause requires strict scrutiny because the Order is
not neutral or generally applicable ..................................................................... 11

B.   The Order cannot survive strict scrutiny ................................................................... 15

1.   The District has no compelling interest in imposing a hard numerical cap
on Mass attendance .......................................................................................... 16

2.   Hard numerical caps do not further the District's interest in preventing
the spread of COVID ........................................................................................ 19

3.   Hard numerical caps are not the least restrictive means available to the
District ............................................................................................................... 20

III.   THE EQUITABLE FACTORS SUPPORT RELIEF ........................................................ 23

CONCLUSION ............................................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014).................................................................................................4, 5, 9

*Calvary Chapel Dayton Valley v. Sisolak*,
140 S. Ct. 2603 (2020)...................................................................................................21

*Calvary Chapel Dayton Valley v. Sisolak*,
No. 20-16169, 2020 WL 7350247 (9th Cir. Dec. 15, 2020)................................2, 21

*Capitol Hill Baptist Church v. Bowser*,
2020 WL 5995126 (D.D.C. Oct. 9, 2020) ....................................................5, 7, 22

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993)...................................................................................................12, 13

*Denver Bible Church v. Azar*,
No. 20-cv-2362, 2020 WL 6128994 (D. Colo. Oct. 15, 2020).............................14

*Elim Romanian Pentecostal Church v. Pritzker*,
962 F.3d 341 (7th Cir. 2020) ....................................................................................2, 8

*Emp. Div., Dep't of Human Res. of Or. v. Smith*,
494 U.S. 872 (1990)......................................................................................................5

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U. S. 167 (2000).................................................................................................1, 3

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006)...........................................................................................15, 17, 19

*Hardaway v. DC Housing Auth.*,
843 F.3d 973 (D.C. Cir. 2016) ...................................................................................2

*Henderson v. Kennedy*,
253 F.3d 12 (D.C. Cir. 2001) ....................................................................................7

*Holt v. Hobbs*,
574 U.S. 352 (2015)........................................................................................20, 22, 23

*Islamic Center of Miss., Inc. v. City of Starkville*,
840 F.2d 293 (5th Cir. 1988) ....................................................................................9

*Karem v. Trump*,
404 F. Supp. 3d 203 (D.D.C. 2019) .........................................................................6

*Levitan v. Ashcroft*,
281 F.3d 1313 (D.C. Cir. 2002).................................................................................5

*Mahoney v. Doe*,
642 F.3d 1112 (D.C. Cir. 2011)................................................................................7

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Payden-Travers, v. Talkin*,
  No. CV 13-1735 (CKK), 2017 WL 2371116 (D.D.C. May 31, 2017) ...................................7

*Planned Parenthood of Wisconsin, Inc.* v. *Azar*,
  942 F.3d 512 (D.C. Cir. 2019) ....................................................................................2

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  No. 20A87, 2020 WL 6948354 (U.S. Nov. 25, 2020) ................................................ *passim*

*Sherbert v. Verner*,
  374 U.S. 398 (1963) ....................................................................................................5

*Tabernacle Baptist Church, Inc. of Nicholasville v. Beshear*,
  459 F. Supp. 3d 847 (E.D. Ky. 2020) .......................................................................15

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ....................................................................................................5

STATUTES

42 U.S.C. § 2000bb–1 ...............................................................................................15, 19

42 U.S.C. § 2000cc–5 ...................................................................................................5

OTHER AUTHORITIES

Canon Law 932 ............................................................................................................8

Catechism of the Catholic Church § 2178 ....................................................................8

Colorado Department of Public Health & Environment, *Places of worship &
  associated ceremonies* (Dec. 11, 2020) ....................................................................22

Colorado Department of Public Health & Environment, *Third Amended Public
  Health Order 20-36: Covid-19 Dial* (Dec. 7, 2020) .................................................22

District of Columbia, COVID-19 Outbreak Data Guide .............................................18

Local Rule 65.1 .............................................................................................................6

Mayor's Order 2020-075 .............................................................................................13

Mayor's Order 2020-126 .............................................................................................17

Nevada Health Response, *Nevada Covid-19 Safety Guidance: Places of Worship*
  (Dec. 15, 2020) .........................................................................................................23

Order of 12/16 ..............................................................................................................2

After weeks of refusing to budge, the Mayor issued a midnight Order last night changing the restrictions on indoor worship from a 50-person cap to a 25% capacity limit with a 250-person cap. As the Supreme Court recently held, however, this type of unilateral change designed to evade judicial review "clear[ly]" does not moot a request for injunctive relief. *Roman Catholic Diocese of Brooklyn v. Cuomo*, No. 20A87, 2020 WL 6948354, at *3 (U.S. Nov. 25, 2020). Without an injunction, the "applicants remain under a constant threat" that the Mayor could re-impose the prior restrictions at any time "without prior notice," which would "almost certainly bar individuals in the affected area from attending [religious] services before judicial relief can be obtained." *Id*. That concern is especially acute with Christmas on the horizon, because "there may not be time for [the Archdiocese] to seek and obtain relief from this Court" before Christmas Mass next week. *Id*. Accordingly, this Court should not "turn away" the Archdiocese's "meritorious claims just because the [mayor] decided to hit the 'off' switch in the shadow of [judicial] review." *Id*. at *6 (Gorsuch, J., concurring). It should enter an injunction to protect the Archdiocese's rights, just as the Supreme Court did in *Diocese of Brooklyn*.

## I.      THE CHALLENGE TO THE 50-PERSON CAP IS NOT MOOT

Contrary to Defendants' drive-by assertion (Opp., at 2, n.1), "[i]t is clear that [the Archdiocese's claims for injunctive relief are] not moot." *Diocese of Brooklyn*, 2020 WL 6948354, at *3. Although the Mayor's latest order has unilaterally altered the cap on worship services for the time being, the government cannot demonstrate that the challenge to the 50-person cap is moot unless it "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 189-90 (2000). The District does not even attempt to satisfy this "stringent" standard, nor can it. *Id.* at 189.

