**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**ROMAN CATHOLIC ARCHBISHOP
OF WASHINGTON**, a corporation sole,

      Plaintiff,

  v.

**MURIEL BOWSER**, et al.,

      Defendants.

Civil Action No. 20-3625 (TNM)

ELECTRONICALLY FILED

RELIEF REQUESTED BY
MARCH 25, 2021

**<u>STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
SECOND APPLICATION FOR A TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION</u>**

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

    A.    The Archdiocese of Washington................................................................... 3

    B.    The Archdiocese's efforts to combat COVID-19 ........................................ 4

    C.    D.C.'s uniquely harsh restrictions on houses of worship............................ 6

        1.    Phase One......................................................................................... 6

        2.    Phase Two ........................................................................................ 7

        3.    "Modified" Phase Two .................................................................... 8

        4.    This Litigation and the Christmas Truce ......................................... 9

        5.    The Improving Pandemic and the Continuing Restrictions............................ 11

ARGUMENT ..................................................................................................................... 13

I.     THE ARCHDIOCESE IS LIKELY TO SUCCEED ON THE MERITS ......................... 13

    A.    Both RFRA and the Free Exercise Clause require strict scrutiny.............................. 13

        1.    RFRA requires strict scrutiny because the Order substantially burdens religious exercise................................................................ 13

        2.    The Free Exercise Clause requires strict scrutiny because the Order is not neutral or generally applicable ................................ 18

        3.    The Free Exercise Clause requires strict scrutiny because the Order interferes with religious worship ...................................... 21

    B.    The worship restrictions cannot survive strict scrutiny ............................. 23

        1.    The District has no compelling interest in its strict worship limits ................. 25

        2.    The District's worship limits—more severe than those of any State in the Nation—are not the least restrictive way to protect public health.............. 28

II.    ABSENT RELIEF, THE ARCHDIOCESE WILL SUFFER IRREPARABLE HARM .......................................................................................... 31

III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR RELIEF ............................................................................................................. 32

CONCLUSION................................................................................................................... 33

# **TABLE OF AUTHORITIES**

**Page(s)**

C**ASES**

*Abdulhaseeb v. Calbone,*
  600 F.3d 1301 (10th Cir. 2010) ........................................................................................16

*Agudath Israel of Am. v. Cuomo,*
  983 F.3d 620 (2d Cir. 2020)........................................................................................1, 33

*Agudath Israel of Am. v. Cuomo,*
  No. 20-cv-4834, 2021 WL 804717 (E.D.N.Y. Feb. 9, 2021) ....................................1

*Am. Legion v. Am. Humanist Ass'n,*
  139 S. Ct. 2067 (2019)......................................................................................................22

*Burwell v. Hobby Lobby Stores, Inc.,*
  573 U.S. 682 (2014)............................................................................................... *passim*

*Calvary Chapel Dayton Valley v. Sisolak,*
  982 F.3d 1228 (9th Cir. 2020) ..........................................................................................1

*Cannon v. District of Columbia,*
  717 F.3d 200 (D.C. Cir. 2013)........................................................................................12

*Capitol Hill Baptist Church v. Bowser,*
  No. 20-cv-02710, 2020 WL 5995126 (D.D.C. Oct. 9, 2020) ........................ *passim*

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993)................................................................................................ *passim*

*City of Boerne v. Flores,*
  521 U.S. 507 (1997)..........................................................................................................24

*Cutter v. Wilkinson,*
  544 U.S. 709 (2005)...................................................................................................14, 18

*Emp. Div., Dep't of Human Res. of Or. v. Smith,*
  494 U.S. 872 (1990)..........................................................................................................23

*Fowler v. Rhode Island,*
  345 U.S. 67 (1953)............................................................................................................22

*Gateway City Church v. Newsom,*
  No. 20A138, 2021 WL 753575 (Feb. 26, 2021)................................................... 1, 23

*Gonzales v. O Centro Espirita Beneficente Uniao,*
  546 U.S. 418 (2006)....................................................................................................24, 25

*Hobby Lobby Stores, Inc. v. Sebelius,*
  723 F.3d 1114 (10th Cir. 2013) ......................................................................................14

*Holt v. Hobbs,*
  574 U.S. 352 (2015)...............................................................................................17, 25, 29, 30

## TABLE OF AUTHORITIES
(continued)

Page(s)

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) .................................................................13

*Lux v. Rodrigues*,
  561 U.S. 1306 (2010) ...................................................................24, 32

*Markowicz v. Johnson*,
  206 F. Supp. 3d 158 (D.D.C. 2016) .......................................................12

*Melton v. District of Columbia*,
  46 F. Supp. 3d 22 (D.D.C. 2014) .........................................................13

*Murdock v. Pennsylvania*,
  319 U.S. 105 (1943) ........................................................................22

*Mylan Pharms., Inc. v. Shalala*,
  81 F. Supp. 2d 30 (D.D.C. 2000) .........................................................32

*Pursuing Am.'s Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016) .............................................................13

*\*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020) ................................................................... *passim*

*\*S. Bay United Pentecostal Church v. Newsom*,
  141 S. Ct. 716 (2021) .................................................................. *passim*

*Sherbert v. Verner*,
  374 U.S. 398 (1963) ........................................................................16

*Simms v. District of Columbia*,
  872 F. Supp. 2d 90 (D.D.C. 2012) .......................................................32

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ........................................................................23

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ...................................................................24, 25

**CONSTITUTIONAL AUTHORITIES**

N.H. Const., art. I (1784) .....................................................................22

N.Y. Const., art. XXXVIII (1777) ............................................................22

Pa. Const., art. I (1776) .......................................................................22

**STATUTES**

42 U.S.C. § 2000bb ...........................................................................14

42 U.S.C. § 2000bb-1 ...........................................................13, 14, 18, 23

42 U.S.C. § 2000bb-2 .............................................................13, 14, 17

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

42 U.S.C. § 2000cc-5 ...................................................................................................14, 17

D.C. Code § 7-2307 ........................................................................................................8, 16

**OTHER AUTHORITIES**

Catechism of the Catholic Church ...............................................................3, 4, 14, 15

General Instruction of the Roman Missal ...........................................................4, 14, 15

Samuel Johnson, A Dictionary of the English Language (Phila. ed. 1805)...................21

*Lumen Gentium*, The Dogmatic Constitution of the Church (Nov. 21, 1964)..............15

Michael W. McConnell, Establishment and Disestablishment at the Founding,
  Part I: Establishment of Religion, 44 Wm. & Mary L. Rev. 2105 (2003)...............21

Michael W. McConnell, Free Exercise Revisionism and the *Smith* Decision,
  57 U. Chi. L. Rev. 1109 (1990) .............................................................................21

Michael W. McConnell, Freedom from Persecution or Protection of the Rights of
  Conscience?: A Critique of Justice Scalia's Historical Arguments in *City of
  Boerne v. Flores*, 39 Wm. & Mary L. Rev. 819 (1998)..........................................22

Michael W. McConnell, Reflections on *Hosanna-Tabor*,
  35 Harv. J.L. & Pub. Pol'y 821 (2012)..................................................................22

*Roman Missal, Universal Norms on the Liturgical Year and the Calendar*.................14

## **INTRODUCTION**

This case is controlled by settled principles of law that the Supreme Court and lower courts have repeatedly applied to strike down similar worship restrictions in recent months. *See, e.g.*, *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021); *Gateway City Church v. Newsom*, No. 20A138, 2021 WL 753575 (Feb. 26, 2021); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020); *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620 (2d Cir. 2020); *Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228 (9th Cir. 2020); Permanent Inj. Order, *Agudath Israel of Am. v. Cuomo*, No. 20-cv-4834, 2021 WL 804717 (E.D.N.Y. Feb. 9, 2021) (enjoining 25% and 33% capacity limits). Just as in those cases, the District has imposed strict capacity limits on worship services while allowing more flexible limits and often *no* limits for secular venues. And just as in those cases, the District cannot show any scientific basis for the arbitrary and discriminatory limits it has chosen. Much less can it prove that these limits are the least restrictive means of protecting public health, particularly when *no state* maintains such draconian restrictions. More than once, the Supreme Court has found these circumstances to trigger—and flunk—strict scrutiny, and to warrant emergency relief. The same is true here.