Mayor Bowser "could restore the [challenged] restrictions just as easily as [s]he replaced them, or impose even more severe restrictions." *Calvary Chapel Dayton Valley v. Sisolak*, No. 20-16169, 2020 WL 7350247, at *1, n.1 (9th Cir. Dec. 15, 2020); *see also Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 344–45 (7th Cir. 2020). In fact, the Mayor "regularly changes" the District's COVID-19 restrictions on public gatherings, *Diocese of Brooklyn*, 2020 WL 6948354, at *3, and has done so five times over the past eight months. *See* ECF Nos. 11-8, 11-9, 11-10, 11-11; Order of 12/16, https://tinyurl.com/ydc6h7na. And the last time the District voluntarily loosened restrictions on houses of worship, it turned around and re-imposed tighter restrictions just months later. *See Planned Parenthood of Wisconsin, Inc*. v. *Azar*, 942 F.3d 512, 518 (D.C. Cir. 2019) ("When estimating the likelihood of an event's occurring in the future, a natural starting point is how often it has occurred in the past.").

The District concedes that such changes are the natural consequence of fluctuating pandemic conditions. *See* Opp., at 6; https://tinyurl.com/ydc6h7na, at 2 ("[C]ircumstances have warranted a tightening, not a loosening, of several Phase Two requirements, and *further restrictions are contemplated*[.]" (emphasis added)). And given that the future of the pandemic is yet unknown, the District simply cannot claim—let alone guarantee—that circumstances in the District will not worsen yet again. If they do, the District's track record provides no reassurances that the unlawful and discriminatory restrictions on worship will not be re-imposed.

Notably, Defendants *never even represent to this Court* that the 50-person cap on Masses will not be reinstated. And even if they had done so, such "meager 'promise[s]'" and "'waves of [the] hand'" cannot satisfy the District's burden under the voluntary-cessation doctrine. *Hardaway v. DC Housing Authority*, 843 F.3d 973, 980 (D.C. Cir. 2016). Indeed, just this week the Supreme Court granted certiorari and remanded a similar case for further proceedings in light

of *Diocese of Brooklyn* over the dissent of three Justices who claimed the case was moot in light

of the State's assurances that it would not re-impose its now-repealed restrictions on worship.

*See High Plains Harvest Church v. Polis*, No. 20A105, (U.S. Dec. 16, 2020), ECF. No. 15, Ex.

C. It is telling that here, the District has not even attempted to offer such assurances to the Court.

On the contrary, Defendants remarkably devote much of their opposition brief to

*defending* the unlawful 50-person cap on houses of worship, strongly suggesting that they may

try to re-impose it. They continue to assert that this arbitrary cap "was the correct approach,"

ECF No. 17-1, at 7, arguing that it "d[id] not substantially burden or interfere with [the

Archdiocese]'s ability to conduct its religious activities," Opp., at 2, and even going so far as to

falsely insinuate that it accords with the sentiments of Pope Francis himself, *see* Opp., at 1, 7.

Thus, the only thing the District has made "absolutely clear," *Friends of the Earth*, 528 U.S. at

189, is that the Archdiocese "remain[s] under a constant threat" that the 50-person cap will be

reinstated. *Diocese of Brooklyn,* 2020 WL 6948354, at *3.

Absent injunctive relief, the Mayor remains free to restore the illegal 50-person cap on

worship "[a]t the flick of a pen." *Id.* at *5 (Gorsuch, J., concurring). And without an injunction,

reinstating the cap would irreparably harm on the Archdiocese because, in light of the weekly

and daily nature of the Mass, such restrictions would "bar [many] from attending services before

judicial relief can be obtained." *Id.* at * 3 (per curiam). The Archdiocese therefore requests that

the Court enter a temporary restraining order and preliminary injunction prohibiting the District

from reinstating its unlawful 50-person cap on houses of worship.

## II.     THE ARCHDIOCESE IS LIKELY TO SUCCEED ON THE MERITS

In its opening brief, the Archdiocese explained that both RFRA and the Free Exercise

Clause independently require strict scrutiny of the 50-person cap on indoor worship, which

imposes a substantial and discriminatory burden on religious exercise. The Archdiocese also

explained that the cap cannot survive strict scrutiny in light of the many other ways that the District could protect public health—including by using capacity-based limits or mask and social-distancing requirements as it does for many comparable secular activities, and as many jurisdictions do for churches.  Defendants' response confirms as much.

### A.   Both RFRA and the Free Exercise Clause require strict scrutiny

### 1.   RFRA requires strict scrutiny because the Order substantially burdens religious exercise

Defendants cannot seriously deny that banning Mass with more than 50 people substantially burdens the Archdiocese's religious exercise. As the Supreme Court recently recognized, such hard caps "effectively bar[] many from attending religious services, strik[ing] at the very heart of the First Amendment's guarantee of religious liberty." *Diocese of Brooklyn*, 2020 WL 6948354, at *3. Indeed, holding religious services for the faithful is a core religious exercise, and imposing fines on a church for doing so is a textbook substantial burden. Defendants' contrary arguments lack merit.

**a.**   Defendants claim that there is no substantial burden because the Archdiocese is not religiously "required" to hold Mass with more than 50 people. Opp. at 7. This is wrong as a matter of both law and fact. As a matter of fact, the Archdiocese does sincerely believe that it has a religious duty to open the church doors to its flock and offer Mass to more than 50 people at a time under the effective safety protocols that it has developed. *See* TRO Br. at 12-13; Carson Decl. ¶ 12. Defendants do not offer any basis to doubt the sincerity of that religious belief, and they cannot question its validity. As the Supreme Court has repeatedly held, "it is not for [the courts or the Mayor] to say that [a plaintiff's] religious beliefs are mistaken or insubstantial." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014). Instead, what matters is that the Archdiocese has a "sincere" and "honest" belief that it has a religious duty to make Mass

4

available for more than 50 people in churches that can hold 200-3,000 people. *Id*. And because the 50-person cap threatens "substantial" penalties against the Archdiocese for carrying out that religious duty, it imposes a clear substantial burden on religious exercise. *Id*. at 720; *see also Wisconsin v. Yoder*, 406 U.S. 205, 208 (1972) (substantial burden because plaintiffs "were fined" for their religious exercise).