The District's worship restrictions are uniquely stringent and discriminatory. The District imposes a hard numerical cap of 250 worshippers on churches—no matter how large the church—even though every state in the country has now completely abandoned hard caps. The District further limits churches to 25% capacity, which is more stringent than the rules of 46 states, including neighboring Maryland and Virginia. Yet the District imposes *no occupancy limits whatsoever* on other venues where people often congregate, including "big box" retail stores and transportation stations. These harsh restrictions on religious worship trigger strict scrutiny under both the Religious Freedom Restoration Act and the Free Exercise Clause. And they cannot survive that scrutiny because they far exceed what is necessary to protect public health.

The District cannot prove any "compelling" need to impose its uniquely harsh limits on worship when states around the country have shown that they can rely on far less restrictive means such as masking and social distancing. Again, *no* state relies on a hard numerical cap like the District's. And 46 states manage to prevent the spread of COVID-19 without imposing a 25% limit on worship attendance. A full 34 states do not impose *any* percentage-based limit at all, and 12 states allow higher percentage limits (mostly set at 50%). Indeed, the District itself recognizes that capacity limits are not required at various secular facilities, and it cannot show that worship services pose any special risks that would justify singling them out for harsher treatment. To the contrary, the experience of other jurisdictions and the District's own data show that responsible worship services do not impose any unique risks as long as they follow guidelines for masking, social distancing, and adequate cleaning. In light of these facts—not to mention the plummeting case rates and soaring vaccination rates—the District cannot bear its burden to justify ongoing church-specific restrictions.

In First Amendment cases, the likelihood of success on the merits alone justifies relief, but here the equitable factors point in the same direction. The deprivation of free exercise for any period—let alone the deprivation of worship itself—is a *per se* irreparable harm. And it is not outweighed by anything close to a compelling public interest on these facts.

To allow sufficient time to plan Holy Week (March 28-April 3) and Easter (April 4), the Archdiocese respectfully requests that the Court resolve this motion by March 25. As before, the Archdiocese makes this request only after working diligently outside of court in the hope that the District would grant relief from its unlawful restrictions. Although the District loosened some of its rules under threat of litigation in December, it has proved unwilling to do so voluntarily even in the face of clear legal obligations. The Archdiocese thus has no choice but to seek judicial relief.

# BACKGROUND

### A.    The Archdiocese of Washington

The Archdiocese of Washington is one of the largest dioceses of the Catholic Church in America. Under civil law, the Archdiocese is a corporation sole established by a 1948 Act of Congress, with 501(c)(3) nonprofit status. It serves 655,000 Catholics in the District and in five surrounding Maryland counties. *See* Declaration of Fr. Daniel Carson ("Carson Decl.") ¶ 5. As part of its religious mission, the Archdiocese offers Mass and other Sacraments every day of the year, with particular significance given to Mass offered on Sundays and Holy Days, including Palm Sunday, Holy Thursday, and Easter. *Id*. ¶¶ 12-13. In addition, the Archdiocese engages in various corporal and spiritual works of mercy for Catholics and non-Catholics alike in the D.C. area. *Id*. ¶ 6. Its 91 schools serve 24,000 students in all financial conditions, from all backgrounds, and of any or no faith. *Id*. ¶ 7. And to make its schools available to as many as possible, the Archdiocese awards $6 million in tuition assistance to students in need each year. *Id*. The Archdiocese also provides legal and financial services, food, shelter, and healthcare. *Id*. ¶ 6. Its various programs and ministries are all motivated by the Catholic faith central to its identity. *Id.* Therefore, in addition to performing corporal and spiritual works of mercy, the Archdiocese meets the religious needs of its community by providing opportunities for religious worship and ensuring the availability of Mass and the sacraments to all Catholics in the D.C. area. *Id*. ¶ 8.

For the Archdiocese, "[t]he Sunday celebration of the Lord's Day and his Eucharist is at the heart of the Church's life"—not only a gathering of people, but an action of the gathered people together with Christ. *Id.* ¶ 9 (quoting Catechism of the Catholic Church § 2177). "The celebration of Mass … is the center of the whole of Christian life for the Church both universal and local, as well as for each of the faithful individually. For in it is found the high point both of the action by which God sanctifies the world in Christ and of the worship that the human race offers to the

Father, adoring him through Christ, the Son of God, in the Holy Spirit." *Id*. (quoting General Instruction of the Roman Missal at 16).

"[T]his practice of the Christian assembly dates from the beginnings of the apostolic age" and is reflected in the Letter to the Hebrews, which instructs the faithful "not to neglect to meet together." *Id*. ¶ 11 (quoting Catechism of the Catholic Church § 2178 (in turn quoting Hebrews 10:25)). In other words, these practices cannot be adequately replicated by remote means, and in fact, congregants cannot participate in many practices and sacraments, such as partaking in the Eucharist, except in person. *Id*. ¶¶ 10-11 (quoting Catechism of the Catholic Church § 2179) ("[One] cannot pray at home as at church, where there is a great multitude, where exclamations are cried out to God as from one great heart, and where there is something more: the union of minds, the accord of souls, the bond of charity, the prayers of the priests.").

As a result, the celebration of Sunday Mass in person is "the foremost holy day of obligation in the universal Church." *Id*. ¶ 12 (quoting Catechism of the Catholic Church § 2177). In addition to Sunday Masses each week, the Catholic Church offers Mass every day of the year. *Id.* ¶ 13. Indeed, Holy Week together with the Easter celebration of the Resurrection of Christ "shines forth as the high point of the entire liturgical year. Therefore the preeminence that Sunday has in the week, the Solemnity of Easter has in the liturgical year." *Id*. ¶ 15.

### B.    The Archdiocese's efforts to combat COVID-19

As the COVID-19 pandemic hit in March 2020, the Archdiocese—on its own initiative and out of concern for its flock and love for its neighbors—temporarily cancelled public Mass and suspended the religious obligation to attend Mass. *Id*. ¶ 17. The Archdiocese also shut down in-person education in its schools, even though its educational ministries are central to its religious mission and to thousands of the District's children. *Id.*

At the same time, recognizing the growing need in its communities, the Archdiocese redoubled its efforts to serve the District's most vulnerable residents, particularly through Catholic Charities and the Archdiocese's various parish ministries. For example, at the height of the pandemic, Catholic Charities' food pantry in Columbia Heights served 650 people a week—more than sixteen times the number of people served before the COVID-19 crisis began. *Id*. ¶ 18.

In June 2020, after the District entered "Phase Two" of its reopening, the Archdiocese resumed public Masses in full compliance with the Mayor's orders. *Id.* ¶ 19. Since then, the Archdiocese has continued to fully comply with all government regulations and gone above and beyond such requirements in order to protect public health. *Id.* The Archdiocese reviewed current guidance from the World Health Organization and the U.S. Centers for Disease Control and Prevention in crafting health and safety protocols. *Id.* ¶ 20. The Archdiocese also relied on the *Road Map to Re-Opening our Catholic Churches Safely*, a document created by doctors at some of the nation's top research hospitals and universities. *Id.*.

Following the science, the Archdiocese instituted rigorous social distancing and hygiene measures for all in-person worship services. Among other protocols, the Archdiocese reconfigured worship spaces to use every other pew and required 6 feet of space between individuals or groups who did not arrive together; mandated the use of masks or face coverings during worship services; curtailed singing during worship services; created indoor traffic plans and entry and exit plans to maintain social distancing before, during, and after Mass—including during the distribution of Holy Communion; sanitized and disinfected worship spaces after each liturgy; and encouraged the use of reservation systems for scheduling attendance at each Mass. *Id*. ¶ 21.

The Archdiocese's extensive efforts have worked. Over the past nine months, during which thousands of public Masses have been celebrated, no evidence has emerged showing that these

worship services pose any heightened risk of COVID transmission compared to other activities the District allows. *Id.* ¶ 23. In fact, the Archdiocese operates many churches in Maryland that have been safely holding Masses for eight months without the severe restrictions imposed by the District. *Id.* ¶ 24. The same is true in the neighboring Diocese of Arlington, where the government imposes neither percentage-capacity nor numerical caps on Mass. *Id.* ¶ 25. This experience has been confirmed by a scientific study where three infectious disease experts reviewed more than one million public Masses held across the nation over several months following Catholic churches' reopening during the pandemic, when fewer people had immunity and no one had been vaccinated. The infectious disease experts concluded that wherever the protocols described in the *Road Map to Re-Opening* were followed, there was not a single documented outbreak of COVID-19 linked to church attendance. *See* Declaration of Anthony J. Dick, Ex. B-10.