In any event, it makes no difference whether holding Mass for more than 50 people is in some sense "required" under the Archdiocese's religious beliefs. RFRA protects "any exercise of religion, *whether or not compelled by*, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A) (emphasis added). Thus, as this Court previously held, "the burdened [religious] practice need not be strictly compelled by the religious tradition at issue to merit protection." *Capitol Hill Baptist Church v. Bowser*, 2020 WL 5995126, at *5 (D.D.C. Oct. 9, 2020). Indeed, "[m]any cherished religious practices are performed devoutly by adherents who nonetheless do not or cannot insist that those practices are mandated." *Levitan v. Ashcroft*, 281 F.3d 1313, 1320 (D.C. Cir. 2002). For example, it is not *mandatory* for Catholics to say the Rosary or attend Mass on weekdays that are not Holy Days of Obligation, but it surely would be a substantial burden for the government to *prohibit* them from doing so.

Those commonsense examples show why "[n]either the Supreme Court nor [the D.C. Circuit] has ever adopted a rule limiting protection to practices that are compelled by a litigant's religion." *Id*. Instead, the protected "exercise" of religion includes any "religiously motivated conduct." *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990); *see also Sherbert v. Verner*, 374 U.S. 398, 403 (1963) (describing religious exercise as any "conduct prompted by religious principles"); *Hobby Lobby*, 573 U.S. at 696 (explaining that protected religious exercise under RFRA is even broader than under the First Amendment). Accordingly,

even if opening the church doors to more than 50 people were somehow "optional" rather than "required" under the Archdiocese's religious beliefs (which is an impermissible inquiry for a secular court to make), that still would not matter to the substantial-burden inquiry.

      **b.**      Defendants curiously contend that there is no substantial burden here because the Archdiocese has not "proved" that more than 50 people would attend Mass if allowed. Opp. at 9-10. But if Masses with over 50 people did not regularly occur, then the District would not have felt the need to ban them. It is glaringly obvious on its face that many Masses within the Archdiocese would draw more than 50 people if not prohibited by the government. Such Masses continue to occur every week just a short drive up the road in Maryland. *See* Supplemental Declaration of Very Reverend Daniel Carson ("Carson Supp. Decl.") ¶ 10.[1] Pre-registration for Christmas Masses in many parishes throughout the District filled up under the 50-person cap; one within thirty minutes of the online registration opening. *Id*. ¶ 12.  And many churches in the Archdiocese have reported that they have recently had to turn people away from Mass under the 50-person cap imposed by Defendants, even as they have increased the number of Masses available. Carson Supp. Decl. ¶ 14. Accordingly, there can be no serious doubt that imposing a 50-person substantially interferes with the Archdiocese's core religious exercise—and key religious duty—of making Mass broadly available to the faithful.

      **c.**      Contrary to what Defendants say, imposing a 50-person cap on church services is nothing like an ordinary "reasonable restriction[] on the time, place, or manner of protected speech." Opp. at 8. As the Supreme Court has recognized, a church's freedom to open its doors to the faithful implicates "the very heart of the First Amendment's guarantee of religious liberty." *Diocese of Brooklyn*, 2020 WL 6948354, at *3. The sanctuary of a church is not just a generic

---

[1] The Archdiocese contemporaneously files a motion for leave to file the supplemental declaration under Local Rule 65.1(c).

"place" like any other where religious expression can be regulated at will, but a unique and sacred setting that has irreplaceable value for religious believers. *See* Carson Supp. Decl. ¶¶ 16-18 ("The Archdiocese believes that God is truly and sacramentally present inside its churches.").

Accordingly, this case is nothing like other cases involving reasonable time-place-and-manner rules as applied to religious exercise. The two most prominent examples are *Henderson v. Kennedy*, 253 F.3d 12 (D.C. Cir. 2001), and *Mahoney v. Doe*, 642 F.3d 1112 (D.C. Cir. 2011); *see also id*. at 1122 (Kavanaugh, J., concurring). Both cases involved only incidental regulations of the time, place, and manner of speech on *public* property. In *Henderson*, the plaintiffs were prohibited from selling t-shirts on the National Mall, and in *Mahoney* they were prohibited from chalking on the street in front of the White House. But in both cases they were free to pursue the same religious exercise of spreading the gospel through an "infinite" variety of alternative means that would serve their purposes equally well. *Capitol Hill Baptist*, 2020 WL 5995126, at *6. The particular places and means of expression (chalking at the White House and selling t-shirts on the Mall) did not have any particular religious significance. Nor were the alternatives inferior in any way: it was not less effective or more expensive to spread the gospel by chalking or selling t-shirts in other places, or by different means of communication altogether. *Cf. Payden-Travers , v. Talkin*, No. CV 13-1735 (CKK), 2017 WL 2371116, at *4–5 (D.D.C. May 31, 2017) (time-place-and-manner rules do not interfere with religious exercises that has a special significance "at this particular time and place as compared to all others").

Here, by contrast, there is no adequate substitute for holding Mass in person in the unique setting of a church. Catholics cannot worship remotely because it is not possible to receive the Eucharist by Zoom. Carson Decl. ¶ 10. And the Catechism places special emphasis on in-person gatherings at Mass, in accordance with the Biblical injunction "not to neglect to meet together."

*Id*. ¶¶ 10-11 (quoting Catechism of the Catholic Church § 2178 (quoting Hebrews 10:25)). Accordingly, while RFRA may not give religious adherents the right to express themselves on government property in disregard of reasonable time-place-and-manner rules, it also does not give the *government* a blank check to reach into *church* property and impose caps on the number of people who can worship there. Denying the Archdiocese the liberty to make its churches broadly available to the faithful is an undeniable substantial burden on religious exercise.

> **d.**     Defendants appear to suggest that the Archdiocese could avoid the burden of the 50-person cap simply by holding "outdoor" Masses without any limitation. Opp. at 8. But forcing parishioners out into the cold in the middle of winter is not an adequate substitute for holding Masses in church, for both religious and practical reasons.

As a religious matter, the Archdiocese sincerely believes that outdoor Masses are not an adequate religious substitute because God is truly and sacramentally present inside its churches. Carson Supp. Decl. ¶ 16. It further believes that the iconography and architecture of its churches are key aspects of the liturgical experience. *Id.* ¶ 17. And importantly, under Canon Law, "[t]he eucharistic celebration is to be carried out in a sacred place unless in a particular case necessity requires otherwise," with "necessity" being determined by the Archbishop of Washington—not secular authorities. *Id.* ¶ 15 (citing Code of Canon Law 932, § 1).