### C.   D.C.'s uniquely harsh restrictions on houses of worship

#### 1.   Phase One

Beginning in March 2020, the Mayor issued a series of orders to respond to the pandemic. On March 11, the Mayor issued Orders 2020-045 and 2020-046 declaring public emergencies due to COVID-19. Ex. B-1; Ex. B-2. On March 24, more than a week after the Archdiocese voluntarily suspended public Masses, the Mayor closed all non-essential businesses and forbade gatherings of 10 or more people in one confined or outdoor space. Ex. B-3 at 2-3, 7. Though the March 24 Order did not discuss houses of worship, the Mayor's webpage stated that "large gatherings of ten or more people are prohibited, so as a practical matter, most churches are not holding services." Ex. B-7 at 11.

At the same time, the Mayor's March 24 Order stated that "[a]ll Essential Businesses are strongly encouraged to remain open." Ex. B-3 at 3. "Essential Businesses" included liquor stores, laundromats, grocery stores (including big-box stores that sell groceries alongside other items),

and medical marijuana "dispensaries" and "cultivation centers." *Id*. at 4-5. For these "Essential Businesses," the Mayor declined to establish any capacity limits and merely encouraged them to implement social distancing and staggered shifts for their employees. *Id.* at 4. The Mayor's webpage indicated that "big box stores" were permitted to have "more than ten people … in them at once" and need only "make efforts to preserve a safe distance between customers." Ex. B-7 at 12. Thus, the Mayor's March regulations placed no hard caps on "essential" businesses such as big-box stores or medical marijuana dispensaries and cultivation centers, but limited the number of people allowed in houses of worship to ten, regardless of capacity.

In May and June 2020, the Archdiocese sought a waiver from the 10-person cap for several parishes, which the District denied. Carson Decl. ¶ 34. Then, just days before the District entered Phase 2, the Archdiocese sought a one-time waiver to host ordinations at the Basilica of the National Shrine of the Immaculate Conception at no more than 10% occupancy. *Id.* ¶ 35. That was also denied. *Id.*

### 2.     Phase Two

On June 19, the Mayor issued Mayor's Order 2020-075 and announced that the District was entering Phase Two of its reopening. Ex. B-4 at 1-2. Under Phase Two rules, houses of worship were singled out and capped at the lesser of 100 people or 50% capacity. *Id.* at 6. But "essential businesses" continued to face no capacity-based restrictions. *Id*. And non-essential retail businesses, personal service businesses (including tattoo parlors, nail salons, and tanning facilities), restaurants, and public libraries were also allowed to open subject only to capacity-based limits, without fixed numerical caps. *Id.* at 3-5. To enforce these regulations, Mayor's Order 2020-075 also provided that those who "knowingly violate[]" the District's restrictions "may be subject to civil and administrative penalties authorized by law," including civil fines of $1,000 per

violation. *Id*. at 11; *see* D.C. Code § 7-2307. After the District entered Phase Two, the Archdiocese resumed public Masses in full compliance with the relevant Orders.

On October 9, this Court ordered the District to allow Capitol Hill Baptist Church to hold outdoor religious services without any numerical cap. *See Capitol Hill Baptist Church v. Bowser*, No. 20-cv-02710, 2020 WL 5995126, at *2 (D.D.C. Oct. 9, 2020). The District later updated its Phase Two guidance for houses of worship to reflect that the 100-person cap would not be enforced on outdoor gatherings held by houses of worship. Ex. B-12 at 1. But the uniquely harsh restrictions on indoor religious worship remained in place.

On October 22, after several months of COVID-free Masses in D.C.—and several months of COVID-free Masses in nearby jurisdictions without numerical attendance caps—the Archdiocese again approached the District about lifting the numerical cap on Mass attendance. Carson Decl. ¶ 36; Ex. B-8 at 1. The Archdiocese emphasized the need for relief in time for the holiday season including Thanksgiving, the holy season of Advent, and Christmas. Carson Decl. ¶ 36; Ex. B-8 at 3. District officials eventually agreed to a conference call on October 29 to hear the Archdiocese's concerns and pledged to get back to the Archdiocese quickly. Carson Decl. ¶ 37. Despite multiple emails and calls, however, the District gave no further response. *Id.* ¶ 38.

### 3. "Modified" Phase Two

On November 23 (the Monday before Thanksgiving), Mayor Bowser issued "modified" Phase Two rules that further restricted attendance at religious services. Ex. B-5 at 1, 4. Under Mayor's Order 2020-119, houses of worship continued to be singled out for disfavored treatment. Specifically, attendance at worship services was capped at the lesser of 50 people or 50% of occupancy, *id.* at 3, even though half the Archdiocesan churches in the District can accommodate 500 or more, *see* Carson Decl. ¶ 28 & Ex. A-1. Meanwhile, restaurants, public libraries, nail salons, tattoo parlors, and other non-essential businesses faced no hard numerical caps—they were

permitted to operate with only capacity-based limits. Ex. B-4 at 3-5; Ex. B-5 at 2. Even fitness centers were allowed to have more than 50 people exercising indoors, as long as they had enough space for social distancing. *See* Ex. B-4 at 7. And "essential" businesses—including laundromats, liquor stores, and certain big-box retail stores—were subject to *no* occupancy caps at all. *See* Ex. B-3 at 3-6.

Later that same evening, the U.S. Supreme Court enjoined similar restrictions on worship in *Diocese of Brooklyn*, 141 S. Ct. 63.

On December 7, the Archdiocese again asked the District to lift the numerical cap on worship and instead use the kind of capacity-based regulations that govern other activities, such as indoor dining, shopping, and personal services. Carson Decl. ¶ 41; Ex. B-9 at 1. The Archdiocese pointed out that the Supreme Court had just confirmed that capacity-based limits are a less restrictive alternative to numerical caps, making the District's policy plainly illegal under RFRA and the First Amendment. Carson Decl. ¶ 41; Ex. B-9 at 1, 5-7. On December 10, several District officials participated in a conference call with the Archdiocese. Carson Decl. ¶ 42. When asked, District officials did not indicate that they were aware of any Catholic Masses that were responsible for any COVID spread, and they admitted that the Archdiocese has been "conscientious." *Id.* But the District nevertheless refused to remove the cap. *Id.* ¶ 43.

### 4.  This Litigation and the Christmas Truce

With only two weeks remaining until Christmas, the Archdiocese filed this suit and sought emergency relief from the 50-person worship cap. ECF Nos. 1, 11. As the Archdiocese pointed out, the cap was both arbitrary and unlawfully discriminatory. It made no sense to limit Mass to 50 people in such cavernous churches as the Basilica, which could ordinarily accommodate over 3,000 people under 100-foot ceilings. At the same time, the District set a looser 25% capacity limit for indoor dining (with no hard cap), thus allowing more than 50 people at a time to dine indoors

in many restaurants—where they could sit across tables eating and drinking for hours. The District also imposed no occupancy caps at all on other venues where people often would congregate and linger, including many "big box" retail stores, train stations, and fitness centers.

After the Court scheduled an emergency hearing for December 18, the District issued an order near midnight on December 16 modifying its worship restrictions. The order began by noting that the "daily case rate in the District" at that time had "shot up to 35.59 cases per 100,000 persons, having multiplied nearly eight-fold since early July," and that "[t]he rate of transmission, percent hospital utilization, and test positivity rates" were rising. Ex. B-13 at 1-2. The order thus emphasized that it was making changes only "[i]n order to resolve litigation" in which the Archdiocese had "insist[ed] on a constitutional right to hold indoor worship services" without a 50-person cap—an insistence that the District warned would "doubtlessly put parishioners in harm's way." *Id.* at 2.

To create the appearance of equal treatment, the order proclaimed that it would achieve "parity" between restaurants and places of worship, as well as various retail stores and other facilities. *Id*. Thus, because restaurants were previously set at 25% capacity, the same limit would apply to churches. That would have allowed the Basilica to have 750 people attend Mass (25% of its normal 3,000-person capacity). But the District came up with a way to avoid that result: The order stated that since "the largest restaurant" in the District could ordinarily hold a thousand people, up to 250 people could be seated for indoor dining. *Id.* Based on that number, the order proclaimed that a 250-person hard cap would apply to both restaurants and churches—even churches like the Basilica that could normally hold 3,000 people. *Id.* The District gave no explanation for why it designed the 250-person hard cap in a way that affected only churches, but did not affect restaurants.