In addition, myriad practical considerations make outdoor Masses an inadequate alternative. Carson Supp. Decl. ¶ 19.  Well over a third of the Archdiocese's churches do not have enough outdoor space to hold Mass, especially with social-distancing requirements. *Id.* ¶ 20.  Weather and other conditions present further obstacles. In the winter, cold temperatures will render it impossible for many elderly or young Catholics to attend Mass at all. *Id.* ¶ 21.  The presence of rain, snow, ice, or strong winds could likewise endanger parishioners, as well as the

physical integrity of the Eucharistic hosts, which the Church regards as sacred. *Id.* And the expense and other burdens of planning, setting up, and taking down daily outdoor Mass would be substantial. *Id.* at 26; *see also, e.g., Hobby Lobby*, 573 U.S. at 722–23 (2014) (finding substantial burden where taking extra steps to comply would entail significant practical burden and expense); *cf. Islamic Center of Miss., Inc. v. City of Starkville*, 840 F.2d 293, 299 (5th Cir. 1988) (same). This is especially true considering that parishes would be required to invest in sound systems, Carson Supp. Decl. ¶ 23-24, and lighting systems for early morning and evening Masses, *id.* at ¶ 22. Finally, even if a parish were able to bear such financial and administrative burdens, noises and other distractions would significantly impair the solemnity of the Mass. *Id.*  ¶ 25. This is especially true of Masses celebrated on week days in busy commercial areas throughout the District, which would be forced to compete with the sounds of rush hour, commuters passing by, construction, and other disruptions. *Id.*

    **e.**    Defendants also argue that the 50-person cap is not a substantial burden because the Archdiocese could "hold many Masses in a day" to accommodate worshippers indoors. Opp. at 11. But as a religious matter, canon law limits the number of Masses a priest can celebrate each day—typically up to three on Sundays (if pastoral need requires it) and two on weekdays (for good reason). Carson Supp. Decl. ¶ 4. And most parishes have only one or two priests available to say the Mass. *Id.* ¶ 4. Moreover, it would be statistically *impossible* for the Archdiocese to hold enough Masses of that size to accommodate its full flock—especially at Christmas. For example, St. Matthew's Cathedral typically holds seven different hour-long Masses on Christmas that are nearly full to capacity. Carson Supp. Decl. ¶ 11. In Christmas 2019, a total of 6,000 people attended Christmas Mass there. *Id.* Thus, in order to accommodate all of these people under the District's 50-person cap, the Cathedral would need to hold at least 120

Masses. *Id.* Even outside of the Christmas season, nearly 2,000 people typically attend Mass at St. Matthew's on a regular Sunday, which would require roughly 40 Masses to accommodate under the cap. *Id*. ¶ 8. The problem is even more acute in the Basilica, which had approximately 13,650 attendees for its Christmas Masses in 2019—that would require 273 Christmas Masses at a 50-person cap. *Id.* ¶ 11. There simply are not enough hours in the day.

This reality explains why the Supreme Court has recognized that numerical caps "effectively bar[] many from attending religious services." *Roman Catholic Diocese of Brooklyn v. Cuomo*, No. 20A87, 2020 WL 6948354, at *3. And as noted above, many churches in the Archdiocese have reported that they have recently had to turn people away from Mass under the 50-person cap imposed by Defendants, even as they have increased the number of Masses available. Carson Supp. Decl. ¶¶ 12, 14.

Even if it were somehow possible for the Archdiocese to hold hundreds or thousands of extra Masses to accommodate everyone under the 50-person cap, forcing the Archdiocese to do so would itself be a substantial burden. For one thing, the scheduling of Masses on the liturgical calendar is itself a religious decision in which the government has no business interfering. Carson Supp. Decl. ¶ 5.  And even putting that aside, holding so many extra Masses would involve an extraordinary drain on the church's resources, both physical and spiritual. There are only so many Masses the clergy can celebrate, and each additional Mass also entails additional financial cost to pay for cantors, organists, security guards, cleaning, and utilities. *Id*. ¶ 7. On top of that, there are also significant logistical burdens in lining up Deacons, ushers, altar servers, Eucharistic ministers, and others needed to help with each service. *Id*. ¶ 7. And, notably, the Archdiocese's public-health precautions place further practical constraints on the number of Masses that can be offered each day. *Id.* ¶ 6. Thus, even if it were feasible, forcing these

additional costs on the Archdiocese to comply with Defendants' 50-person cap would be substantially burdensome in its own right.

## 2. The Free Exercise Clause requires strict scrutiny because the Order is not neutral or generally applicable

As the Archdiocese showed, the November order discriminated against churches by subjecting them to a 50-person cap never applied to restaurants, "public libraries, big-box retail stores, train and metro stations, . . . offices, tattoo parlors, nail salons, laundromats, liquor stores, and marijuana dispensaries." Mem. at 1, 12, 13, 21, 25. "Because the challenged restriction[ was therefore] not 'neutral' and of 'general applicability,'" it triggered strict scrutiny. *Diocese of Brooklyn*, 2020 WL 6948354, at *2.

The District now contends that the 50-person cap did not discriminate against houses of worship at all. Opp. at 12. To be clear, the District does not—because it cannot—assert that any secular facility (at all) labored under a 50-person cap or anything like it. *See id.* (admitting that "the [November] order . . . did distinguish between houses of worship and secular facilities"). So no one disputes that the hard numerical limit, on its face, targeted houses of worship. Instead, the District is reduced to arguing that this facial discrimination probably would have made no practical difference in the end, or at least not very often. *See id.* at 14 (allowing that plaintiff might be able to establish a few "exceptions" to supposedly uniform treatment of churches and other buildings, but arguing that "it is unclear that" this "would support a finding of disparate treatment"). But the District's arguments on this score are variously irrelevant, self-defeating, and contrary to precedent and commonsense.