Under the December 16 order, houses of worship were thus limited to the lesser of 250 people or 25% of their capacity. *Id.* at 3. Meanwhile, numerous secular entities—including train, bus, and metro stations such as Union Station, laundromats, garages, and marijuana dispensaries—remained free from any occupancy caps whatsoever. *See* Ex. B-3 at 4-5, 7.

Notably, the December 16 order fleetingly placed big-box stores, retail food sellers, and houses of worship on equal footing by applying the same 250 hard cap and 25% limit to all of them. Ex. B-13 at 4. But that parity was short-lived: Just two days later, the Mayor issued another order that lifted all capacity restrictions for many big-box stores and food sellers. *See* Ex. B-14 at 3-4. The more onerous restrictions on houses of worship, however, remained.

The modified regulatory regime continued to unlawfully subject houses of worship to discriminatory treatment, but with Christmas fast approaching, the Archdiocese sought to work with the District to resolve certain aspects of this conflict outside of court. The parties agreed that in order to resolve the emergency request for relief, the Archdiocese would presumptively be allowed to hold Mass with "at least 250 people or 25% of a church's capacity (whichever is lesser)" during the Christmas season, and that the District would pay the attorney's fees incurred by the Archdiocese in seeking relief. ECF No. 28-1 at 2 Based on this agreement, the Archdiocese reserved its rights, *id.* at 3-4, and moved to withdraw its application for emergency relief without prejudice and hold this case in abeyance, ECF Nos. 27-28. The Court granted both motions, placing this case in abeyance without prejudice to the Archdiocese's right to renew its request for injunctive relief if necessary. *See* Minute Orders (Dec. 22, 2020).

### 5.    The Improving Pandemic and the Continuing Restrictions

Over the next several months, the pandemic peaked in late December and cases began a precipitous decline as the vaccine became available. From a high of 492 daily cases on December 27, the District is now seeing a far lower rate of under 100 new cases per day: On the last three

days for which CDC data are available, the District saw 86 new cases on March 1, 83 on March 2, and 51 on March 3. *See* https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases (District of Columbia) (last visited on March 5, 2021).[1]  The daily case rate is thus roughly six times lower than it was at the time the District imposed the current restrictions in December, and it is forecast to continue dropping as the weather gets warmer and vaccination rates increase. *See* https://covid.cdc.gov/covid-data-tracker/#forecasting_weeklycases (last visited on March 5, 2021).  Indeed, CDC data show that as of March 4, nearly 20% of District residents 18 or older have received at least one dose of the vaccine, with heavy priority for those at most risk. *See* https://covid.cdc.gov/covid-data-tracker/#vaccinations (last visited on March 5, 2021). Vaccinations are rapidly increasing, such that everyone in high-risk categories will have had a chance to be vaccinated by Holy Week. According to Dr. Anthony Fauci, the Director of the National Institute of Allergy and Infectious Diseases, "virtually everybody and anybody in any category can start to get vaccinated" "[b]y the time we get to April." Ex. B-18 at 1.

Near the beginning of Lent in mid-February, and with Holy Week and Easter approaching, the Archdiocese once again requested that the District loosen its remaining worship restrictions. On February 18, the District informed the Archdiocese that it would provide a response on whether to loosen the restrictions by Wednesday, February 24. When that day arrived, the District stated that, "On or about March 15, the District will reassess and determine what guidelines and limitations, if any, to moderate (or begin moderating)." Carson Decl. ¶ 47. "We have not had a sufficient window to make this assessment as of today, so the District declines to amend the Order or grant a waiver today." *Id*. The Archdiocese then moved to lift the abeyance and requested a

---

[1] The official government websites cited herein are subject to judicial notice.  *See Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013); *Markowicz v. Johnson*, 206 F. Supp. 3d 158, 161 n.2 (D.D.C. 2016).

briefing schedule that would allow it to seek relief by the start of Holy Week on March 28. The Court granted that request, Minute Order (Mar. 1, 2021), and this application now follows.

## ARGUMENT

A TRO or preliminary injunction turns on four factors: (1) the plaintiff is likely to succeed on the merits; (2) it will likely suffer irreparable harm absent interim relief; (3) the balance of equities tip in its favor; and (4) interim relief serves the public interest. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016); *Melton v. District of Columbia*, 46 F. Supp. 3d 22, 25 (D.D.C. 2014). When First Amendment rights are at stake, "the likelihood of success 'will often be the determinative factor.'" *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Here every factor supports relief.

## I.      THE ARCHDIOCESE IS LIKELY TO SUCCEED ON THE MERITS.

The Archdiocese is likely to prevail under RFRA and the Free Exercise Clause. Both require strict scrutiny, which is fatal to the District's arbitrary worship restrictions.

### A.      Both RFRA and the Free Exercise Clause require strict scrutiny.

#### 1.      RFRA requires strict scrutiny because the Order substantially burdens religious exercise.

As the Supreme Court and this Court have recognized, the Religious Freedom Restoration Act provides "very broad protection[s] for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693-94 (2014); *see Capitol Hill Baptist*, 2020 WL 5995126, at *4. RFRA bars the government from "substantially burden[ing] a person's exercise of religion" unless it can satisfy strict scrutiny by "demonstrat[ing] that application of the burden to the person" is "the least restrictive means of furthering" a "compelling governmental interest." 42 U.S.C. § 2000bb-1; *see also id.* § 2000bb-2(2) (covering the District). Because "laws 'neutral' toward religion may burden religious exercise as surely as laws" targeting religion, the same scrutiny applies even if the law

13

creating the burden does not *discriminate* against religion. *Id.* §§ 2000bb, 2000bb-1.

RFRA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* §§ 2000cc-5(7)(A), 2000bb-2(4). An "exercise of religion" is any religiously motivated "conduct," which includes "assembling with others for a worship service" and "participating in sacramental use of bread and wine." *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (cleaned up); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1134, 1137 (10th Cir. 2013) (rejecting "an understanding of 'substantial burden' that presumes 'substantial' requires an inquiry into the theological merit of the belief in question rather than the *intensity of the coercion* applied by the government to act contrary to those beliefs").

Here it is clear that the District's ban on Masses with more than 25% of capacity or 250 people substantially burdens the exercise of religion. As this Court has observed, worship services are the paradigmatic example of religious exercise safeguarded by RFRA. *See Capitol Hill Baptist*, 2020 WL 5995126, at *5-6. For Catholics, in particular, Mass is among the most important aspects of religious practice. The Catholic Church offers Mass every day of the year. *See* Carson Decl. ¶ 13. Church teaching puts "[t]he celebration of Mass" at "the center of the whole of Christian life for the Church both universal and local, as well as for each of the faithful individually." *Id.* ¶ 9 (quoting General Instruction of the Roman Missal at 16). Sunday Mass is especially important, as "the foremost holy day of obligation in the universal Church." *Id.* ¶ 12 (quoting Catechism of the Catholic Church § 2177). Easter Sunday Mass celebrates an event central to the faith—the Resurrection of Christ, *id.* ¶ 15 (citing *Roman Missal, Universal Norms on the Liturgical Year and the Calendar*)—making it the most important holy day of the year. On the Sunday before Easter, Holy Week begins with Palm Sunday, followed by Holy Thursday—which celebrates the Last Supper—and then Good Friday, which commemorates the passion and death of Christ. That is

followed by Easter Vigil Mass on Saturday evening, and Mass during the day on Easter Sunday. Celebrating and attending Mass during this time is of special importance because "Easter is not simply one feast among others, but the 'Feast of feasts,' the 'Solemnity of solemnities,'" and "the high point of the entire liturgical year." *Id*.