As to each of the comparators mentioned by the Archdiocese, the District's overriding strategy is to argue that *for all we know*, those buildings might never have gone beyond 50 occupants absent a hard cap anyway. Yet the District evidently worried that churches would

have. (Why else impose the cap?) The District cannot have it both ways. If it is content to assume without evidence that secular buildings will never exceed 50 occupants, it must give churches the benefit of the same assumption. Its failure to do so highlights the discriminatory nature of its November order, and the fundamental reason that all its defenses on this score fail: The order by its terms *allowed* every other facility to exceed 50, but not churches. It is irrelevant that contingent factors outside the order might, in the end, conspire to keep it from having the discriminatory effect built into its design. On the contrary, it is "the *minimum* requirement of neutrality" "that a law not discriminate *on its face*." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) (emphasis added).

Put otherwise, if the District were right that secular buildings would rarely or never exceed 50 occupants, there would have been no harm in applying the 50-person cap to all buildings, just in case, and thus no reason to refrain from doing so. *See id.* at 545 (a law "underinclusive on its face" triggers strict scrutiny under the Free Exercise Clause). That the District went out of its way to limit the numerical cap to churches proves that churches were treated worse. In short, if the shape of the 50-person cap served any purpose at all, it was necessarily a discriminatory one.

The District's various ancillary arguments—all meant to support its "no practical difference in the end" defense of this discrimination against houses of worship—likewise fail.

*First*, the District offers a self-defeating rebuttal to the Archdiocese's illustration of the discriminatory treatment based on four D.C. restaurants likely to seat more than 50 in the absence of a hard cap. Mem. at 16. The District's response addresses none of the restaurants save one: The Hamilton. And its primary point is that The Hamilton's large occupancy (848 in ordinary times, by the District's own concession) is spread over "separate rooms." Opp. at 13.

But just two pages earlier the District had leaned on the fact that many of "plaintiff's churches" likewise have "multiple sanctuaries and chapels." *Id.* at 11. If the sprawling churches nonetheless faced an absolute limit of 50, so should The Hamilton, however intricate its floorplan. If the District were concerned about "clouds of aerosol particulates" wafting from room to room within a building, Opp. at 16, consistency would have required it to limit even multi-room restaurants to 50 people. But it did not. This under-inclusiveness proved that large churches were treated worse than large restaurants for no good reason. *See Lukumi*, 508 U.S. at 545. In fact, the under-inclusiveness is even more glaring when one considers that while The Hamilton has 848 seats for *diners*, its official occupancy limit is 1,358—which includes waiters, cooks, and other staff. *See* Opp. Ex. E (certificate of occupancy specifying 848 seats but a total occupant load of 1358).

*Second*, in another attempt to rebut the Archdiocese's comparison to restaurants, the District points out that they faced "additional restrictions on their operation that do not apply to houses of worship"—for example, a rule that dining tables "must be placed at least 6 feet apart." *Id.* at 13–14. Of course, it was no great act of self-restraint for the District to spare the churches from this rule since church sanctuaries *have* no dining tables to keep 6 feet apart. But churches do host families of worshippers, subject to a *substantively identical* rule requiring them to remain "at least six (6) feet from each other group." Mayor's Order 2020-075, at 6.

Likewise, the District notes that restaurants are now (though not under the November order at issue here) required to stop selling alcohol at 10:00 p.m. Opp. at 14. And that might perhaps have offset the disparate burden created by the 50-person cap on churches—in the imaginary world in which churches hosted recreational drinking past 10:00 p.m. or, indeed, *at all*. Back in the real world, the District's imposition of an "last call" rule on restaurants but not churches hardly cures the discrimination in cutting off churches but not restaurants at 50 people.

*Third*, the District attempts only in passing—and quite unconvincingly—to distinguish the nearly dozen other facilities that the November order treated better than churches, including big-box stores, laundromats, liquor stores, marijuana dispensaries, and train and bus terminals. First, it says that the Archdiocese cannot rely on these without providing evidence that "employees and patrons spend hours" at such venues. Opp. at 14. But this is a commonsense fact already accepted by many judges, including in the most recent Supreme Court decision on this matter, where Justice Gorsuch made the same point about some of the exact same comparators. *See Diocese of Brooklyn*, 2020 WL 6948354, at *4 (Gorsuch, J., concurring) ("People may gather inside *for extended periods* in *bus stations* and airports, in *laundromats* and banks, in *hardware stores and liquor shops*.") (emphases added); *see also Denver Bible Church v. Azar*, No. 20-cv-2362, 2020 WL 6128994, at *12 (D. Colo. Oct. 15, 2020) ("What is the meaningful difference between, say, a warehouse, a restaurant, or an elementary school—where employees, diners, and students spend long periods in a closed-indoor setting—and a house of worship")

The District's only other attempt to distinguish churches from big-box retail stores—some of which faced *no occupancy limit*, percentage-based *or* numerical—rests on the fact that stores are subject to occupancy limits that were put in place *long before COVID*. But then so are churches. That did not stop the Supreme Court from homing in on disparate treatment of retail stores over churches in its most recent opinion on COVID and worship. *Diocese of Brooklyn*, 2020 WL 6948354, at *2 (finding it "troubling" that "a large store in Brooklyn . . .  could 'literally have hundreds of people shopping there on any given day'" while "a nearby church or synagogue would be prohibited from" exceeding a rigid cap blind to its size or capacity). Indeed, courts around the country have drawn the same comparisons. *See, e.g.*, *Tabernacle Baptist Church, Inc. of Nicholasville v. Beshear*, 459 F. Supp. 3d 847, 855 (E.D. Ky. 2020) ("If social

distancing is good enough for Home Depot and Kroger, it is good enough for in-person religious services which, unlike the foregoing, benefit from constitutional protection.").

In the end, commonsense, precedent, and even (inadvertently) some of the District's own points in its briefing here confirm what has always been apparent on the face of its November order: that its 50-person cap singled out churches for no good reason. That was discriminatory. And discrimination against churches triggers strict scrutiny under the First Amendment—in COVID as in ordinary times. *See Diocese of Brooklyn*, 2020 WL 6948354, at *2.

## B.      The Order cannot survive strict scrutiny

Defendants bear the burden of proving their strict-scrutiny affirmative defense, but they have not even acknowledged that they bear that burden, much less come close to meeting it. In *Gonzales v. O Centro*, 546 U.S. 418 (2006), the Supreme Court held that in evaluating a strict scrutiny affirmative defense, courts must "look[ ] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants." Indeed, strict scrutiny is evaluated "through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Id*. at 430-31 (quoting RFRA, 42 U.S.C. § 2000bb–1(b)). That requirement applies to all three elements of the affirmative defense—compelling interest, furtherance of that interest, and least restrictive means.