There is no substitute for holding and attending Mass in person. Scriptures instruct Catholics "not to neglect to meet together," and Catholics understand the Mass as "an action of the gathered people together with Christ." *Id.* ¶¶ 9-11 (quoting Catechism of the Catholic Church § 2178 and General Instruction of the Roman Missal at 16); *cf. Capitol Hill Baptist*, 2020 WL 5995126, at *5 (recognizing the importance that another Christian faith places on in-person gatherings); *Diocese of Brooklyn*, 141 S. Ct. at 68 (noting "important religious traditions in the Orthodox Jewish faith that require personal attendance"). After all, it is through personal attendance at Mass that Catholics receive the Eucharist—the "source and summit of the Christian life." Carson Decl. ¶ 10 (quoting Catechism of the Catholic Church § 1324 (quoting *Lumen Gentium*, The Dogmatic Constitution of the Church (Nov. 21, 1964))). Alternatives to in-person Mass, such as "remote viewing," simply are "not the same as personal attendance" because "Catholics who watch a Mass at home cannot receive communion." *Diocese of Brooklyn*, 141 S. Ct. at 68. Quite simply, holding and attending Mass is central to Catholics' religious exercise. Accordingly, the Archdiocese has a religious duty to open the church doors and offer Mass to the faithful who want to attend. Carson Decl. ¶ 12.

The Mayor's Order limiting attendance at indoor worship services plainly imposes a substantial burden on religious exercise. Substantial burdens exist whenever the government imposes substantial penalties on religious adherents for engaging in sincere religious practice. *Hobby Lobby*, 573 U.S. at 726; *Capitol Hill Baptist*, 2020 WL 5995126, at *5-6; *see also, e.g.*,

*Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1315 (10th Cir. 2010) (government substantially burdens religious exercise when it "prevents participation in conduct motivated by a sincerely held religious belief," or "places substantial pressure on an adherent . . . not to engage in conduct motivated by a sincerely held religious belief").

Here, the Mayor's Order threatens the Archdiocese with substantial penalties for engaging in religious exercise. It flatly prohibits the Archdiocese from holding its ordinary religious services under threat of fines of $1,000 per violation. Ex. B-13 at 5; D.C. Code § 7-2307. And compliance creates more than a substantial interference with religious exercise.

*First*, the 25% limit imposes a substantial burden because the Archdiocese cannot fully offer—and many parishioners cannot attend—Masses they believe spiritually crucial. Carson Decl. ¶¶ 9-12, 27-33, 48. Under its own safety protocols, the Archdiocese would open its Churches to hold more than 25% capacity if it were allowed to do so. *Id.* ¶¶ 20-21, 23-26, 30. And imposing a lower percentage cap forces the Archdiocese to turn away worshippers it would otherwise admit to Mass, preventing the Church from offering them the Eucharist that it believes is the "source and summit" of Christian life. *Id.* ¶ 10. As the Supreme Court has recognized, such worship restrictions "strike at the very heart of" free exercise "by effectively barring many from attending religious services." *Diocese of Brooklyn*, 141 S. Ct. at 68; *see also Capitol Hill Baptist*, 2020 WL 5995126, at *6 (finding a substantial burden where a 100-person limit on worship services prevented a church from meeting as its faith required); *Sherbert v. Verner*, 374 U.S. 398, 404, 406 (1963) (finding a substantial infringement where the "effect of a law is to impede the observance of one or all religions").

*Second*, the 250-person cap imposes the same type of substantial burden, because the Archdiocese has some churches that are large enough to hold more than 250 people with ample

social distancing. The most dramatic illustration of this is the Basilica of the National Shrine of the Immaculate Conception, which is one of the ten largest churches on the planet. The interior of the church spans 129,912 square feet, with a ceiling 100 feet high. Ordinarily, the Basilica can accommodate 3,000 people in the upper church for Mass, and even with ample social distancing it can safely hold more than 1,000 worshippers there.  Carson Decl. ¶¶ 28-30.  Thus, as a result of the District's worship restrictions, hundreds of people are barred from attending each Mass at the patronal church of the United States, a crown jewel of the Catholic community in the nation's capital. Indeed, the cap has forced the Basilica to regularly turn away parishioners seeking to attend Mass, and this burden will be especially pronounced during Holy Week, when the Archdiocese expects that at least 1,000 worshippers would attend each Mass if not for the cap. *Id*. ¶ 30.

It makes no difference whether the District thinks that Catholics could exercise their faith in other ways without in-person Mass, such as the "web-based services" "encouraged" by the District. Ex. B-13 at 3. The question is "whether the government has substantially burdened religious exercise[,] … not whether [the Church] is able to engage in other forms of religious exercise." *Capitol Hill Baptist*, 2020 WL 5995126, at *5 (quoting *Holt v. Hobbs*, 574 U.S. 352, 361-62 (2015)). Nor does this inquiry permit any second-guessing of the importance of the Archdiocese's religious commitments. RFRA protects "*any* exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000cc-5(7)(A), 2000bb-2(4) (emphasis added). As the Supreme Court has made crystal clear, if a government threatens substantial penalties for sincere religious practice—that is, activity motivated by sincere religious conviction—"it is not for [the courts or the Mayor] to say that their religious beliefs are mistaken or insubstantial." *Hobby Lobby*, 573 U.S. at 725. That is why a court's "narrow function" is to

examine whether the government is threatening substantial penalties for religious activity motivated by the plaintiff's "honest conviction." *Id.* There can be no doubt about that here.

At the end of the day, recognizing the substantial burden here is the only conclusion that accords with common sense. If the rule were otherwise, then the District would be free to limit Mass attendance at any time without triggering *any* RFRA scrutiny, regardless of the justification—even if there were no pandemic. That is not the law. The proper question is whether the District can justify the substantially burdensome worship limits it has imposed, not whether they are substantially burdensome.

In sum, because the District's restrictions on worship substantially burden the Archdiocese's religious exercise, they trigger strict scrutiny under RFRA—and that is true *regardless* of whether they discriminate against religion. 42 U.S.C. § 2000bb-1.

### 2. The Free Exercise Clause requires strict scrutiny because the Order is not neutral or generally applicable.

Even if RFRA did not apply here, strict scrutiny would still be required under the First Amendment because the District's worship restrictions are not only substantially burdensome but also discriminatory. The Free Exercise Clause forbids the government to disfavor religious exercise—including "assembling with others for a worship service," *Cutter*, 544 U.S. at 720—relative to secular activity. So any "law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). A law is not neutral or generally applicable if, for example, it "discriminate[s] on its face," *id.* at 533; "targets religious conduct for distinctive treatment," *id.* at 546; or treats religious practices worse than secular activities, *see id.* at 537-38, 542-43. "Neutrality and general applicability are interrelated," and "failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.* at 531.

The disparity here is clear in light of the Supreme Court's decision in *Diocese of Brooklyn*, which applied the First Amendment to enjoin New York's numerical caps on churches in areas deemed to pose a high risk of spreading COVID. 141 S. Ct. at 65-66. As the Court held, those caps were not neutral or generally applicable "because they single[d] out houses of worship for especially harsh treatment" compared to secular venues. *Id.* In particular, businesses deemed "essential" were allowed to admit "as many people as they wish," including at large retail stores and transportation facilities. *Id.* at 66. It was especially "troubling" that while hundreds of people could go shopping together at "a large store," they could not go to church. *Id.* at 66-67. That disparate treatment triggered strict scrutiny. *Id.*

Likewise here. *First*, while imposing both numerical and percentage-capacity limits on churches, the District sets *no* occupancy limits on the large retail stores and transportation facilities whose preferential treatment the Supreme Court emphasized in *Diocese of Brooklyn*, 141 S. Ct. at 66-67. Ex. B-14 at 3. Indeed, the District went out of its way to "repeal" *all* capacity limits on "[f]ood sellers and big box stores." *Id.* Those establishments are "no longer subject to the twenty-five percent (25%) / two hundred fifty (250) person occupancy cap." *Id.* They need only "make plans that provide for safe social distancing between persons and limit occupancy to the extent necessary for safety." Yet that is all the Archdiocese requests for its churches here. And such parity of treatment is the minimum demanded by a Constitution which, after all, guards the exercise of religion but not the purchase of merchandise. *Cf. Diocese of Brooklyn*, 141 S. Ct. at 72 (Gorsuch, J., concurring) ("[T]here is no world in which the Constitution tolerates . . . executive edicts that reopen liquor stores . . . but shutter churches, synagogues, and mosques."); *id.* at 73 (Kavanaugh, J., concurring) (rejecting capacity limits imposed on "a church or synagogue" but not "a grocery store, pet store, or big-box store down the street").

The impact of this disparity is especially striking in the case of the Basilica, which has an interior large enough to fit the Statue of Liberty. Carson Decl. ¶ 28. There the 250-person cap mandates a 519 square-foot space for each individual worshipper. *Id.* But if the Basilica replaced its pews full of worshippers with aisles lined with shoppers, the District's 100% capacity "limit" for big-box stores would allow it to host *as many people as it could fit*.