Defendants' eleventh-hour decision to raise the cap from 50 to 250 persons shows by itself that the 50-person cap fails strict scrutiny. By raising the cap, the District can no longer defend it as truly necessary. That fact alone would be enough to dispose of Defendants' strict-scrutiny defense with respect to the preliminary injunction.

However, even without the last-minute change of heart, the District's in-person cap on the number of Catholics who can attend worship fails strict scrutiny. First, the lack of a rigid

numerical cap on many other indoor gatherings—both before and even after the new order—
shows that Defendants have no compelling need to impose the cap on religious worship. Indeed,
Defendants' own contact-tracing data belie their claim of a compelling interest in applying a hard
numerical cap to the Archdiocese's worship services. Defendants' lack of credibility is only
furthered by their frank admission that they came up with their new cap by looking at the
capacity of the largest restaurant in the District and multiplying by 25%.

Second, Defendants have not met their burdens of evidence and persuasion to show that
their chosen means—a rigid numerical cap—furthers their interest in preventing the spread of
COVID. Forty-one states have not found it helpful to use a cap to further the identical interest,
instead using social distancing and other CDC-approved means, or percentage limits. And caps
also directly undermine the District's interest by forcing more parishioners into smaller churches
instead of accommodating them in much larger facilities like the Cathedral or the Basilica, which
can create far lower density of parishioners due to their enormous size.

Third, Defendants also cannot show that the cap is the least-restrictive means available to
protect public health when they themselves use other means elsewhere; when both Virginia and
Maryland are allowing Masses to safely continue with more than 50 people every day of the
week; and when the District is an outlier nationally, with only 9 states and the District imposing
numeric in-person caps at all. Although they would have to show all three elements to prevail on
their strict scrutiny claim, Defendants fail on each one.

> ### 1. The District has no compelling interest in imposing a hard numerical cap on Mass attendance.

"Stemming the spread of COVID–19 is unquestionably a compelling interest[.]" *Diocese of
Brooklyn*, 2020 WL 6948354, at *2. But the District must show that it has a compelling interest

in banning the *specific religious practice* here. Generalized interests in protecting public health are not enough. *See O Centro*, 546 U.S. at 436.

The District's numeric caps on worship attendance cannot meet this standard. First, by abandoning the 50-person cap (at least for now), the District has essentially conceded that it lacks a compelling interest in such a stringent limit—after all, if it were compellingly important to keep a 50-person limit, the District would do so. The District stated that it adopted the new policy "[i]n order to resolve litigation," and that it chose the number 250 based on "the maximum number of persons at the largest restaurant," The Hamilton. Mayor's Order 2020-126 at 2; District Opp. Ex. E. By its own admission, then, the District's 250-person cap was designed to avoid harming the interests of District restauranteurs while limiting religious worship at large churches like the Shrine.

The District's evidence is not enough to overcome its transparent admission that its new cap is based on politics, not science. The District's declarant, Dr. Nesbitt, cites religious events in Washington State, Arkansas, and South Korea, all from the early days of the pandemic, when masks and social distancing were not widely practiced. Nesbitt Decl. at 5; *see also* District Opp. Ex. C D. The District makes no effort to engage with the data from more than one million Masses celebrated publicly in the U.S. since the pandemic began, nor with the experiences of public health officials in Virginia and Maryland, where public Masses have been allowed without fixed caps for months.

Instead, the District asserts that religious worship is riskier than shopping, exercising in an indoor gym, or dining out. District Opp. at 16. But the District's own data rebut this point. According to the District's contact tracing, shopping and eating out are both far riskier than

17

religious worship, and exercising in an indoor gym (which involves sustained presence and increased aerosol spread through deep breathing), has a roughly equal risk level.

The District has publicly posted contact tracing data identifying settings where COVID outbreaks have occurred ("Outbreak Data"),[2] and about the activities of COVID-positive District residents in the two weeks before their diagnosis ("Exposure Activities").[3] The District's Outbreak Data identifies settings in which there has been an "outbreak"—defined as "two or more cases of COVID-19 reported at a location within a 14-day period."[4] Of the 136 outbreaks traced between August 1 and December 10, just two have occurred at houses of worship.[5] In other words, less than 1.5 % of all COVID outbreaks in the District have been traced to houses of worship. By contrast, restaurants, bars, and food retail buildings account for 32 COVID outbreaks, or 23.5% of the total. *See* App'x A. The District's Exposure Activities data tell a similar story. The District collects data on activities that COVID-positive District residents reported having engaged in during the two weeks preceding their diagnosis. According to this data, from November 20 to December 10, just 3% of COVID-positive residents reported having participated in "faith events." COVID-positive DC residents were five times as likely to report traveling or dining out, and twice as likely to report receiving personal care services. App'x B.

---

[2] District of Columbia, https://coronavirus.dc.gov/page/outbreak-data.

[3] District of Columbia, https://coronavirus.dc.gov/page/exposure-activities.

[4] On the same page, the District observes that, "in communities with substantial COVID-19 transmission, even if two or more cases are identified at a location, it is possible that the cases are not related." https://coronavirus.dc.gov/page/outbreak-data.

[5] According to the "Data Notes" provided with this chart, "The place of worship category includes persons involved in activities both within the building (e.g. prayer services, communion, sacraments, services, meetings), on its premises (e.g. service held outside), and offsite activities (e.g. food distribution locations, volunteer activities)." District of Columbia, COVID-19 Outbreak Data Guide (https://tinyurl.com/yctzo3ao). In other words, the two outbreaks attributed to "Place of worship" may not have involved a worship service at all.