*Second*, the Basilica also fares worse than restaurants under the rigid 250-person cap—a part of the Mayor's order that defies "the minimum requirement of neutrality . . . that a law not discriminate on its face." *Lukumi*, 508 U.S. at 533. In a moment of rare bureaucratic candor, the December 16 order divulges that its 250-person cap was calculated not for any scientific reason whatsoever, but only to favor the largest restaurant over the largest church. The order notes that "the maximum number of persons at the largest *restaurant*, based on twenty-five percent (25%) of *their* Certificates of Occupancy, is approximately two hundred fifty (250) persons." Ex. B-13 at 2 (emphasis added). And on that basis, the order limits houses of worship *and* restaurants both to the 250-person cap and calls the result "parity." *Id.*

In other words, the District admits that it rifled through its occupancy records to figure out exactly what cap would have *no impact whatsoever on restaurants*, and imposed *that* cap on churches. This is a classic "religious gerrymander." *Lukumi*, 508 U.S. at 535. In intent and substance, it is no different from providing that a rigid numerical cap "shall apply to churches and *not* to restaurants." With either phrasing, "[i]t is a necessary conclusion that," between dining and worship, "the only conduct subject to [the 250-person cap] is the religious exercise." *Id*. If the numerical cap had any effect, it was guaranteed to fall on churches and not restaurants; the "text[] show[s] that [it was] drafted . . . to achieve this result." *Id.* In particular, "[t]he net result of the gerrymander" is to subject the largest churches—but not the largest restaurant—to an arbitrarily

rigid numerical cutoff, regardless of the building's capacity. *Id.* at 536. And that is so even though indoor dining at restaurants poses a far *greater* risk of COVID spread: Patrons sit across the table from each other while eating and drinking without wearing masks. Many consume alcohol. They often linger together at meals for far longer than the duration of a typical Mass. And servers come in much closer contact with restaurant patrons than do different households attending Mass pews apart from each other. The rigid numerical cap thus "fail[s] to prohibit nonreligious conduct that endangers [public] interests in a similar or greater degree." *Id.* at 543.

This unequal treatment of religion, as in *Diocese of Brooklyn*, triggers strict scrutiny. 141 S. Ct. at 67 (citing *Lukumi*, 508 U.S. at 546)).

### 3. The Free Exercise Clause requires strict scrutiny because the Order interferes with religious worship.

The District's restrictions also trigger strict scrutiny under the Free Exercise Clause because they threaten penalties for holding religious worship services, an activity that lies at the very core of the free exercise of religion. *See* 141 S. Ct. at 68 (if a law "effectively bar[s] many from attending religious services," it "strike[s] at the very heart of the First Amendment's guarantee of religious liberty."). This conclusion follows from the text, history, and tradition of the Free Exercise Clause.

The text protects the "exercise of religion," of which "worship" is a core part. Samuel Johnson defined religious "exercise" to include an "Act of divine worship whether publick or private." Michael W. McConnell, Free Exercise Revisionism and the *Smith* Decision, 57 U. Chi. L. Rev. 1109, 1114 n.23 (1990) (quoting Samuel Johnson, A Dictionary of the English Language (Phila. ed. 1805)). Likewise, two central targets of the Establishment Clause were "compulsory church attendance" and "prohibitions on worship in dissenting churches." Michael W. McConnell, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion, 44 Wm.

& Mary L. Rev. 2105, 2131 (2003); *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2096 (2019) (Thomas, J., concurring) ("punish[ing] dissenting worship" forbidden by Religion Clauses). Both Religion Clauses thus place worship at the heart of "exercise."

The historical context supports the same point. The state constitutional provisions on which the Amendment was modeled specifically protected "worship." *See, e.g.*, N.Y. Const., art. XXXVIII (1777) ("the free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever hereafter be allowed"); Pa. Const., art. I, § 2 (1776) (forbidding authorities to "in any case interfere with, or in any manner controul, the right of conscience in the free exercise of religious worship"); N.H. Const., art. I, § 5 (1784) (guarding each person's "right to worship God according to the dictates of his own conscience, and reason").

As Professor McConnell sums up the evidence, "[i]t is extremely unlikely" that the Founders "would have countenanced an interpretation" allowing "government to dictate matters of worship to the church . . . ." Michael W. McConnell, Freedom from Persecution or Protection of the Rights of Conscience?: A Critique of Justice Scalia's Historical Arguments in *City of Boerne v. Flores*, 39 Wm. & Mary L. Rev. 819, 847 (1998). And that was no less true when the Fourteenth Amendment was adopted. *See* Michael W. McConnell, Reflections on *Hosanna-Tabor*, 35 Harv. J.L. & Pub. Pol'y 821, 832 (2012) ("People have a right to say how they will worship, what they will worship, and with whom they will worship") (quoting Sen. Morton).

Indeed, the Supreme Court has repeatedly recognized that "worship in the churches" enjoys "high estate under the First Amendment," *Murdock v. Pennsylvania*, 319 U.S. 105, 109 (1943); that "our constitutional scheme" forbids the state to "regulate, or in any manner control sermons delivered at religious meetings," *Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953); and thus that "freedom[ ] of . . . worship" may be curbed "only to prevent grave and immediate danger to

interests which the state may lawfully protect," *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 639 (1943). Even when it applied less scrutiny to neutral and generally applicable laws, the Court reaffirmed that it would "doubtless be unconstitutional" to ban particular activities undertaken "for worship purposes." *Emp. Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877-78 (1990). And just recently, the Court has repeatedly applied this enduring principle to numerical caps that "strike at the very heart of the First Amendment's guarantee of religious liberty." *Diocese of Brooklyn*, 141 S. Ct. at 68; *cf. Gateway City Church,* 2021 WL 753575; *S. Bay United Pentecostal Church*, 141 S. Ct. 716.

Simply put, a law that restricts worship on pain of legal penalty prompts the most rigorous scrutiny, whether or not it targets religion. Text, history, and tradition demand nothing less. The Mayor's orders flatly prevent countless Archdiocesan parishioners from assembling for worship as Catholics have done for millennia. *See* Carson Decl. ¶¶ 27-33. For this reason, and not only because of their disparate treatment of religion, the Mayor's orders must undergo strict scrutiny.

* * *

Strict scrutiny applies to the District's worship restrictions for all three of the independent reasons discussed above—the restrictions substantially burden religious exercise under RFRA, they discriminate against churches, and they severely impinge on the core right of worship that the Free Exercise Clause protects.

### B.    The worship restrictions cannot survive strict scrutiny.

To survive strict scrutiny, the District bears the burden to establish that its restrictions on Mass attendance are "narrowly tailored" to advance a "compelling" state interest. *Lukumi*, 508 U.S. at 546. Under RFRA, in particular, the District must show that "application of the [restrictions] to" the Archdiocese "is the *least restrictive means* of furthering" such an interest. 42 U.S.C. § 2000bb-1(b) (emphasis added). This is an "exceptionally demanding" test, *Hobby Lobby*, 573

U.S. at 728—indeed, "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997), ensuring that "only those interests of the highest order and those not otherwise served" can justify religious coercion, *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). And it is the District's burden to show that it clears this hurdle—not just by arguments, but by evidence that its draconian restrictions on worship are necessary to achieve the vital public-health goals that would not otherwise be achieved if the Archdiocese were allowed to invite more people to Mass while following its own rigorous safety procedures. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 427-28 (2006) ("[RFRA's] term 'demonstrates' means meets the burdens of going forward with the evidence and of persuasion").

That burden would be hard to carry in any case. It would be especially hard to shoulder for an order as gerrymandered as the District's, when so many other jurisdictions manage to protect the public health through less-restrictive means. And carrying that burden is *impossible* in the wake of the Supreme Court's recent decisions, which were decided in favor of plaintiffs who had to show that they were "indisputably" entitled to relief in order to obtain emergency injunctions from the Supreme Court. *Lux v. Rodrigues*, 561 U.S. 1306, 1307 (2010) (Roberts, C.J., in chambers). Those decisions have made clear that "[a]s this crisis enters its second year—and hovers over a second Lent, a second Passover, and a second Ramadan—it is too late for the State to defend extreme measures with claims of temporary exigency." *S. Bay United Pentecostal Church*, 141 S. Ct. at 720 (statement of Gorsuch, J.).[2]

---

[2] Justice Gorsuch's statement, apart from its treatment of California's singing ban, garnered the agreement of five Justices. *See S. Bay United Pentecostal Church*, 141 S. Ct. at 718 (statement of Gorsuch, J.); *id*. at 717 (Barrett, J., concurring in partial grant of application for injunctive relief).