The District's Exposure Activities data also track the size of gatherings that COVID-positive residents attended and whether social distancing was observed. The data show that over 93% of the time, the gatherings were under 50 people. For the week of December 4, the most common social gathering size was 5-10 people (68.7%). A large majority reported that social distance was "NOT Maintained" during these gatherings (60.2%). These data, like the District's other data, simply do not support imposing additional limits on the Archdiocese's religious services, where social distancing is carefully maintained and supervised. *See* App'x C

### 2. Hard numerical caps do not further the District's interest in preventing the spread of COVID.

Defendants bear "burdens of going forward with the evidence and of persuasion" to show that their chosen means—an in-person cap—"is in furtherance of" their interest in preventing the spread of COVID. *O Centro*, 546 U.S. at 428 (quoting RFRA, 42 U.S.C §§ 2000bb–1(b); 2000bb–2(3). Here, caps do not further the District's claimed interest—they *undermine* it. With a cap, parishioners who wish to attend Mass will be turned away from lower-density environments—specifically the Cathedral and the Basilica—and sent toward higher-density churches that are smaller and thus can meet the cap. Indeed, this will always be the case where a numerical cap is used instead of a percentage limit based on a facility's pre-existing occupancy limits, which are keyed to the size of the facility. The District's insistence on a cap will thus force parishioners seeking to attend Mass into higher-density environments, which the District admits are more likely to spread COVID than low-density environments.

Given this scientific reality, it is unsurprising that 41 states have not found it helpful to use a cap to further their interest in preventing the spread of COVID—an interest that is identical to the District's. Instead, these states further their interest in preventing COVID by means of social distancing, mask-wearing, and other cooperative CDC-approved means—or, in some

states, percentage limits. But the District has presented no evidence that it even *considered* the practices of the "vast majority of States" that do not use caps, much less *explained* why its situation is so different that it justifies taking a different path. *Holt v. Hobbs*, 574 U.S. 352, 368 (2015). The situation is thus exactly like the situation in *Holt*, where Arkansas could not explain why it was in a small minority of states that did not allow religious beard accommodations for Muslim prisoners even though it had the same interest as all the other states—prison security. *Id.* at 368-69. To prevail on this application, under *Holt*, the District has to explain why it is so different from the 41 states without caps, or it needs to explain why all those states are wrong and it is right. It doesn't even try.

### 3.   Hard numerical caps are not the least restrictive means available to the District.

The District has no response to the point that there are less-restrictive means to prevent the spread of COVID at worship services without a hard numerical cap. The District could use percentage-of-capacity-based limits instead, as it does in comparable secular settings—and as *Diocese of Brooklyn* expressly recognized as an adequate alternative. 2020 WL 6948354, at *2. Or the District could follow the same approach as 32 other states, which do not impose any direct capacity-based limits at all and instead rely on social-distancing and mask-wearing requirements plus sanitization protocols. And at a minimum, the District's new 250-person cap establishes beyond quibble that the 50-person cap is not narrowly tailored and must be struck down.

The District's main defense relies on the denial of a writ of injunction in *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603 (2020). Opp. at 17. The District asserts that its 50-person cap must be upheld because the Supreme Court "did not enjoin" "the same 50-person cap" in that case. *Id.* But this argument entirely fails to grapple with the Supreme Court's subsequent decision in *Diocese of Brooklyn*, where the Supreme Court explicitly concluded that the

"maximum attendance at a religious service could be tied to the size of the church or synagogue," such that the State's hard numerical caps in that case were not the least restrictive means for furthering a compelling governmental interest. 2020 WL 6948354, at *2.

Indeed, the Ninth Circuit recently applied *Diocese of Brooklyn*, which it called "a seismic shift in Free Exercise law," to enjoin the very same 50-person cap in *Calvary Chapel Dayton Valley v. Sisolak*, --- F.3d ---, 2020 WL 7350247, at *3-5 (9th Cir. Dec. 15, 2020). The Ninth Circuit specifically found that less-restrictive means were available, because "'maximum attendance at a religious service could be tied to the size of the [house of worship].'" *Id.* (citing *Diocese of Brooklyn*, 2020 WL 6948354, at *2). The District quibbles with the Ninth Circuit's ruling and contends that, unlike in *Calvary Chapel*, a percentage-based cap here is inadequate. But the District cannot have it both ways, at times relying on *Calvary Chapel* and at other times dismissing it. Opp. at 17. And in any event, the District's less restrictive regulations on comparable businesses—such as laundromats, garages, and train stations, *see Diocese of Brooklyn*, 2020 WL 6948354, at *2—completely undermines the District's assertion that there are no less restrictive means to combatting COVID than the District's numeric cap.

The experience and policies of other jurisdictions reinforce this point. As explained previously, the District is an extreme outlier with respect to restrictions on indoor, in-person religious gatherings. ECF No. 11-2 at 24. In the last week of November, when the Order took effect, 32 states had *no* restrictions on indoor, in-person worship; and of the minority that did, most did not use numerical caps. For the few that did use numerical caps, almost none were as low as the District's 50-person cap. *Id.*

The District fails to respond to this argument or to the evidence that Masses have been safely conducted in Maryland and Virginia without the irrational 50-person cap imposed by the

District. Mot. at 2, 6, 24; Carson Decl. ¶¶ 15-18, 21-22. Again, "[t]hat so many other [jurisdictions]" give churches more leeway "while ensuring [health] safety . . . suggests that the [District] could satisfy its [health] concerns through a means less restrictive" than its hard 50-person cap. *Holt*, 574 U.S. at 368-69; *see also Capitol Hill Baptist*, 2020 WL 5995126, at *9 (existence of less restrictive policies in similar jurisdictions "casts doubt on the need for the District's chosen policy"); *Hobby Lobby*, 573 U.S. at 730-31 (determining less restrictive means were available in part by existence of alternative "approach" used in similar circumstances).

Furthermore, since the end of November, the national situation has only made the District's position even more of an outlier. As of December 17, 2020, 32 states place no capacity limits on indoor, in-person worship. Nine states restrict indoor, in-person worship based on capacity or occupancy, and only 9 states and the District impose hard, numerical caps. App'x D.