### 1. The District has no compelling interest in its strict worship limits.

There is no doubt that the District has a compelling interest in protecting public health and fighting the COVID pandemic, broadly defined, and indeed the Archdiocese is strongly supportive of those goals. But under strict scrutiny, courts must "look[] *beyond* broadly formulated interests" to "examine" if there is compelling need to apply the "specific" restrictions at issue here. *O Centro*, 546 U.S. at 431 (emphasis added). For several reasons, the District cannot show with "particularity how its admittedly strong interest . . . would be adversely affected" without a rigid 250-person hard cap and a severe 25% limit on worship. *Id.* (quoting *Yoder*, 406 U.S. at 236).

*First*, the experience of other jurisdictions shows that no "compelling" interest would be imperiled by allowing Masses to proceed in the District without a 250-person cap and a 25% occupancy limit. Every state in the country has abandoned hard numerical caps, and 46 states allow indoor worship services without a 25% limit. Ex. B-16; Ex. B-17. When "so many" other jurisdictions allow indoor worship to proceed in this manner, the District must provide "persuasive reasons why it believes that it must take a different course." *Holt*, 574 U.S. at 369. But here the District cannot explain why it has a compelling interest in imposing worship restrictions that the vast majority of other jurisdictions do not impose.

*Second*, it is well-established that an "interest . . . is not compelling" if the government limits constitutionally protected conduct while "fail[ing] to enact feasible measures to restrict other conduct producing . . . alleged harm of the same sort." *Lukumi*, 508 U.S. at 546-47. Yet here the District has done just that. While the District imposes a tight 25% capacity limit and a rigid 250-person cap on churches, it applies no occupancy limits *at all* to big-box retail stores and train, bus, and metro stations, where employees or patrons can linger for hours at time. *See supra* at 11, 19. These are the precise same comparators that the Supreme Court held undercut the government's asserted interests in *Diocese of Brooklyn*, 141 S. Ct. at 65-67 (noting that the need for worship

restrictions could not be compelling when looser restrictions applied to "a large store in Brooklyn" and "transportation facilities").

*Third*, there is not even a plausible scientific basis for the District's 250-person hard cap on worship services. The District has all but admitted that it picked the 250 number solely because it equals 25% of the capacity of the largest restaurant in the area. *See supra* at 10-11, 20. That is not even a *rational* basis for deciding the maximum number of people that can safely attend worship services, much less a *compelling* one. Indeed the District's hard cap on the Basilica is especially indefensible because the Basilica is far bigger (and thus allows for more social distancing) than the largest restaurant in the District. Moreover, the activity of sitting quietly at Mass wearing a mask is far less risky than eating and drinking in a restaurant without a mask for hours at a time and interacting directly with multiple servers. Thus, it is apparent that the District's imposition of a 250-person cap in the "cavernous" Basilica "reflect[s] not expertise or discretion, but instead insufficient appreciation or consideration of the interests at stake" when restricting religious liberty. *S. Bay United Pentecostal Church*, 141 S. Ct. at 717 (Roberts, C.J., concurring).

*Fourth*, unlike restaurants, there is no evidence that Masses pose a heightened risk of COVID-19 transmission—especially when masking, social distancing, and other hygiene measures are followed. Of the 159 outbreaks recorded by the District between July 31, 2020, and February 24, 2021, only three—less than 2%—came from places of worship of any kind. *See* https://coronavirus.dc.gov/page/outbreak-data (last visited on March 5, 2021) ("Outbreak Data"). Contrast that with the 29 outbreaks in bars and restaurants. *Id.* And among D.C. residents who have tested positive, more than 95% of those interviewed each week since October 2020 reported no participation in "faith events" of any kind. *See* https://coronavirus.dc.gov/page/exposure-activities (last visited on March 5, 2021) ("Exposure Data"). In 27 of the 30 weeks since the

District began conducting these interviews, worship has contributed to no outbreaks at all. *See* Outbreak Data. Over that period, it has contributed to the pandemic less than personal care, dining out, work, travel, and social events. *See id.*; Exposure Data. There is thus no scientific basis for treating churches more harshly than retail shopping and transportation hubs.

Indeed, the Archdiocese is not aware of COVID-19 spreading among members of the public attending Mass in any of its churches. Carson Decl. ¶¶ 23-24, 33. That includes all the Masses celebrated in the District after reopening but before any hard cap was imposed. *Id.* ¶ 23. It includes Masses that the Archdiocese has celebrated for many months in Maryland, where there is no hard occupancy cap and many Masses exceed 25% capacity. *Id.* ¶ 24. And, to the Archdiocese's understanding, the same is true in at least five neighboring dioceses (covering all of Maryland, Virginia, Delaware, and West Virginia), all of which operate without hard caps (and in many cases without any government-imposed capacity limits at all). *Id.* ¶ 26.

This record is no surprise, given the extensive health measures taken by the Archdiocese: requiring masks; using every other pew and keeping six feet between families; creating traffic plans to keep distance during Communion; curtailing singing; using reservations to schedule limited attendance at each Mass; adding Masses to the schedule to space out congregants; disinfecting churches after each Mass; and asking exposed or symptomatic congregants to stay home. *Id.* ¶ 21. *Cf. Diocese of Brooklyn*, 141 S. Ct. at 69 (Gorsuch, J., concurring) ("No apparent reason exists why people may not gather [in churches], subject to identical restrictions, . . . when religious institutions have made plain that they stand ready, able, and willing to follow all the safety precautions required of 'essential' businesses and perhaps more besides."). And it is not only the Archdiocese that observes these measures. The District requires all houses of worship to follow these measures, which the Archdiocese does not challenge. *See* Ex. B-6.

*Finally*, any interest the District may have had when it imposed the current restrictions in December has been significantly attenuated due to the rapid increase in vaccinations and the plummeting rate of COVID-19 infections over the past three months. *See supra* at 12. By the start of Holy Week, vaccinations will have been available for over a month to all District residents who face serious risk of hospitalization or death as a result of the disease. Ex. B-19. This means that the risk of serious harm as a result of infections in the District will have dramatically fallen.

**2.    The District's worship limits—more severe than those of any State in the Nation—are not the least restrictive way to protect public health.**

The District's Order also fails strict scrutiny because it is not the "least restrictive means" of combating the spread of COVID. That is proven by the District's regulations of secular entities; and by the regulations of churches themselves in other jurisdictions near and far. These regulatory benchmarks, set by those with "special expertise and responsibility" for public health, *Diocese of Brooklyn*, 141 S. Ct. at 68, prove decisively that the District's regulation of churches is far from the least restrictive means to protect public health.

*First*, the limits on churches are clearly gratuitous in light of the District's own refusal to place *any* occupancy limits on big-box stores, food sellers, and bus, train, or metro stations, where it relies instead on the less-restrictive means of masking and social distancing to prevent transmission. *See* Ex. B-14 at 3; Ex. B-3 at 4-5, 7. As in *Diocese of Brooklyn*, here it is "troubling" that "a large store . . . could literally have hundreds of people shopping there on any given day" while a "church or synagogue would be prohibited from allowing more than [250 persons or 25% of capacity] inside for a worship service." 141 S. Ct. at 66-67. Simply put, if the District can allow large stores to operate without any occupancy limit *at all* consistent with public health—by encouraging or requiring alternative safety measures such as masking and social-distancing—there is no reason it cannot take the same commonsense, science-based approach to churches. *See S. Bay*

28

*United Pentecostal Church*, 141 S. Ct. at 718 (statement of Gorsuch, J.) (requiring "for houses of worship" COVID measures that the State had "found . . . adequate for so many stores and businesses"); *id.* at 718–19 (The District cannot explain why the "options it thinks adequate in many secular settings—such as social distancing requirements, masks, cleaning, plexiglass barriers, and the like—cannot suffice here. Especially when those measures are in routine use in religious services across the country today.").