Indeed, following the Supreme Court's decision in *Diocese of Brooklyn* and subsequent decisions by the Supreme Court and lower courts, at least two states—Colorado and Nevada—have removed fixed caps on the number of people who can attend a worship service. Colorado now places no hard numerical caps or even capacity-based restrictions on worship services. *See* Colorado Department of Public Health & Environment, *Third Amended Public Health Order 20-36: Covid-19 Dial* (Dec. 7, 2020), available at https://drive.google.com/file/d/14El-qBmb1QTLZb2lBuGdocZrJMJlx3wy/view; Colorado Department of Public Health & Environment, *Places of worship & associated ceremonies* (Dec. 11, 2020), available at https://covid19.colorado.gov/worship-guidance ("Worship and associated ceremonies such as weddings and funerals are classified as critical. This means that they must do their best to follow public health recommendations but may make exceptions if they cannot conduct their essential activity within those restrictions."). And hours after the Ninth Circuit issued its opinion, Nevada

announced new guidance removing its fixed 50-person cap on houses of worship in favor of a 25%

capacity limit. Nevada Health Response, *Nevada Covid-19 Safety Guidance: Places of Worship*

(Dec. 15, 2020), available at https://nvhealthresponse.nv.gov/wp-content/uploads/2020/12/

Places-of-Worship.UPDATED-12-15.pdf ("Faith gatherings and houses of worship are limited to

25 percent of fire code capacity."). This new authority and these recent developments all confirm

what was already clear: the District's numerical cap is not the least restrictive means of

protecting public health.

Finally, if all this was not enough, the District's recent, eleventh-hour retreat to a 250-

person cap dooms its arguments in favor of a 50-person cap. "The least-restrictive-means

standard is exceptionally demanding, and it requires the government to show that it lacks other

means of achieving its desired goal[.]" *Holt*, 574 U.S. at 365 (cleaned up). Here, by definition the

District's new 250-person cap is less restrictive than a 50-person cap and thereby establishes that

it has "other means of achieving its desired goal." *Id.* As a result, the 50-person cap is not the

least restrictive means of protecting public health and must be enjoined as to the Archdiocese.

This does not mean of course that the 250-person cap passes muster, *see supra*, just that the

District is estopped from arguing for the 50-person cap.

## III.    THE EQUITABLE FACTORS SUPPORT RELIEF

The equitable factors continue to favor relief. The District does not dispute that the loss

of freedoms protected by RFRA or the First Amendment, "for even minimal periods of time,

unquestionably constitutes irreparable injury." *Diocese of Brooklyn*, WL 6948354, at *3.

The District does not dispute that "i[t] is in the public interest" to ensure compliance

with RFRA and the First Amendment. Opp. 26. It emphasizes (at 21-22) the dangers posed by

COVID, but that does not justify capping the Archdiocese's Masses because there is no evidence

that they have "resulted in the spread of the disease." *Diocese of Brooklyn*, 2020 WL 6948354, at

*3. The District points to a case involving an Episcopal church, which is not connected to the Archdiocese.  Opp. at 21.  The District also alludes to a Catholic priest who contracted the virus, but does not allege that his infection "le[d] to the spread of COVID-19."  Opp. 21.  The District thus fails to dispute that there has not been a single outbreak related to the Archdiocese's public Masses despite thousands of Masses in Maryland without fixed caps.

Finally, the Order issued last night does not affect the equities, nor does the District argue otherwise.  *See* Opp. at 20-22. As noted, the District studiously declines to promise that it will not re-impose a 50-person cap.  Instead, it expresses annoyance that the Archdiocese must hold in-person services unlike "[t]he vast majority of houses of worship."  Order at 3.  And the District's filings before this Court remain adamant that the discriminatory 50-person cap was wholly lawful.  In these circumstances, the equities and public interest "still call for" relief. *Diocese of Brooklyn*, 2020 WL 6948354, at *3.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court grant the application for injunctive relief.

Respectfully submitted, this the 17th day of December, 2020.

/s/ Anthony J. Dick
Anthony J. Dick (D.C. Bar No. 1015585)
Donald F. McGahn (D.C. Bar No. 449987)
John M. Gore (D.C. Bar No. 502057)
Sherif Girgis (D.C. Bar No. 1048921)
Caroline C. Lindsay
Joseph P. Falvey (D.C. Bar No. 241247)
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
Telephone: (202) 879-7679
Facsimile: (202) 626-1700

John D. Goetz
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone: (412) 391-3939
Facsimile: (412) 394-7959

Mark L. Rienzi (D.C. Bar No. 494336)
Eric C. Rassbach (D.C. Bar No. 493739)
Adèle A. Keim (D.C. Bar No. 989528)
William J. Haun (D.C. Bar No. 1024405)
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 17th, 2020, a true and correct copy of the foregoing was electronically filed using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Anthony J. Dick*
Anthony J. Dick

*Counsel for Plaintiff*

**APPENDIX A**

Outbreaks from Selected Settings in the District of Columbia between August 1, 2020 – December 10, 2020**

| Setting Type | Number of Outbreaks |
| --- | --- |
| College and university | 24 |
| School building (K-12) | 21 |
| Childcare/Daycare | 23 |
| Restaurant/Bar | 21 |
| Food retail building | 11 |
| Office building | 9 |
| Congregate residential building | 7 |
| Construction site | 3 |
| Place of worship | 2 |
| Community-based or social services program building | 3 |
| Retail (non-essential) | 2 |
| Personal care service building | 1 |

**APPENDIX B**



Source: DC Health

Note: Data subject to change on a daily basis. Data are restricted to positive cases with a completed contact tracing interview. Possible exposure data are collected during the contact tracing interview as self-reported activities occurring within the 2-week period before the date of symptom onset for symptomatic individuals or the date of test sample collection for asymptomatic individuals.

* Moderate to High Exposure Activity Types are not exhaustive and include travel, personal services, faith-based events, work, restaurant/bar, and social events.

# APPENDIX C



**Source:** DC Health

**Note:** Data subject to change on a daily basis. Data are restricted to positive cases with a completed contact tracing interview. Possible exposure data are collected during the contact tracing interview as self-reported activities occurring within the 2-week period before the date of symptom onset for symptomatic individuals or the date of test sample collection for asymptomatic individuals.

Number of cases who reported attending an event* and provided an answer to the corresponding characteristic are shown as grey bars.

**APPENDIX D**



**COVID-19 and Restrictions on In-Person Indoor Worship**

The map and graphics below track state government restrictions on in-person indoor worship in reaction to the COVID-19 pandemic. Hover over a state to see its specific restrictions.

*Last updated: 12/17/2020*

**Restrictions**

■ Numerical Cap*   ■ Percentage Limit   ■ No Restrictions

*States colored red may have both a numerical cap AND a percentage limit

**Total for Each Type of Restriction**