As to the 250-person cap on the Basilica, "[i]t is hard to believe that admitting more than [250] people to a [3,000]-seat church . . . would create a more serious health risk," 141 S. Ct. at 67, than allowing 250 people to eat and drink in a restaurant without masks. *See supra* at 10-11. The Supreme Court has taught that when it comes to such absolute numerical caps, there are *always* less-restrictive means, because "the maximum attendance at a religious service could be tied to the size of the church" instead of imposing a hard numerical cap. 141 S. Ct. at 67. That sentence was dispositive in *Diocese of Brooklyn*, and it is equally fatal here. Indeed, the Court's holding on this point may explain why *no state in the country* now imposes numerical limits on worship. *Cf. S. Bay United Pentecostal Church*, 141 S. Ct. at 717 (statement of Gorsuch, J.) (rejecting a California restriction on worship where it was "the only State in the country that has gone so far").

*Second*, and relatedly, in looking for less restrictive alternatives, the Supreme Court has used other jurisdictions as benchmarks, teaching that if "many" other states have advanced an interest by less restrictive means, the government "must, at a minimum, offer persuasive reasons why it believes that it must take a different course." *Holt*, 574 U.S. at 369. Yet here, as in *Diocese of Brooklyn*, the challenged restriction on churches is "much tighter than those adopted by many other jurisdictions hard-hit by the pandemic." 141 S. Ct. at 67.

Again, 50 out of 50 States have dispensed with the kind of rigid numerical limit the District still imposes here. Ex. B-16; Ex. B-17. And even the District's 25% capacity limit is more stringent than those of 46 States. Ex. B-17.[3] Indeed, the District's 25% limit is *at least twice* as strict as any percentage limits in 45 States, *id.*, including D.C.'s neighbors: Maryland allows churches to welcome congregants up to 50% of their capacity, *id.* at 2, and Virginia imposes *no capacity limits at all*, but instead requires only the sensible social-distancing and sanitation practices that the District already requires, *id.* at 3; Ex. B-20 at 13—and that the Archdiocese would observe even if *not* required. "That so many other [jurisdictions]" give churches more leeway "while ensuring [health] safety . . . suggests that the [District] could satisfy its [health] concerns through a means less restrictive" than the ones here. *Holt*, 574 U.S. at 368-69. The District has not and cannot bear its burden to prove otherwise.

Any doubt is eliminated by the proven record of less-restrictive means in Maryland and Virginia. In Maryland's Montgomery and Prince George's Counties, services face no rigid numerical cap. *See* Dick Decl. ¶ 22. Nor is there any such cap in three other counties—Calvert, Charles, and St. Mary's—which furthermore allow churches to fill up to 50% capacity. *See id.* ¶¶ 23-26; Carson Decl. ¶ 31. The Archdiocese has churches in all of these five counties. It has held Masses for several months in each, and it is not aware of COVID spreading among members of the public in attendance at church. Carson Decl. ¶¶ 24, 33. Even more strikingly, in the densely populated Diocese of Arlington just across the river, Masses have been safely held for months subject only to social-distancing and sanitation requirements. *Id.* ¶¶ 32-33. Such measures have worked in those adjacent locales. The District cannot claim that the same measures suddenly lose

---

[3] Even the most restrictive states are moving away from capacity restrictions. Maine announced that it will move to 50% of occupancy for houses of worship later this month. Ex. B-15 at 2.

their effectiveness as they cross the Potomac. Indeed, because the District is part of a unified metropolitan area, it is irrational to act as if it is in some sort of bubble that could justify such starkly different rules from Maryland and Virginia.

## II.    ABSENT RELIEF, THE ARCHDIOCESE WILL SUFFER IRREPARABLE HARM.

"There can be no question" that the District's worship restrictions cause "irreparable harm." *Diocese of Brooklyn*, 141 S. Ct. at 67. As the Supreme Court held in November, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* "[B]y extension the same is true of rights afforded under the RFRA, which covers the same types of rights as those protected under the Free Exercise Clause of the First Amendment." *Capitol Hill Baptist*, 2020 WL 5995126, at *10. Thus, "[t]he conclusion that the Church is likely to succeed on the merits of its RFRA claim . . . also suffices to" show "irreparabl[e] harm[]" absent relief. *Id.*

It is easy to see why. "Missing a chance to gather on Sunday is not a '[m]ere injur[y] . . . in terms of money, time and energy,' but instead a harm for which 'there can be no do over and no redress[.]'" *Id.* at *11 (internal citation omitted); *see supra* at 3-4, 14-16. This is even more true for missing Easter. As the Supreme Court observed, remote participation in worship "is not the same as personal attendance," as "Catholics who watch a Mass at home cannot receive communion." *Diocese of Brooklyn*, 141 S. Ct. at 68. And this injury flows inevitably from capacity limits ensuring that many "who wish to attend Mass on Sunday . . . will be barred." *Id*. at 67.

### III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR RELIEF.

The balance of equities and public interest—which "merge" when "the government is the party opposing the injunction"—also support relief. *Capitol Hill Baptist*, 2020 WL 5995126, at *12. In *Diocese of Brooklyn*, these factors favored the houses of worship because "the State has not claimed that attendance at the applicants' services has resulted in the spread of the disease," and "the State has not shown that public health would be imperiled if less restrictive measures were imposed." 141 S.Ct. at 67-68. This was true even under the All Writs Act standard, which is stricter than the standard here. *See Lux*, 561 U.S. at 1307 (Roberts, C.J., in chambers) (holding that emergency applicants to the Supreme Court must show that their "legal rights at issue are *indisputably* clear" (emphasis added)). And here, the Archdiocese is not aware of COVID-19 spreading among members of the public attending Mass. *See* Carson Decl. ¶¶ 23-26, 33. Lifting the District's harsh limits will not imperil public health because the Archdiocese has safely celebrated Mass during the pandemic in Maryland with far less onerous restrictions—and the same is true in Arlington and Alexandria, where there are no capacity restrictions. *Id*. ¶¶ 24-26, 31-33.

On the other side of the ledger, "[i]t is in the public interest for courts to carry out the will of Congress," *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 45 (D.D.C. 2000), and "to prevent the violation of a party's constitutional rights," *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (internal quotation marks omitted). "[B]y effectively barring many from attending religious services," the District's caps "strike at the very heart of the First Amendment's guarantee." *Diocese of Brooklyn*, 141 S. Ct. at 68. Leaving the restrictions in place for Easter will deeply undermine the public's interest in "honoring protections for religious freedom in accordance with the laws passed by Congress[.]" *Capitol Hill Baptist*, 2020 WL 5995126, at *12. In short, "[n]o public interest is served by maintaining an unconstitutional policy when

constitutional alternatives are available to achieve the same goal." *Agudath Israel*, 983 F.3d at 637.

Here, as in *Diocese of Brooklyn*, *Agudath*, and *Capitol Hill Baptist*, the equities favor relief.

## CONCLUSION

For the foregoing reasons, the Archdiocese requests that the Court adjudicate this application on an expedited basis and issue temporary and injunctive relief by March 25. The Archdiocese requests an injunction against the enforcement of the 250-person limit and the 25% capacity limit on attendance at indoor worship services as set forth in Mayor's Order 2020-126 issued on December 16, 2020, any other Mayor's order, as well as any other discriminatory limit on the number of worshippers at its services.

Respectfully submitted, this the 5th day of March, 2021.

*/s/ Anthony J. Dick*
Anthony J. Dick (D.C. Bar No. 1015585)
Donald F. McGahn (D.C. Bar No. 449987)
John M. Gore (D.C. Bar No. 502057)
Sherif Girgis (D.C. Bar No. 1048921)
Caroline C. Lindsay
Joseph P. Falvey (D.C. Bar No. 241247)
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
Telephone: (202) 879-7679
Facsimile: (202) 626-1700

John D. Goetz
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone: (412) 391-3939
Facsimile: (412) 394-7959

Mark L. Rienzi (D.C. Bar No. 494336)
Eric C. Rassbach (D.C. Bar No. 493739)
Adèle A. Keim (D.C. Bar No. 989528)
William J. Haun (D.C. Bar No. 1024405)
THE BECKET FUND FOR RELIGIOUS LIBERTY

1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that March 5, 2021, a true and correct copy of the foregoing was electronically filed using the CM/ECF system, which will send notification of such filing to all counsel of record. A copy of the foregoing was also served on counsel for Defendants by e-mail.

/s/ *Anthony J. Dick*
Anthony J. Dick

*Counsel for Plaintiff*