## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ROMAN CATHOLIC ARCHBISHOP OF WASHINGTON,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MURIEL E. BOWSER,** *et al.***,**<br><br>**Defendants.** | **Civil Action No. 20-3625 (TNM)** |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S SECOND APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**Table of Contents**

Introduction ..................................................................................................................... 1

Legal Standard ................................................................................................................. 3

Argument .......................................................................................................................... 4

    I.   The Archdiocese Has Not Demonstrated a Likelihood of Success on the Merits. ............. 4

        A.  The Archdiocese Has Failed To Justify the Application of Strict Scrutiny. ................ 5

            1.   Strict Scrutiny Is Not Warranted Under RFRA Because the Archdiocese Has Not Demonstrated That the Capacity Limitations "Substantially Burden" Its Ability To Provide In-Person Mass to Its Congregation. ...................................................... 5

            2.   Plaintiff Has Not Shown That Strict Scrutiny Is Warranted Under the First or Fifth Amendments Because It Has Not Shown that the District's Restrictions on Worship Services Are Stricter Than Those Imposed on Secular Institutions. ...... 11

        B.  Alternatively, the Archdiocese Is Not Likely to Succeed on the Merits Because the District's Science-Based Restrictions Satisfy Strict Scrutiny. .................................... 15

            1.   Plaintiff Relies on Incorrect Representations of the Current Status of COVID-19 in the District of Columbia To Argue the Current Restrictions Are Not Needed. 18

            2.   This Action Differs Too Much from Other Cases To Establish an Adequate Likelihood of Success. ........................................................................................... 23

            3.   Plaintiff Misapplies Orders and Related Opinions from the Supreme Court's "Shadow Docket." ............................................................................................... 30

    II.  Plaintiff Does Not Adequately Allege It Will Suffer Irreparable Harm if a Temporary Restraining Order and Preliminary Injunction Is Denied. ................................................ 33

    III. The Balance of Equities and Public Interest Weigh Against Granting Plaintiff's Motion for Injunctive Relief. ...................................................................................................... 34

    IV. If the Court Is Inclined To Provide Plaintiff Any Relief, It Should Be More Limited Than Plaintiff Seeks. ................................................................................................................ 36

Conclusion ...................................................................................................................... 38

**Table of Authorities**

**Cases**

*Agudath Isr. v. Cuomo*, 983 F.3d 620 (2d Cir. Dec. 28, 2020)................................................. 4, 24

*Agudath Isr. v. Cuomo*, Civil Action No. 20-4834, 2021 U.S. Dist. LEXIS 41176
　(E.D.N.Y. Feb. 9, 2021)................................................................................................. 4

*All. for Cannabis Therapeutics v. Drug Enf't Admin.*, 930 F.2d 936 (D.C. Cir. 1991)............... 32

*Am. Jewish Cong. v. Chicago*, 827 F.2d 120 (7th Cir. 1987) ........................................................ 6

*Amoco Prod. Co. v. Gambell*, 480 U.S. 531 (1987) .................................................................... 34

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314 (D.C. Cir. 2018)
　(*Archdiocese II*) .......................................................................................................... 3, 33

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 910 F.3d 1248 (D.C. Cir. 2018)
　(*Archdiocese III*) .............................................................................................................. 3

*Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656 (2004) ....................................................... 25

*Bill Barrett Corp. v. U.S. Dep't of Interior*, 601 F. Supp. 2d 331 (D.D.C. 2009) ....................... 33

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ............................................................................... 37

* *Calvary Chapel Dayton Valley* v. *Sisolak*, 140 S. Ct. 2603 (2020).................................... 28, 36

*Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228 (9th Cir. Dec. 15, 2020) ........ 25, 28, 32

* *Capitol Hill Baptist Church v. Bowser*, No. 20-cv-02710 (TNM),
　2020 U.S. Dist. LEXIS 188324 (D.D.C. Oct. 9, 2020)................................................. 15, 26, 27

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)...................... 33

*Chapman v. Heath*, 288 F. Supp. 3d 215 (D.D.C. 2018) ............................................................... 3

*Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993)..................................... 15

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ............................................................................. 5

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995)...................... 33

*Ctr. for Democracy & Tech. v. Trump*, Civil Act. No. 20-01456 (TNM),
　2020 U.S. Dist. LEXIS 232972 (D.D.C. Dec. 11, 2020)..................................................... 37

*D.C. Transit Sys., Inc. v. Wash. Metro. Area Transit Com.*, 466 F.2d 394 (D.C. Cir. 1972) ....... 32

*Elim Romanian Pentecostal Church v. Pritzker*, 140 S. Ct. 2823 (May 29, 2020) ...................... 4

*Emp. Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990) ........................................ 26

*Figueroa v. Pompeo*, 923 F.3d 1078 (D.C. Cir. 2019) ................................................... 17

*Fowler v. Rhode Island*, 345 U.S. 67 (1953) ................................................................ 9

*Gateway City Church v. Newsom*, Civil Action No. 20A138, 2021 U.S. LEXIS 1200,
    2021 WL 753575 (Feb. 26, 2021) .................................................................... 31

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ................. 15

*High Plains Harvest Church v. Polis*, 141 S. Ct. 527 (Dec. 15, 2020) ........................................ 4

*In re Navy Chaplaincy*, 738 F.3d 425 (D.C. Cir. 2013) ................................................ 3

*Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008) .......................................... 5

*Lux v. Rodrigues*, 561 U.S. 1306 (2010) ................................................................ 30

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994) .................................... 37

*Maryland v. King*, 567 U.S. 1301 (2012) .................................................... 35

*McCullen v. Coakley*, 573 U.S. 464 (2014) ........................................ 9

*Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34 (D.D.C. 2011) ................................. 33

*New Motor Vehicle Bd. of Cal.* v. *Orrin W. Fox Co.*, 434 U. S. 1345 (1977) ............................ 35

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................ 34

*Open Tech. Fund v. Pack*, 2020 U.S. Dist. LEXIS 116376 (D.D.C. July 2, 2020) ..................... 34

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 571 U.S. 1061 (2013) .. 35

*Potter v. Dist. of Columbia*, 558 F.3d 542 (D.C. Cir. 2009) ........................................ 5

*Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190 (D.D.C. 2005) ........................................ 33

*Roman Catholic Diocese of Brooklyn v. Cuomo* (*Diocese of Brooklyn*), 141 S. Ct. 63
    (Nov. 25, 2020) ............................................................................ passim

*S. Bay United Pentecostal Church v. Newsom* (*South Bay I*), 140 S. Ct. 1613 (May 29, 2020) .. 18

*S. Bay United Pentecostal Church v. Newsom* (*South Bay I.B*), 985 F.3d 1128
    (9th Cir. Jan. 22, 2021) ............................................................ 24, 25, 32

*S. Bay United Pentecostal Church v. Newsom* (*South Bay II*), 209 L.Ed.2d 22, 22
    (Feb. 5, 2021) ................................................................... 25, 30, 31, 38

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ...................................... 3, 4

*Smith v. Henderson*, 944 F. Supp. 2d 89 (D.D.C. 2013) ................................ 4

*Stein v. Ala. Sec'y of State*, 774 F.3d 689 (11th Cir. 2014) ........................ 32

*Sweis v. United States Foreign Claims Settlement Comm'n*, 950 F. Supp. 2d 44 (D.D.C. 2013).. 4

*Thomas v. Review Bd.*, 450 U.S. 707 (1981) ................................................ 5

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) .......................... 6

*Whitman-Walker Clinic, Inc. v. United States HHS*, Civil Action No. 20-1630,
    2020 U.S. Dist. LEXIS 159951 (D.D.C. Sep. 2, 2020) ......................... 37

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ..................... 3, 4, 33

### Statutes

A23-524, *Coronavirus Public Health Extension Emergency Amendment Act of 2020*,
    67 D.C.R. 14747 (Dec. 18, 2020) ...................................................... 35

A24-7, *Protecting Businesses and Workers from COVID-19 Congressional Review
    Emergency Amendment Act of 2021*, 68 D.C.R. 1822 (Feb. 1, 2021) .................... 35

Religious Freedom Restoration Act (RFRA), Pub. L. 103-141,107 Stat. 1488
    (42 U.S.C. 2000bb *et seq.*) ............................................................ 5

### Other Authorities

*Blueprint for a Safer Economy* (Mar. 10, 2021) .................................... 24, 29

Dr. Eric Feigl-Ding, Federation of American Scientists Epidemiologist & Health Economist,
    TWITTER POST (Mar. 14, 2021, 5:19 p.m.) ............................................ 19

*Food Services Business, Requirements*, DCRA ...................................... 15

Garcia-Beltran *et al.*, *Multiple SARS-CoV-2 variants escape neutralization by vaccine-induced
    humoral immunity*, CELL (Mar. 8, 2021) ............................................. 19

*Government of Puerto Rico*, Administrative Bulletin Number: OE-2020-080 (Nov. 13, 2020). 29

*Guidelines for Religious and Funeral Services*, NEW YORK (Feb. 2, 2021)................ 29

Jennifer Dan, *et al.*, *Immunological memory to SARS-CoV-2 assessed for up to 8 months
    after infection*, SCIENCE (Feb. 5, 2021),............................................. 23

*Observed and forecasted weekly COVID-19 cases in District of Columbia*, CDC ..................... 22

*Parish & Mass Finder*, ARCHDIOCESE OF WASHINGTON ............................................... 27

Philip B. Kurland, *The Origins of the Religion Clauses of the Constitution*, 27 Wm. & Mary L. Rev. 839 (1986) ............................................. 6

*Places of worship and cultural ceremonies – updated February 22, 2021*, CALIF. .................... 29

*Rate of coronavirus (COVID-19) cases in the United States as of March 11, 2021, by state*, STATISTA.................................................................................. 20

*Red to Green Framework*, NEW MEXICO ....................................................... 29

*Religious and Faith-based Organizations COVID-19 Requirements*, WASHINGTON (Dec. 21, 2020) ...................................................................................... 28

Stephen I. Vladeck, Univ. of Tex. Charles Alan Wright Chair In Federal Courts, TWITTER POST (Feb. 26, 2021, 8:24 p.m.) ....................................... 19, 31

Thi Loi Dao *et al.*, *Recurrence of SARS-CoV-2 viral RNA in recovered COVID-19 patients: a narrative review*, EUR J CLIN MICROBIOL INFECT DIS. (Jan. 2021) .................................... 22

Vetan Kapoor and Judge Trevor McFadden, *Symposium: The precedential effects of shadow docket stays*, SCOTUSblog (Oct. 28, 2020, 9:18 a.m.) ....................................... 30, 31

**Treatises**

11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure (3d ed. 2013) ............... 37

**Regulations**

12-A DCMR § 1004............................................................................... 13

25-A DCMR A-44 ................................................................................ 15

**Constitutional Provisions**

Fifth Amendment to the Constitution of the United States.......................................... 11

First Amendment to the Constitution of the United States ............................... 11, 25, 33

**News Reports**

Amir Vera and Christina Maxouris, *March and April are critical months in stopping another COVID-19 surge, CDC director says*, CNN (Mar. 9, 2021) ................................. 22

Caroline Chen, *Fauci: Vaccines for Kids as Young as First Graders Could Be Authorized by September*, PROPUBLICA (Feb. 11, 2021) .............................................. 23

Jenna Portnoy, Fenit Nirappil and Antonio Olivo, *Three coronavirus cases linked to D.C. church; Colleges cancel in-person classes*, WASH. POST (Mar. 10, 2020)............................ 34

Megan Cloherty, *After closing crowded Wharf seafood market, DC reviewing open-air markets*, WTOP (Apr. 6, 2020)....................................................................................... 14

Michael Brice-Saddler and Dana Hedgpeth, *Washington region braces for increase in virus cases after Thanksgiving travel*, WASH. POST (Nov. 30, 2020)............................................. 14

Nicole Winfield, *Pope book backs George Floyd protests, blasts virus skeptic*, ASSOC. Press (Dec. 1, 2020) ...................................................................................................................... 7

*Pope cancels traditional pre-Christmas ceremony due to COVID-19*, REUTERS.COM (Nov. 30, 2020) ........................................................................................................................................ 6

Pope Francis, *A Crisis Reveals What Is in Our Hearts*, NEW YORK TIMES (Nov. 26, 2020)......... 7

*Press Briefing by White House COVID-19 Response Team and Public Health Officials*, WHITEHOUSE.GOV (Mar. 1, 2021) ........................................................................................ 19

*Press Briefing by White House COVID-19 Response Team and Public Health Officials*, WHITEHOUSE.GOV (Mar. 10, 2021) ...................................................................................... 23

*Remarks by President Biden on the Anniversary of the COVID-19 Shutdown*, WHITEHOUSE.GOV (Mar. 11, 2021) ...................................................................................... 36

*Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017)............................................ 37

**Mayor's Orders**

Mayor's Order 2020-126 (Dec. 16, 2020) ......................................................... 11, 12, 17

Mayor's Order 2020-127 (Dec. 18, 2020) ....................................................................... 13

Mayor's Order 2020-48 (Mar. 16, 2020) ......................................................................... 13

Mayor's Order 2020-53 (Mar. 24, 2020)......................................................................... 13

**Religious Authorities**

*Archdiocese of Washington Announcement Regarding Coronavirus*, (Mar. 12, 2020) ................ 8

Canon Law ...................................................................................................................... 27

Catechism of the Catholic Church ............................................................................. 9, 27

Matthew 18:20 .................................................................................................................. 9

*Public Celebration of Mass and Holy Communion Outside of Mass*, ARCHDIOCESE OF
WASHINGTON (May 14, 2020, rev. Oct. 15, 2020) (Mass Guidance) ............................... 6, 8, 9

Robert Card. Sarah, *Celebration of Holy Week 2021*, L'OSSERVATORE ROMANO
(Feb. 19, 2021) ........................................................................................................................ 7

Robert Card. Sarah, *Decree In time of Covid-19 (II)*, CONGREGATION FOR DIVINE WORSHIP
AND THE DISCIPLINE OF THE SACRAMENTS (Mar. 25, 2020) ....................................................... 7

*Welcome Back to Mass*, HOLY COMFORTER-SAINT CYPRIAN ROMAN CATHOLIC CHURCH
(Nov. 13, 2020) ....................................................................................................................... 9

**INTRODUCTION**

Two months after the District of Columbia (the District) relaxed its restrictions on the number of people who could worship together indoors, the Roman Catholic Archbishop of Washington (the Archdiocese) demands that the Court prohibit any such restriction, and to do so universally and without developing a full record. The import of the Archdiocese's position is that no restriction on the size of a religious gathering can withstand strict scrutiny. But this is not the law. There is no more compelling interest for a government than protecting the lives of its citizens. The Supreme Court has repeatedly confirmed that, although the threat of COVID-19 may not justify prohibiting worship, both the Constitution and federal law authorize appropriate restrictions on how many people may worship together at one time. In light of these recent opinions, the District continues to examine the ever-developing science and data of COVID-19 and adopt necessary restrictions that provide every worshipper with certainty and the flexibility to protect their physical as well as their spiritual well-being.

Thus, even if the Archdiocese can ultimately prevail on its claims, it has not met the high burden for the preliminary relief it demands. The Archdiocese has not alleged facts, much less offered evidence, showing that it is likely to prevail on the merits of its claim that the restrictions—the lesser of 25% of capacity or 250-persons—are unconstitutional or violate Federal law.[1] The Archdiocese has conducted thousands of Masses under the current and similar restrictions, so it cannot demonstrate that the restrictions pose a substantial burden on the exercise of religion. And the District imposes comparable restrictions on secular institutions, making it impossible for the Archdiocese to establish that the District's restrictions discriminate against religious institutions.

---

[1]      On March 11, 2021, the District granted the Archdiocese a waiver allowing it to operate its largest church at 25% capacity during Holy Week. Ex. G.

Indeed, the current restrictions are only slightly more restrictive than what the Archdiocese concedes it would self-impose, so plaintiff cannot show that they substantially burden its worship.

Moreover, even if the Archdiocese could establish a substantial burden on its religious practices, it is not likely to prevail on its argument that the District's restrictions fail under strict scrutiny. The District plainly has a compelling government interest in preventing the spread of COVID-19, which has taken the lives of more than 1,000 District residents, compromised the health of thousands more, and brought many sectors of its economy to a standstill. And the District offers considerable evidence, even at this early stage of litigation, that its restrictions are narrowly tailored to meet that interest. Even when every reasonable precautions are taken—something the Archdiocese cannot guarantee—large, indoor gatherings, particularly those featuring traditional worship activities like communal speaking and singing, pose a greater risk that someone will contract or spread COVID-19. By raising the total cap on attendance to 250 people, the District has pushed the boundaries of what current scientific data condones to accommodate the needs of its religious institutions.

This same evidence demonstrates the irreparable harm the District—and the public interest it represents—will suffer if this Court issues an injunction precluding it from enforcing its restrictions. The congregation size permitted under the current regulations is already dangerously large. Allowing more people to gather would pose an unacceptable risk to the lives and livelihoods of worshippers and residents in the District, especially at this critical time when the District is racing to vaccinate the population before a potential fourth waive of infections, fueled by new COVID variants, occurs. The District's residents are entitled to the protection provided by the enforcement of its legal, duly enacted laws as effected under the Mayor's Orders.

In contrast, the Archdiocese has not provided the Court with evidence that either restriction has, or likely would, prevent *anyone* from attending in-person Mass, so long as the Church is willing to make reasonable accommodations to ensure as much. Because the Archdiocese has been and can continue conducting its services, and doing so at the times and in the places and—with this one, non-fundamental exception—in the manner in which it chooses, it has not adequately alleged that it has or will suffer an irreparable injury to merit preliminary, injunctive relief. Therefore, the Archdiocese has not adequately established a likelihood of success on the merits to warrant preliminary injunctive relief, nor has it demonstrated that the balance of equities favors such extraordinary relief.

## LEGAL STANDARD

"The same standard applies to both temporary restraining orders and to preliminary injunctions." *Chapman v. Heath*, 288 F. Supp. 3d 215, 217 (D.D.C. 2018) (citation omitted). Each is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "The moving party must make a clear showing that four factors, taken together, warrant relief:  likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.* (*Archdiocese II*), 897 F.3d 314, 321 (D.C. Cir. 2018) (quotation omitted), *reh'g denied* 910 F.3d 1248 (D.C. Cir. 2018). Because injunctive relief is such an extraordinary remedy, a plaintiff seeking such relief must prove all four prongs of the standard before relief can be granted. *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013); *Winter*, 555 U.S. at 22.

**ARGUMENT**

**I.      The Archdiocese Has Not Demonstrated a Likelihood of Success on the Merits.**

Demonstrating a likelihood of success on the merits is a free-standing requirement for a preliminary injunction, *Sherley*, 644 F.3d at 393 (quotation omitted), and "a failure to show a likelihood of success on the merits is alone sufficient to defeat a preliminary-injunction motion." *Smith v. Henderson*, 944 F. Supp. 2d 89, 96 (D.D.C. 2013). Importantly, the Court need not conclude that the Archdiocese will lose on the merits; only that it has not met the extraordinary burden of showing that success is not just a "possibility" but that it is "*likely*." *Winter*, 555 U.S. at 20-22 (emphasis original); *accord Sweis v. United States Foreign Claims Settlement Comm'n*, 950 F. Supp. 2d 44, 48 (D.D.C. 2013). The Supreme Court has emphasized this position in cases similar to this one by remanding them to allow the district courts to engage in more fulsome fact-finding rather than simply granting the requested injunctions. *See*, *e.g.*, *High Plains Harvest Church v. Polis*, 141 S. Ct. 527 (Dec. 15, 2020); *Elim Romanian Pentecostal Church v. Pritzker*, 140 S. Ct. 2823 (May 29, 2020); *see also Agudath Isr. v. Cuomo*, 983 F.3d 620, 625 (2d Cir. Dec. 28, 2020) (vacating and remanding "for the district court to determine in the first instance whether the 25% and 33% capacity limits can satisfy strict scrutiny").[2]

Here, the Archdiocese has not demonstrated that the District's restrictions "substantially burden" religious exercise and therefore it has not shown it is likely to succeed on its claim under the Religious Freedom Restoration Act (RFRA), Pub. L. 103-141,107 Stat. 1488 (42 U.S.C. 2000bb *et*

---

[2]      The Archdiocese's description of *Agudath Isr. v. Cuomo*, Civil Action No. 20-4834, 2021 U.S. Dist. LEXIS 41176, at *4 (E.D.N.Y. Feb. 9, 2021), as "enjoining 25% and 33% capacity limits," Pl.'s Mem. [33-2] at 6, is misleading. The parties in that case agreed to the order, so the court did not rule on the merits. Permanent Inj. Order at 4 ("Defendant has agreed to an injunction against enforcement of the 25% and 33% capacity limits in red and orange zones, respectively, and has not presented additional evidence … ."). And New York's current restrictions are similar to the District's. *See* below at 29.

*seq.*). Even if the Archdiocese could make such a showing it would not have shown its RFRA and Free Exercise claims are likely to succeed because the Mayor's Orders further a compelling government interest while using the least restrictive means to do so in the context of the ongoing public health emergency.

**A.**      **The Archdiocese Has Failed To Justify the Application of Strict Scrutiny.**

      **1.**      **Strict Scrutiny Is Not Warranted Under RFRA Because the Archdiocese Has Not Demonstrated That the Capacity Limitations "Substantially Burden" Its Ability To Provide In-Person Mass to Its Congregation.**

RFRA provides that government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless it can demonstrate the application of the burden:  "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *See* 42 U.S.C. § 2000bb-1(a), (b).[3] This two-prong test—identical to the "strict scrutiny" test applied to laws that interfere with the exercise of fundamental constitutional rights—is not warranted here because the Archdiocese has not met its burden of showing that the Mayor's Orders substantially burden its exercise of religion.

"A substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981)). "Thus, RFRA decisions turn on an element of compulsion." *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 281 F. Supp. 3d 88, 114 (D.D.C. 2017). There is no allegation of this kind of compulsion

---

[3]      Although the Supreme Court struck down the portion of RFRA regulating state and local governments, *City of Boerne v. Flores*, 521 U.S. 507 (1997), RFRA remains applicable to the District as a "covered" federal entity. *See* 42 U.S.C. § 2000bb-2(1)-(2); *Potter v. Dist. of Columbia*, 558 F.3d 542, 546 (D.C. Cir. 2009).

here. The Archdiocese does not allege that the District has ever attempted to "ban particular activities undertaken for worship purposes" or "dictate matters of worship to the church." Pl.'s Mem. [33-2] at 23, 27[4] (quotations omitted). Instead, to the extent that the pandemic has affected the *content* or *substance* of a Mass, these changes have been made voluntarily by the Archdiocese. *See*, *e.g.*, *Public Celebration of Mass and Holy Communion Outside of Mass*, ARCHDIOCESE OF WASHINGTON (May 14, 2020, rev. Oct. 15, 2020) (Mass Guidance) *generally*, https://adw.org/wp-content/uploads/sites/2/2020/10/ADW-Worship-Reopening-Plan-Master-WITH-REVISIONS-2020-OCTOBER.pdf. There is in the Mayor's Orders nothing that touches the content of speech and no "interference [in] how to commune with [plaintiff's] god." *Am. Jewish Cong. v. Chicago*, 827 F.2d 120, 138, 128 (7th Cir. 1987) (Easterbrook, J., dissenting against holding that "displaying a creche in City Hall during the Christmas season" violated the Establishment Clause) (quoting Philip B. Kurland, *The Origins of the Religion Clauses of the Constitution*, 27 Wm. & Mary L. Rev. 839, 860 (1986), quoting from *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). The Archdiocese makes no allegation of such interference, nor can it.

The Mayor's Orders do restrict the number of people who can attend a single Mass, and "Mass is among the most important aspects" of religious practice for Catholics. Pl.'s Mem. at 19. But COVID-19 has required everyone, including the Archdiocese, to be flexible. Last year, for example, "Pope Francis … cancelled a ceremony that traditionally begins Rome's Christmas season … which popes have been carrying out on the feast of the Immaculate Conception since 1953, 'in order to avoid any risk of contagion caused by gatherings of people.'" Philip Pullella, *Pope cancels traditional pre-Christmas ceremony due to COVID-19*, REUTERS.COM (Nov. 30, 2020), https://www.reuters.com/article/us-health-coronavirus-pope-idUSKBN28A1X6. And in

---

[4]   All citations to previous filings are to ECF pagination irrespective of internal numbering.

December 2020, the Pope "blasted people who protested anti-virus restrictions 'as if measures that governments must impose for the good of their people constitute some kind of political assault on autonomy or personal freedom!'" Nicole Winfield, *Pope book backs George Floyd protests, blasts virus skeptic*, Assoc. Press (Dec. 1, 2020), https://apnews.com/article/race-and-ethnicity-pope-francis-coronavirus-pandemic-racial-injustice-8e6f5fb54479069f2604426b8a37a194; *see also* Pope Francis, *A Crisis Reveals What Is in Our Hearts*, New York Times (Nov. 26, 2020), https://www.nytimes.com/2020/11/26/opinion/pope-francis-covid.html.

In February 2021, the Vatican told its bishops and episcopal conferences that "the drama of the COVID-19 pandemic … has brought many changes, even to our normal way of celebrating the liturgy. The norms and directives contained in the liturgical books, drawn up with normal times in view, are not entirely applicable in exceptional moments of crisis such as these." Robert Card. Sarah, *Celebration of Holy Week 2021*, L'Osservatore Romano (Feb. 19, 2021), https://www.vatican.va/roman_curia/congregations/ccdds/documents/rc_con_ccdds_doc_20210217_settimanasanta-2021_en.html. For this reason, it noted that it still authorized COVID-19-inspired changes to religious practice including authorizing "a possible transfer to another date" of the Chrism Mass and a prohibition on certain rituals. *Id.*; Robert Card. Sarah, *Decree In time of Covid-19 (II)*, Congregation for Divine Worship and the Discipline of the Sacraments (Mar. 25, 2020), http://www.vatican.va/roman_curia/congregations/ccdds/documents/rc_con_ccdds_doc_20200325_decreto-intempodicovid_en.html.

The Archdiocese has also recognized and supported this need for flexibility in the past. In March 2020, Archbishop Wilton Cardinal Gregory explained that his "number one priority" was "to ensure the safety and health of all who attend our Masses." *Archdiocese of Washington Announcement Regarding Coronavirus*, (Mar. 12, 2020), https://adw.org/news/archdiocese-of-

washington-announcement-regarding-coronavirus/. The Archdiocese has expressed that priority in different ways, including granting a dispensation from the obligation to attend Mass that remains in effect. Mass Guidance at 3. The Archdiocese also has cautioned its parishioners from returning to services if they risk spreading, or are more vulnerable to, COVID-19. *Id. See also* below at 26.

Moreover, the Archdiocese acknowledges that "thousands of public Masses have been celebrated" in the District "[o]ver the past nine months." Pl.'s Mem. at 10.[5] It does not allege that these restricted-capacity, in-person services have failed to satisfy attendants' right to exercise their religious beliefs. It has thus given this Court no reason to conclude that the District's restrictions "flatly prohibit[ ] the Archdiocese from holding its ordinary religious services." Pl.'s Mem. at 21; *see also id.* at 7 (claiming "the deprivation of worship itself"). It cites no rite the District's restrictions have prevented. *But see* Pl.'s Mem. at 7 (discussing "the deprivation of worship itself"). And the Mayor's Orders do not prohibit the Archdiocese from holding as many Masses as it wants, in order to provide each worshiper the in-person service he or she seeks.

The only aspect of worship the Archdiocese claims is restricted is the number of congregants who may assemble in one place. But the Archdiocese does not allege there is a minimum number of people required for a Mass. *Cf. Roman Catholic Diocese of Brooklyn v. Cuomo* (*Diocese of Brooklyn*), 141 S. Ct. 63, 69 (Nov. 25, 2020) (Gorsuch, J., concurring) ("10

---

[5]     The Archdiocese bases some part of its claim of urgency on the nearness of the arrival of Easter. *See*, *e.g.*, Pl.'s Mem. at 17. However, though "Easter Sunday Mass celebrates *an event* central to the faith," *id.* at 19 (emphasis added) and Easter is "the 'Feast of feasts,' the 'Solemnity of solemnities,'" *id.* at 20, plaintiff makes no allegation that Easter *Mass* is more important than any other Sunday Mass. *Id.* at 8 ("[t]he Sunday celebration of the Lord's Day and his Eucharist"— rather than that of Easter Sunday—"is at the heart of the Church's life"); *id.* at 9 ("the celebration of Sunday Mass in person is 'the foremost holy day of obligation in the universal Church.'") (quoting Third Carson Decl. [33-3] ¶ 12 (quoting Catechism of the Catholic Church (Catechism) § 2177)).

men are necessary to establish a *minyan*, or a quorum" for plaintiff). Plaintiff concedes that its churches vary greatly in size. See Pl.'s Ex. A-1 [33-4]. Eighty-five people can be adequate at St. Louis de France at St. Louis Chapel and, according to the Archdiocese, among its churches only the Basilica of the National Shrine of the Immaculate Conception (Basilica) has been affected by the 250-person cap since December 16, 2020. *Id. Compare also*, *e.g.*, *Welcome Back to Mass*, HOLY COMFORTER-SAINT CYPRIAN ROMAN CATHOLIC CHURCH (Nov. 13, 2020) ("For where two or three gather in my name, there am I with them.") (quoting Matthew 18:20), https://hcscchurch.org/parish-communications/ *and* Pl.'s Mem. at 9 (quoting Catechism § 2179 authorizing prayer at home) *and* Mass Guidance at 3, 7 *with Diocese of Brooklyn*, 141 S. Ct. at 67 (discussing "important religious traditions in the Orthodox Jewish faith that require personal attendance"). Two months ago, the Archdiocese considered 250 people an adequate number for any Mass. ECF Nos. 25 and 27. It does not allege any change in the requirements of its faith. The number of persons who can attend any given Mass is not material to the Archdiocese's arguments.

Plaintiff alleges only that it is unable to conduct Mass at the specific times, in the specific places, and in one of the specific but non-foundational manners it would like, namely with greater than 250 people in the Basilica and at more than 25% of capacity there and elsewhere. But the Supreme Court has long upheld "reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech" and are narrowly tailored. *McCullen v. Coakley*, 573 U.S. 464, 477 (2014). Plaintiff makes no allegation that the District has attempted to "regulate, or in any manner control sermons delivered at religious meetings," Pl.'s Mem. at 27 (quoting *Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953)), or discriminated against any speech based on its content.

The Archdiocese does claim to have "turn[ed] away worshippers it would otherwise admit to Mass." *Id.* at 21. But this allegation—the only claim of actual interference with religious practice—is so broadly set forth that it is impossible to determine whether it represents a substantial burden. The Archdiocese concedes that attendance at all of its churches was limited even before the pandemic. *See* Pl.'s Ex. A-1. The Archdiocese does not say how many worshipers were affected by these restrictions or whether it could have accommodated those worshipers without appreciable burden at another of its churches or by holding additional services at the same church. *See* below at 27. Plaintiff also does not address how the pandemic—or the cautions the Archdiocese has urged, *see* above at 6—has affected the thinking, desires, intentions, or actions of its parishioners. The Court has no information about how many parishioners prefer to participate in services with fewer people in attendance, or even to attend service remotely—even if that is less than ideal—because of the pandemic or otherwise. *See* below at 26.

Moreover, the Archdiocese concedes that, under its voluntary social distancing protocols, its churches can only "be filled at roughly 30-40% capacity." Third Carson Decl. [33-3] ¶ 30; *see id.* at 10, 27 ("Among other protocols, the Archdiocese [has] reconfigured worship spaces to use every other pew and required 6 feet of space between individuals or groups who did not arrive together … ."). This means that the capacity difference being challenged is only 5-15 percentage points, an average of just 50 people per church; fewer excluding the outlier Basilica. Pl.'s Ex. A-1. Even by the Archdiocese's own standards, therefore, a cap of approximately 25% of normal capacity is appropriate and necessary to keep worshipers safe. The District's restrictions are not "draconian," Pl.'s Mem. at 6, 29, and the burden on plaintiff is not "substantial." The District, guided by the expertise of Dr. LaQuandra S. Nesbitt and her staff at D.C. Health, may be slightly more cautious and more protective of the physical health of its citizens than the Archdiocese, which

is focused on the spiritual well-being of its parishioners. But the Archdiocese points to no case holding a restriction of 5 to 15 percent of capacity is evidence of a "substantial burden" on worship; rather, it is evidence of how narrowly tailored the District's restrictions are.

> **2.      Plaintiff Has Not Shown That Strict Scrutiny Is Warranted Under the First or Fifth Amendments Because It Has Not Shown that the District's Restrictions on Worship Services Are Stricter Than Those Imposed on Secular Institutions.**

The Archdiocese also fails to satisfy its burden of showing that it faces stricter restrictions than any other institution, *e.g.*, that the Mayor's Orders are non-neutral, content-based restrictions that would warrant strict scrutiny under the First Amendment's Free Exercise Clause, Freedom of Assembly Clause, Freedom of Association Clause, Freedom of Speech Clause, or the Fifth Amendment's guarantee of equal protection under the law. The restrictions are content-neutral, affecting only the time and place of worship and the manner, if at all, only slightly. The Archdiocese has not shown that either restriction has, or imminently will, affect even the time, place, or manner of *its* worship. The restrictions do not discriminate against religious institutions, because secular facilities are subject to greater additional, operational restrictions that further limit their capacity and provide different protections against the spread of COVID-19.

Plaintiff makes no allegation that the District has discriminated against the Roman Catholic faith in favor of other faiths, and its comparisons to secular institutions are deficient. Virtually every indoor facility that can accommodate large numbers of people—even those that cannot reasonably be described as a "gathering"—is subjected to the same, if not stricter, capacity restrictions as the Archdiocese, and generally in addition to restrictions that do not apply to the Archdiocese. *See* Mayor's Order 2020-126 (Dec. 16, 2020) (modifying the District's "Phase II"

limits on large gatherings to the lesser of 25% of occupational capacity or 250 people).[6] This restriction applied not only to houses of worship, but to any secular facility that could draw large numbers of people, including restaurants, recreational and fitness facilities, museums, auditoriums, libraries, grocery stores and any other essential or nonessential retail businesses. *Id.*, Sec. III.

Plaintiff proffers a host of secular establishments for comparison, including "public libraries, big-box retail stores, train and metro stations, … offices, tattoo parlors, nail salons, laundromats, liquor stores, and marijuana dispensaries," Pl.'s Mem. at, *e.g.*, 11, 30, but does not name one that can even allegedly hold 250 or more people, at 25% of its capacity or otherwise. Indeed, the Archdiocese does not even attempt to provide the Court with numbers on the capacity of one of these establishments. *Compare with* District's Opp'n [17] at 18-19 (the Archdiocese's first motion at least alleged, albeit inaccurately, that one District restaurant's capacity exceeded the limits for places of worship then in effect). The Complaint includes no allegations about the actual capacity of any store, only conclusory allegations that they exceed 50 people at a time. *See*, *e.g.*, Compl. ¶ 73. Plaintiff's brief merely states, without evidentiary support, that "employees and patrons spend hours" in these places, Pl.'s Mem. at 30, but does not indicate how many employees and patrons have been inside any particular store at one time.[7]

---

[6]     The Archdiocese misrepresents this order's commentary on how it responded to plaintiff's prior application for preliminary injunctive relief. *Compare* Pl.'s Mem. at 15 ("The order thus emphasized that it was making changes only '[i]n order to resolve litigation' in which the Archdiocese had 'insist[ed] on a constitutional right to hold indoor worship services' without a 50-person cap—an insistence that the District warned would 'doubtlessly put parishioners in harm's way.'") *with* Mayor's Order 2020-126 ("A recent lawsuit appears to insist on a constitutional right to hold indoor worship services *of even a thousand persons or more* at the largest facilities, which flies in the face of all scientific and medical advice and will doubtlessly put parishioners in harm's way.") (emphasis added). Mayor's Order 2020-126 made a narrowly tailored change while warning of the dangers of the proposed order plaintiff now seeks.

[7]     Similarly, plaintiff repeatedly contends without support that patrons currently spend "hours" in restaurants, Pl.'s Mem. at 14-16, 31. In its prior opposition, the District discussed

Plaintiff, moreover, asserts repeatedly but incorrectly that "the District imposes *no occupancy limits whatsoever* on other venues where people often congregate, including 'big box' retail stores and transportation stations." Pl.'s Mem. at 6, 12, 14-16, 24 ("the District went out of its way to 'repeal' *all* capacity limits on "[f]ood sellers and big box stores."), 30 (all emphasis plaintiff's). This is presumably a reference to Mayor's Order 2020-127 (Dec. 18, 2020), which did repeal the 25%/250-person occupancy limit "for retail food sellers." *Id.*, Sec. IV. That order continued, however, that those food sellers "must make plans that provide for safe social distancing between persons *and limit occupancy* to the extent necessary for safety." *Id.* (emphasis added).

The fact is, the District imposes occupancy restrictions on all such places; the distinction is that places of worship can determine for themselves how to meet the 25% restriction, whereas the District reserves to itself the determination of what measures are adequate for retail establishments. *See*, *e.g.*, Mayor's Order 2020-127 ("Stores must … limit occupancy to the extent necessary for safety."). Among other things, businesses must conform to the Maximum Floor Area Allowances Per Occupant set out in Section 1004 of the D.C. Building Code. 12-A DCMR § 1004. Under these provisions, stores must allow 60 square feet per person, whereas commercial areas with fixed seating—*e.g.*, theatres with seats like the pews in the Archdiocese's churches—can have "one person for each 18 inches" of space. Of course, theaters were among the first institutions closed and remain so. *See*, *e.g.*, Mayor's Orders 2020-48, § I.B.a (Mar. 16, 2020) and 2020-53 (Mar. 24, 2020), § IV.[3] Fitness centers must provide at least 50 square feet of gross space and libraries must provide 50 square feet of net space (excluding the stacks and other fixtures) per

---

plaintiff's inaccurate and unsupported allegations about restaurants, *see* Defs.' First Opp'n [17] at 17-19, but plaintiff repeats many here.

person. *Id.*[8] Plaintiff's arguments do not address how any of these restrictions affect or ever affected the capacity of the businesses to which it asks the Court to compare its dozens of churches. This oversight may be based, in part, on the fact that the Archdiocese, like all places of worship in the District, is subject only to the restriction on indoor mass gatherings, whereas every commercial establishment is subject to far more direct forms of regulatory interference with its operations.

For example, the District has closed fitness centers and even *outdoor* retail food sellers for failing to adhere to restrictions requiring social distancing and masking, something to which no place of worship has been subject. *See*, *e.g.*, Michael Brice-Saddler and Dana Hedgpeth, *Washington region braces for increase in virus cases after Thanksgiving travel*, WASH. POST (Nov. 30, 2020) ("Tensions over measures to combat the virus rose in D.C. over the weekend when the city shut down SolidCore fitness studio locations."), https://www.washingtonpost.com/local/coronavirus-thanksgiving-travel-dc/2020/11/30/5d7218ec-3306-11eb-8d38-6aea1adb3839_story.html; Megan Cloherty, *After closing crowded Wharf seafood market, DC reviewing open-air markets*, WTOP (Apr. 6, 2020), https://wtop.com/dc/2020/04/after-closing-crowded-wharf-seafood-market-dc-reviewing-open-air-markets/; *AG Racine Sues Washington Sports Club For Flouting COVID-19 Emergency Orders*, OFC. OF THE ATTY. GEN. (Mar. 11, 2021), https://oag.dc.gov/release/ag-racine-sues-washington-sports-club-flouting. *Compare with* Pl.'s Mem. at 12-13, 21 (discussing only a fear of fines, without citing any yet imposed). As Mayor Bowser has said, the District is "sympathetic with any business owner … who this virus is affecting … [b]ut we have rules, and we have the enforcement mechanisms to make sure they're followed." Brice-Saddler and Hedgpeth, *above*. As such, if "the Basilica replaced its pews full of worshippers

---

[8]     The Archdiocese alleges "fitness centers were allowed to have more than 50 people exercising indoors," Pl.'s Mem. at 14, but does not allege a single fitness center that *could* have so many people, let alone one that ever did.

with aisles lined with shoppers," the District would not, as the Archdiocese suggests, "allow it to host *as many people as it could fit*." Pl.'s Mem. at 25 (plaintiff's emphasis). Rather, the Archdiocese would have to satisfy the inspectors of the Department of Consumer and Regulatory Affairs before it could allow even a single person to enter, and would then be subject to additional COVID-19 specific restrictions. *See*, *e.g.*, *Food Services Business, Requirements*, DCRA (among other things, a new grocery store must secure a certificate of occupancy and DC Health Inspection Report and government licenses), https://dcra.dc.gov/node/1429586; 25-A DCMR A-44 (describing inspection regime for "Food And Food Operations"). Plaintiff has not presented nearly enough evidence to justify the Court's application of strict scrutiny to the Mayor's Orders.

      **B.**      **<u>Alternatively, the Archdiocese Is Not Likely to Succeed on the Merits Because the District's Science-Based Restrictions Satisfy Strict Scrutiny.</u>**

Even if strict scrutiny applies, the Archdiocese has not shown its claims are likely to succeed because the District's actions are "justified by a compelling governmental interest and … narrowly tailored to advance that interest." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531-32 (1993). "Stemming the spread of COVID-19 is unquestionably a compelling interest." *Diocese of Brooklyn*, 141 S. Ct. at 67. And the District has offered considerable evidence that its science-based restrictions on houses of worship are narrowly tailored to meet that goal. *See* Nesbitt Decls. As such, unlike in *Capitol Hill Baptist Church v. Bowser*, No. 20-cv-02710 (TNM), 2020 U.S. Dist. LEXIS 188324 (D.D.C. Oct. 9, 2020), the District has "demonstrate[d] that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Capitol Hill Baptist Church*, 2020 U.S. Dist. LEXIS 188324, at \*23 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006)).

15

It has long been clear that indoor worship presents unique and particular risks of the spread of COVID-19 and respiratory illnesses in general. *See* Aff. A, First Declaration of LaQuandra S. Nesbitt (First Nesbitt Decl.) [17-1] ¶¶ 8B-12.[9] Here, the Archdiocese challenges a restriction that would prevent more than 250 people from being seated in one room for an extended period, producing clouds of droplets or aerosol particulates as they participate in Mass. *Id.* ¶¶ 15, 26. Speaking is not an essential part of the activities conducted at "laundromats, retail stores, restaurants, tattoo parlors, nail salons, fitness centers" or liquor stores, grocery stores or "big box stores." Compl. ¶¶ 5, 53-55, 73. Indeed, for many if not most people, particularly during the last year, these are solitary activities involving little or no communication with anyone else in the facility. First Nesbitt Decl. ¶ 15; Aff. B, Second Declaration of LaQuandra S. Nesbitt (Second Nesbitt Decl.), ¶ 30. And people shopping for groceries or other retail items do not tend to linger in any particular location; they spend most of their time walking to and from the places where they will purchase their items. Second Nesbitt Decl. ¶ 30.

Plaintiff contends "there is not even a plausible scientific basis for the District's 250-person hard cap on worship services." Pl.'s Mem. at 31.[10] In fact, Dr. Nesbitt provided that scientific basis in December:  increasing the number of people increases the likelihood someone has COVID-19.

---

[9]    Due to a typographical error, the paragraphs of the First Nesbitt Declaration are numbered, in part, 7, 8, 9, 8, 9, 10. To clarify references, the latter Paragraph Nos. 8 and 9 are referred to here as 8B and 9B.

[10]    It is misleading for the Archdiocese to contend "every state in the country has now completely abandoned hard caps." Pl.'s Mem. at 6. This unsupported claim is apparently limited to restrictions on places of worship but even there it is incorrect. Maine's current rules authorize "5 persons per 1,000 square feet of functionally available space, or 50 persons, whichever is greater," Exec. Order 31 FY 20/21 (Feb. 12, 2021), and a small church is suing over the numerical cap. *See Calvary Chapel of Bangor v. Mills*, Civil Action No. 20-156 (D. Me.). Maine is scheduled to change its restrictions March 26, 2021. *See Moving Maine Forward* (Mar. 5, 2021), https://www.maine.gov/covid19/moving-maine-forward. *See also* Pl.'s Mem. at n. 3.

"The risk that someone in a gathering of 50 people is infected with COVID-19 has been shown to be 80% greater than in a gathering of 25 people." First Nesbitt Decl. ¶ 17. Increasing the number of people from 100 to 500 people more than doubles the risk. Second Nesbitt Decl. ¶ 3. That is why, as Dr. Nesbitt explains, the District rejected that option as inadequate using only a percentage-based cap. First Nesbitt Decl. ¶ 19.

The District's decision to allow 250 people as its numerical cap, however, demonstrates that the restriction has been tailored as narrowly as is reasonably possible. Allowing more people than that poses an ever greater risk of COVID-19 spread. Second Nesbitt Decl. ¶¶ 3, 6-7. Further, the larger a gathering, the harder it becomes to conduct adequate contact tracing, which is essential to control spread in the event of an outbreak; too large a gathering can make contact tracing impossible. *Id.* ¶ 11. Plaintiff's standing to challenge the 250-person cap is also unclear. Given the Archdiocese's contention that only the Basilica has a capacity greater than 1,000 people, only the Basilica was affected by the 250-person rather than the 25% cap, and the District has already granted the Archdiocese a waiver to conduct Mass at the Basilica at 25% of its capacity, more than 250 people, during Holy Week. Ex. G, Mar. 11, 2021 Letter; *see also* First Nesbitt Decl. ¶¶ 18-22 (discussing possibility of exemption or waiver for the Basilica).[11] The District will be hard-pressed to do contact tracing should there be a report of infection at the Basilica under its 25% waiver; additional events with more than 250 people could be overwhelming.

---

[11] Because the District "presents a legitimate, nondiscriminatory reason" for the restrictions, the "Court need not—*and should not*—" consider plaintiff's arguments about the reasons for the 250-person cap. *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019) (emphasis original; quotation omitted). Further, Mayor's Order 2020-126 notwithstanding, no restaurant in the District *has* a room that can hold 1,000 people. *See* Defs.' First Opp'n at 18-19.

The risk of transmitting COVID-19 is greatly increased when particularly large numbers of different households gather in close proximity for extended periods of time. *Id.* ¶¶ 8B-12. Although the judicial branch should not blindly defer to the expert judgments of local officials or abdicate its responsibility to evaluate constitutional challenges to public health policies, "the Constitution 'principally entrusts the safety and the health of the people to the politically accountable officials of the States.'" *Diocese of Brooklyn*, 141 S. Ct. at 73 (Kavanaugh, J. concurring) (quoting *S. Bay United Pentecostal Church v. Newsom* (*South Bay I*), 140 S. Ct. 1613 (May 29, 2020) (Roberts, C.J., concurring)); *see also Diocese of Brooklyn*, 141 S. Ct. at 68 (*per curiam*) ("Members of this Court are not public health experts, and we should respect the judgment of those with special expertise and responsibility in this area."). When, as here, restrictions on the free exercise of religion are narrowly tailored to protect public health against a surge in the spread of a deadly virus, the Court "must afford substantial deference to state and local authorities about how to best balance competing policy considerations during the pandemic." *Id.* For the reasons above, the District's 25% and 250-person limit on houses of worship each survive strict scrutiny. This is particularly true of the 25% of capacity restriction, the Supreme Court having upheld California's 25% capacity restriction in February. *South Bay II*, 209 L.Ed.2d at 22.

> **1.    Plaintiff Relies on Incorrect Representations of the Current Status of COVID-19 in the District of Columbia To Argue the Current Restrictions Are Not Needed.**

Plaintiff suggests that the threat of COVID-19 has decreased. In reality, the threat has increased as the virus continues to spread widely. Second Nesbitt Decl. ¶¶ 17, 20-22. Plaintiff cherry-picks its statistics, claiming that, "[f]rom a high of 492 daily cases on December 27, the District is now seeing a far lower rate of under 100 new cases per day … ." Pl.'s Mem. at 11-12. But these three days had an abnormally low number of new cases. For the previous four days, new cases totaled 120, 194, 162, and 179; for the following four days, new cases totaled 196, 108, 151,

and 146; and the 7-day average of new cases on the days the Archdiocese cites were 132, 131, and 125. Community Spread Table and Chart. The 492 cases on December 25, 2020, the correct date of the peak in new cases, was equally abnormal; the 7-day average that day was 266 new cases per day; today it is 159. *Id.* Indeed, the 7-day average has not been below 100 new cases since November 10, 2020. Second *Id.*

In addition, new variants present in the District of Columbia have been shown to be more virulent and more infectious. Second Nesbitt Decl. ¶¶ 12-17; Dr. Eric Feigl-Ding, Federation of American Scientists Epidemiologist & Health Economist, TWITTER POST (Mar. 14, 2021, 5:19 p.m.) ("Troubling new peer-reviewed paper shows even 2-dose recipients have serious trouble neutralizing the #B1351 [Flag of South Africa] variant"), https://twitter.com/DrEricDing/status/1371209487491735553 (discussing Garcia-Beltran *et al.*, *Multiple SARS-CoV-2 variants escape neutralization by vaccine-induced humoral immunity*, CELL (Mar. 8, 2021), doi: https://doi.org/10.1016/j.cell.2021.03.013). And this is only known variants; there may well be variants as yet undetected. Second Nesbitt Decl. ¶ 13. The District of Columbia and states across the country and around the world could be seeing the beginning of the end of this pandemic or be on the verge of a new wave of community spread. It all depends on what happens now. Dr. Rochelle Walensky, the director of the Centers for Disease Control and Prevention, recently said she "remain[s] deeply concerned about a potential shift in the trajectory of the pandemic" and a new wave setting new records of COVID-19 cases. *Press Briefing by White House COVID-19 Response Team and Public Health Officials*, WHITEHOUSE.GOV (Mar. 1, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/03/01/press-briefing-by-white-house-covid-19-response-team-and-public-health-officials-9/. "Now is not the time to relax the critical safeguards that we know can stop the spread of Covid-19 in our communities," Dr.

Walensky said, "not when we are so close. We have the ability to stop a potential fourth surge of cases in this country." *Id.* See also Second Nesbitt Decl. ¶ 19.

Plaintiff incorrectly contends that "states around the country have shown that they can rely on far less restrictive means such as masking and social distancing." Pl.'s Mem. at 7; *see also id.* at 35 (contending "so many other [jurisdictions] give churches more leeway while ensuring [health] safety") (quotation omitted; alterations original). Although many states have *tried* less restrictive means, it remains unclear how much this has protected public health. Most of those states have much higher COVID-19 spread than the District, despite differences that create a greater risk here. Second Nesbitt Decl. ¶ 31. For example, among the "full 34 states [that] do not impose any percentage-based limit," Pl.'s Mem. at 7, is North Dakota, which has an infection rate more than double that in the District of Columbia. *Rate of coronavirus (COVID-19) cases in the United States as of March 11, 2021, by state*, STATISTA, https://www.statista.com/statistics/1109004/coronavirus-covid19-cases-rate-us-americans-by-state/. And other states have not "shown" or proven anything about what would happen if the District adopted those approaches here. Second Nesbitt Decl. ¶¶ 31-32. According to Johns Hopkins University, the District of Columbia ranked 45th for cases per 100,000 people (6023.53) but 21st in the last 30 days (3,978), suggesting both an overall success but a threat of new spread. And this is without considering all of the relevant factors. *Id.* at 32. The practices adopted by other states cannot reasonably be construed as evidence that the District could "prevent the spread of COVID-19 without imposing a 25% limit on worship attendance." Pl.'s Mem. at 7.

Furthermore, no one even knows if these states' decisions regarding the proper restrictions on places of worship are *a*—let alone *the*— determining factor. The Archdiocese repeats its allegation that the District "cannot show that worship services pose any special risks that would

justify singling them out for harsher treatment," Pl.'s Mem. at 7, 10, 13; *compare with* First Pl.'s Mem. at, *e.g.*, 13, the first Nesbitt Declaration did precisely this. First Nesbitt Decl. ¶¶ 8B-12 (discussing the "particular risk" posed by "the traditional activities that occur in places of worship").[12] And there have been outbreaks tied specifically to worship services. First Nesbitt Decl. ¶¶ 8B-12. Plaintiff chose its words carefully in asserting that "the Archdiocese is not aware of COVID-19 spreading among members of the public attending Mass in any of its churches." Pl.'s Mem. at 32. There have been multiple potential infections at Masses in the District:  first when an infected priest led services, *see* First Nesbitt Decl. ¶¶ 21-23, later when several people who attended Christmas Mass on December 24 and 25, 2020, tested positive for SARS-CoV-2. Ex. H, Jan. 3, 2021 Email from Blessed Sacrament Communications; Pl.'s Ex. A-1. The Archdiocese was sufficiently concerned that it cancelled all public Masses at the Shrine of the Most Blessed Sacrament, one of the its larger churches, for two weeks. Ex. H. The Archdiocese notified the District of this later event on December 30, 2020. Second Nesbitt Decl. ¶ 33. However, the Archdiocese does not appear to have notified the general public, and it is unknown how many of the attendants of either Mass, or their close contacts, know of the email. This potential ignorance by attendees is one reason why the self-reported Exposure Data on which plaintiff asks the Court to rely, Pl.'s Mem. at 26-27, is not evidence that no faith event is the source of an outbreak. Despite all of this, rather than "singling [places of worship] out for harsher treatment," Pl.'s Mem. at 7, the District gives them *more* latitude than comparable secular institutions. *See* Subsection I.A.2.

Plaintiff also asserts that the rate of community spread "is forecast to continue dropping as the weather gets warmer and vaccination rates increase." Pl.'s Mem. at 17. This does not mean

---

[12]    Further, whatever "the District's own data show" about "responsible worship services," Pl.'s Mem. at 7, 13 ("several months of COVID-free Masses in D.C."), they show it about services subject to restrictions including those plaintiff now challenges.

that the risk has abated; the rate has not fallen *yet*. More importantly, it is misleading. Within the 95% confidence interval of that forecast, the District could see anywhere from 200 to 1,400 cases per week compared to the 795 the forecast plaintiff uses currently shows or the 1,044 new cases from March 8 to 14. *Observed and forecasted weekly COVID-19 cases in District of Columbia*, CDC, https://covid.cdc.gov/covid-data-tracker/#forecasting_weeklycases (last accessed Mar. 10, 2021); *Community Spread Table*. This is more evidence about how hard it remains to predict what the pandemic will bring. The longer the pandemic rages, the greater the risk that more easily transmitted variants will become dominant, or that a new variant will emerge that is less- or even unresponsive to treatment or vaccines. This is why Dr. Walensky recently said, "[h]ow quickly we will vaccinate versus whether we will have another surge really relies on what happens in March and April." Amir Vera and Christina Maxouris, *March and April are critical months in stopping another COVID-19 surge, CDC director says*, CNN (Mar. 9, 2021), https://www.cnn.com/2021/03/08/health/us-coronavirus-monday/index.html.

The efficacy of current protections is also more limited than the Archdiocese claims. The new variants are much more readily transmissible, such that the cloth masks on which most Americans rely are now widely considered inadequate. Second Nesbitt Decl. ¶¶ 4, 8. It is unclear what the Archdiocese means by referencing a time "when fewer people had immunity," Pl.'s Mem. at 11, because no one knows how many people have *any* immunity *now*, let alone how many will in the future, or the nature or extent of that immunity. COVID-19 reinfections have occurred. Second Nesbitt Decl. ¶ 15; Thi Loi Dao *et al.*, *Recurrence of SARS-CoV-2 viral RNA in recovered COVID-19 patients: a narrative review*, EUR J CLIN MICROBIOL INFECT DIS. (Jan. 2021), doi: 10.1007/s10096-020-04088-z.  The science is clear that those who recover are not necessarily *ever* immune and "that durable immunity against secondary COVID-19 disease is [only] a *possibility*

for *most* individuals." Jennifer Dan, *et al.*, *Immunological memory to SARS-CoV-2 assessed for up to 8 months after infection*, SCIENCE (Feb. 5, 2021), https://science.sciencemag.org/content/371/6529/eabf4063 (emphasis added).

Plaintiff's discussion of vaccines, Pl.'s Mem. at, *e.g.*, 7, 11, 16-17, is similarly irrelevant. Plaintiff makes no allegation as to how many of its parishioners have been vaccinated.[13] Among the general public, although the federal government and the District have made great progress, only 6.8% of Washingtonians are fully vaccinated, *i.e.*, have had their last dose of vaccine. Second Nesbitt Decl. ¶ 22. And most people who are fully vaccinated are not yet fully *protected*, because it takes two weeks before the vaccine is fully effective. *Id.* The existence of effective vaccines is not yet relevant to the question before the Court.

### 2. This Action Differs Too Much from Other Cases To Establish an Adequate Likelihood of Success.

Although the Archdiocese may be able to convince the Court that some alternative restriction would be more narrowly tailored, it has not done so here, and the similarities to the other cases plaintiff cites are inadequate to support a conclusion that the Archdiocese is "substantially likely" to prevail in making that argument. For example, the Ninth Circuit recently

---

[13] It is unclear why plaintiff cites vaccination statistics only on "District residents 18 or older." Pl.'s Mem. at 17. The Archdiocese does not allege that only this group of people would be allowed in its churches whose parishioners include both non-District residents and residents under the age of 18. President Biden just announced that vaccines for all Americans would not be available until the "end of May," emphasizing that not everyone would be vaccinated until July. *Remarks by President Biden on the Anniversary of the COVID-19 Shutdown*, WHITEHOUSE.GOV (Mar. 11, 2021). Dr. Fauci has said vaccines will not be available for teenagers until "likely by the beginning of the fall." *Press Briefing by White House COVID-19 Response Team and Public Health Officials*, WHITEHOUSE.GOV (Mar. 10, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/03/10/press-briefing-by-white-house-COVID-19-response-team-and-public-health-officials-13/. Vaccines for younger children are not even expected to be *authorized* until September. Caroline Chen, *Fauci: Vaccines for Kids as Young as First Graders Could Be Authorized by September*, PROPUBLICA (Feb. 11, 2021), https://www.propublica.org/article/fauci-vaccines-kids.

"affirm[ed the] denial of South Bay [Pentecostal Church]'s request to enjoin California's temporary prohibition on indoor worship under the Regional Stay at Home Order and Tier 1 of the Blueprint." *S. Bay United Pentecostal Church v. Newsom* (*South Bay I.B*), 985 F.3d 1128 (9th Cir. Jan. 22, 2021). Indeed, the Ninth Circuit concluded California had "submitted substantial evidence as to why indoor worship is unsafe *at any level* in counties where COVID-19 is 'widespread' and ICU capacity is non-existent … ." *Id.* (emphasis added). A California county is Tier 1 if COVID-19 is considered widespread, meaning community spread—the 7-day average of new cases per 100,000 people—above 7.0 cases, and places of worship are limited to 25% of capacity. *See Blueprint for a Safer Economy* (Mar. 10, 2021), https://covid19.ca.gov/safer-economy/. Community spread in the District is currently 22.95, not much below the 26.94 peak of the first wave in May 2020. Second Nesbitt Decl. ¶ 21; Ex. F, *Community Spread Table and Charts*. Thus, the District is allowing indoor worship to meet even though it is demonstrably *unsafe*. Although the Supreme Court rejected the Ninth Circuit's upholding of a complete ban, it declined to reverse the portion of the Ninth Circuit's opinion upholding the 25% cap. *South Bay II*, 209 L.Ed.2d at 22.

In the absence of evidence to the contrary, the Court in *Diocese of Brooklyn* concluded that "less restrictive rules could be adopted to minimize the risk to those attending religious services" including the possibility that "the maximum attendance at a religious service could be tied to the size of the church or synagogue." *Diocese of Brooklyn*, 141 S. Ct. at 67; *see also id.* at 69 (Gorsuch, J. concurring) ("No apparent reason exists why people may not gather, subject to identical restrictions [on essential businesses], in churches"), *id.* at 73 (Kavanaugh, J. concurring) ("New York has not sufficiently justified treating houses of worship more severely than secular businesses"). The District, however, has provided evidence to the contrary and largely tied maximum attendance to the size of the place of worship—again, among the Archdiocese's

churches, only the Basilica was affected by the 250-person cap—and it is not required to accept "proposed alternatives" that "will not be as effective" in achieving "the legitimate purpose the [order] was enacted to serve." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 665 (2004). Here, the current 250-person limit on attendance is "required to prevent the spread of the virus at [plaintiff's] services." *Diocese of Brooklyn*, 141 S. Ct. at 67. Second Nesbitt Decl. ¶¶ 6, 29.

Also unlike in *Diocese of Brooklyn*, there is no allegation here "that the [Mayor] specifically targeted" the Catholic community in enacting the restrictions on houses of worship. *See Diocese of Brooklyn*, 141 S. Ct. at 66. Further, the restrictions here are not "more restrictive than [the] COVID-related regulations that [had] previously" been analyzed by the Supreme Court. *Id.* at 209; *see also id.* at 72 (Kavanaugh, J. concurring) (finding New York's 10- and 25-person caps on attendance likely violate the First Amendment, in part, because they were "much more severe than" the limits at issue in the previous cases considered). In fact, whereas *Diocese of Brooklyn* challenged capacity restrictions of 10 or 25 persons, the District's 250-person cap is five times higher than the 50-person cap the Supreme Court considered but did not enjoin in *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603 (July 24, 2020). The Ninth Circuit's subsequent decision, *Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228 (9th Cir. Dec. 15, 2020), is not contrary. Although the Ninth Circuit struck down the 50-person cap, it concluded that a cap at "25% of the fire-code capacity" appeared proper. *Id.* at 1234. *See also South Bay I.B*, 985 F.3d at 1128 (again upholding a 25% cap); *S. Bay United Pentecostal Church v. Newsom* (*South Bay II*), 209 L.Ed.2d 22, 22 (Feb. 5, 2021) ("The application is denied with respect to the percentage capacity limitations, and respondents are not enjoined from imposing a 25% capacity limitation on indoor worship services in Tier 1."). The District's numerical cap is five times that level and its percentage cap the same.

Plaintiff also is mistaken in its contention that the circumstances here directly parallel those in *Capitol Hill Baptist Church* or *Diocese of Brooklyn*. Capitol Hill Baptist Church offered evidence that it "believes that its [entire] congregation must meet in person each Sunday to worship together." *Capitol Hill Baptist Church*, 2020 U.S. Dist. LEXIS 188324, at *14 (D.D.C. Oct. 9, 2020).[14] *See also* above at 9 (discussing similar requirements in *Diocese of Brooklyn*). For that reason, "the Church resisted holding multiple worship services on Sundays, even as attendance approached 1,000 congregants." *Id.* at *15. This was a "particular activit[y] undertaken 'for worship purposes'" of Capitol Hill Baptist Church. Pl.'s Mem. at 28 (quoting *Emp. Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877-78 (1990)). In further contrast, whereas Capitol Hill Baptist concluded that "web-based services" were incompatible with its worship, the Archdiocese is not only willing to provide a "MASS LIVESTREAM" but urges parishioners to "WATCH MASS ONLINE." Ex. I, Screenshots of the Basilica's Website, *see also* https://www.nationalshrine.org/mass/ (last accessed Mar. 15, 2021); Ex. H, Blessed Sacrament Email ("We are grateful to those who have perfected our livestream abilities and plan to transmit weekend Masses via this technology."). In *Capitol Hill Baptist Church*, therefore, any restriction requiring fewer than 1,000 people presented a complete bar to a fundamental part of the plaintiff's religious practice: meeting as one congregation. Recognizing that this was unusual, Capitol Hill Baptist Church sought reasonable accommodation with the District; for example, offering to conduct its services outdoors where the risk, although great, is significantly less than for indoor

---

[14] Also, unlike Capitol Hill Baptist Church, which arguably had associational standing to assert the rights of its parishioners, the Archdiocese is "a corporation sole" and asserts only its own rights. Compl. ¶ 13. Thus, the Archdiocese cannot allege that *it* "cannot receive communion." *Roman Catholic Diocese*, 141 S. Ct. at 68.

worship. 2020 U.S. Dist. LEXIS 188324 at *29 (describing "other policies, such as holding services outside with mandatory social distancing and mask-wearing").

The Archdiocese alleges none of these distinguishing characteristics. Each parish is of a different size and members attend services at different churches. Indeed, one the foundations of the Roman Catholic faith is that its adherents make up "one, holy, catholic and apostolic Church," rather than multiple, separate ones. Catechism § 750, http://www.vatican.va/archive/ ccc_css/archive/catechism/p1s2c3a9.htm. The Archdiocese's many churches have always held multiple Masses daily and it alleges no minimum participation requirement. *See* above at 8. Because its Masses typically take "less than thirty minutes," and because many if not all of the Archdiocese's churches have multiple sanctuaries and chapels, each church can hold multiple Masses in a day at each location. And the Roman Catholic Church has demonstrated a willingness to waive certain restrictions and obligations when there is need, including specifically related to COVID-19. *See*, *e.g.*, Canon Law 905, § 2 ("the local ordinary can allow priests to celebrate twice a day for a just cause, or if pastoral necessity requires it, even three times on Sundays and holy days of obligation."); Third Carson Decl. ¶ 50; above at 7. The sheer number of the Archdiocese's churches is adequate to distinguish this case from *Capitol Hill Baptist Church*; the Archdiocese asks the Court to weigh the proper treatment not of one church that would be meeting outside but of the interior architecture of each of the 38 churches it has in the District of Columbia ranging in occupancy capacity from 85 to 3,000 persons. Pl.'s Ex. A-1[15]; *Parish & Mass Finder*, ARCHDIOCESE OF WASHINGTON, https://adw.org/parishes-masses/parish-mass-finder/.

---

[15]     The Archdiocese repeatedly asserts this 3,000-person capacity, *see*, *e.g.*, Pl.'s Mem. at 15, 22, although its website asserts the "Seating capacity [of the] Upper Church (approximate):  3,500 persons" and "Total capacity, Upper Church (approximate):  6,000 persons." Ex. J, *Architectural Details of the Basilica* at 3, also https://www.nationalshrine.org/wp-content/uploads/2018/11/

Moreover, rather than being "far more restrictive than any COVID–related regulations that have previously come before the Court," *Diocese of Brooklyn*, 141 S. Ct. at 67, the restrictions the Archdiocese challenges are similar or even identical to ones the Supreme Court has suggested may be proper. *See Calvary Chapel Dayton Valley* v. *Sisolak*, 140 S. Ct. 2603 (July 24, 2020); *accord Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228, 1234 (9th Cir. Dec. 15, 2020) ("preliminarily enjoin[ing only] limitations on in-person services in houses of worship that are *less favorable* than 25% of the fire-code capacity.") (emphasis added). *See also* above at 23. As discussed above at 4, the lesson of the related cases is that courts should generally create a full record before upholding or enjoining a COVID-19 restriction. The Court should follow the path laid out in these recent decisions and generate a greater record before deciding if the District's restrictions are proper.

The District's cap at 25% of capacity is not an outlier. The State of Washington mandates all places of worship in the state not exceed "25% of room (or building) capacity with a recommended maximum of 200 people, whichever is less, so long as six feet of physical distancing can be achieved between households in all directions." *Religious and Faith-based Organizations COVID-19 Requirements*, WASHINGTON (Dec. 21, 2020) https://www.governor.wa.gov/sites/default/files/COVID19%20Phase%201%20to%203%20Religious%20and%20Faith%20Based%20Organization%20Guidance.pdf. In California, "[i]n response to recent judicial rulings, the interim capacity limits" include "25% of capacity where there is

---

BNSIC-Architectural-Details-of-the-Basilica.pdf (last accessed Mar. 9, 2021). *See also* Pl.'s Mem. at 14 (alleging the "Basilica … could ordinarily accommodate *over* 3,000 people") (emphasis added). The Archdiocese also makes no effort to distinguish the portions of the Upper Church, *Architectural Details* at 6, or that the "ceiling that is at least 100 feet high," Third Carson Decl. [33-3] ¶ 28, is actually only that high at "the apex of the nave domes" and in parts of the Great Dome, *Architectural Details* at 2, being much lower elsewhere.

widespread or substantial community spread," that is the 7-day average of new cases per 100,000 people, which is defined as a much lower level than is currently present in the District of Columbia. *Places of worship and cultural ceremonies – updated February 22, 2021*, CALIF. https://covid19.ca.gov/industry-guidance/#worship; *Blueprint for a Safer Economy*, CALIF. (Mar. 11, 2021) ("Widespread" means community spread greater than 7.0), https://covid19.ca.gov/safer-economy/; Second Nesbitt Decl. ¶ 21 (community spread on March 14, 2021, was 22.95); EX. F, *Community Spread Table and Charts* (community spread has been above 7.0 since October 6, 2020). The same is true in New Mexico. *Red to Green Framework*, NEW MEXICO ("Red Level" showing "Very High Risk" if community spread if greater than 8.0), https://cv.nmhealth.org/public-health-orders-and-executive-orders/red-to-green/ (last accessed Mar. 12, 2021). In Puerto Rico, the maximum is 30% of capacity for all places of worship. *Government of Puerto Rico*, Administrative Bulletin Number:  OE-2020-080 (Nov. 13, 2020), https://basecero.ogp.pr.gov/apex/apex_util.get_blob?s=8605667567131&a=161&c=1120635546 95324788&p=15&k1=5087&k2=&ck=rTUUSq1AOyXVX6YR6LglWF-v3MtNEHq0dk-fWP7 wTaTu_aZtOuuMJVx7RBZGwEHO_q9FJF3Ezih_5pcIdVvwFA&rt=IR.  Similarly, states that allow a higher percentage of occupancy do so only with greater social distancing. For example, New York allows worship at 50% of capacity but only with "12 feet between people singing," rather than the 6-foot requirement in the District, imposing effectively the same restriction. *Guidelines for Religious and Funeral Services*, NEW YORK (Feb. 2, 2021), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/ReligiousandFuneralServic esSummaryGuidance.pdf.

### 3.   Plaintiff Misapplies Orders and Related Opinions from the Supreme Court's "Shadow Docket."

Plaintiff repeatedly cites to recent Supreme Court orders—and concurrences on and even dissents from them—as if they bore the authority of full opinions. This is incorrect. Even the most authoritative precedents from this so-called shadow docket "have less precedential value than an opinion on the merits." Vetan Kapoor and Judge Trevor McFadden, *Symposium: The precedential effects of shadow docket stays*, SCOTUSblog (Oct. 28, 2020, 9:18 a.m.), https://www.scotusblog.com/2020/10/symposium-the-precedential-effects-of-shadowdocket-stays/ (last accessed Mar. 8, 2021).

Plaintiff also wrongly compares Supreme Court orders with in-chambers opinions. Pl.'s Mem. at, *e.g.*, 37. The recent orders related to COVID-19 have all been handled by the full Court. *See*, *e.g.*, *South Bay II*, 209 L.Ed.2d at 22 (discussing "[t]he application for injunctive relief presented to Justice Kagan and by her referred to the Court"). In contrast, "[a]n in-chambers opinion is written by a single justice to dispose of stay applications and other requests for interim relief." Kapoor and McFadden, *above*. It is because only one justice is reviewing an in-chambers petition that, "[t]o obtain injunctive relief from a Circuit Justice, an applicant must demonstrate that the legal rights at issue are indisputably clear." *Lux v. Rodrigues*, 561 U.S. 1306, 1307 (2010) (Roberts, C.J., in chambers) (quotations and citations omitted). For the same reason—namely because they are *not* "emergency applicants to the Supreme Court," Pl.'s Mem. at 37—in-chambers opinions "do not bind the full court." Kapoor and McFadden, *above*. Thus, in none of the cases to which the Archdiocese cites is it known that any justice found the "plaintiffs … were 'indisputably' entitled to relief … ." Pl.'s Mem. at 29.

Such errors begin in the first words of plaintiff's brief with the contention that "[t]his case is controlled by settled principles of law … ." Pl.'s Mem. at 6. The first case the Archdiocese cites

in support of this proposition, *South Bay II*, 209 L.Ed.2d at 22[16], is an unsigned order of 170 words, attributed to no group of justices, accompanied by three concurrences, none of which represents more than three justices, and a dissent by three other justices. It could hardly be clearer that the Supreme Court is divided and the law is unsettled—not one of those *South Bay II* opinions commanded even a four-vote plurality. It may be true that "when a majority of the Supreme Court signals its views on the merits of an issue, even in a brief shadow docket order, lower courts should either defer to the court's ruling or justify a departure from that view," Kapoor and McFadden, *above*, but the Archdiocese relies overmuch on *minority* opinions. *See* Pl.'s Mem. at, *e.g.*, 24.

It does not matter that the order in *Gateway City Church v. Newsom*, No. 20A138, 2021 U.S. LEXIS 1200, 2021 WL 753575 (Feb. 26, 2021), asserts that its stay "is clearly dictated by this Court's decision" in *South Bay II*; whatever may have been clear to that authoring-but-anonymous justice has not been shown to the rest of the world. *See* Stephen I. Vladeck, Univ. of Tex. Charles Alan Wright Chair In Federal Courts, TWITTER POST (Feb. 26, 2021, 8:24 p.m.), https://twitter.com/steve_vladeck/status/1365472841269993473. No one can "say with confidence that a majority of the Supreme Court has expressed a view on the merits" in *Gateway*. Kapoor and McFadden, *above*. And even if it did, the restrictions in *Gateway* amounted to a complete ban on indoor worship, making the case too dissimilar to guide the Court here. *See* Appl. For Stay ("Does the County of Santa Clara's 0% capacity public health order on indoor worship services violate the Free Exercise clause of the First Amendment?").

Plaintiff's reliance on *Diocese of Brooklyn* is equally misguided. Under those restrictions, "no more than 10 persons [could] attend each religious service … [or] attendance [wa]s capped at 25." 141 S. Ct. at 66 (2020). Plaintiff cannot simply import the District's 25% and 250-person

---

[16]     The Archdiocese's citation to "141 S. Ct. 716" is inaccurate.

limits into that opinion. *See* Pl.'s Mem. at 33. In fact, the *Diocese of Brooklyn* plaintiffs' argument was based on the fact that they had previously "operated at 25% or 33% capacity"—similar to the restrictions to which the Archdiocese now objects—and wished to return to that capacity. And, of course, the restrictions to which those plaintiffs objected were no longer in effect, making the precedential value of the opinions questionable. *Id.* at 75-81 (Roberts, C.J., dissenting). The Archdiocese thus has not identified a single court that has rejected restrictions like those at issue here, much less "[m]ore than once." Pl.'s Mem. at 6. Rather, the courts have *refused* to enjoin such restrictions. *Calvary Chapel Dayton Valley*, 982 F.3d at 1234; *South Bay I.B*, 985 F.3d at 1128.

The Archdiocese has not quantified how many worshipers have truly been denied access to in-person Mass under the District's current restrictions. Rather, it appears to argue that *any* restriction on the number of people allowed to worship would be subject to strict scrutiny. Pl.'s Mem. at 23. The Archdiocese appears to suggest that, as a pandemic is raging and scientists are operating on the best available evidence, it is impossible for any meaningful restrictions to survive strict scrutiny. But narrow tailoring does not require the District to show with mathematical certainty at what occupancy level the risk of spreading COVID-19 becomes too high. *See Stein v. Ala. Sec'y of State*, 774 F.3d 689, 701 n.18 (11th Cir. 2014) (rejecting similar quibbling). An unpassable test is no test at all. *All. for Cannabis Therapeutics v. Drug Enf't Admin.*, 930 F.2d 936, 940 (D.C. Cir. 1991) ("Impossible requirements imposed by an agency are perforce unreasonable") (citing *D.C. Transit Sys., Inc. v. Wash. Metro. Area Transit Com.*, 466 F.2d 394, 424 (D.C. Cir. 1972) (McKinnon, J., concurring)). And none of the Supreme Court's recent orders regarding COVID-19 restrictions on worship has suggested that no restriction would be acceptable. Most have said the opposite; that some level more restrictive than that imposed here is acceptable. *See* Section I.B.2.

## II.   Plaintiff Does Not Adequately Allege It Will Suffer Irreparable Harm if a Temporary Restraining Order and Preliminary Injunction Is Denied.

The D.C. Circuit has held that "failure to demonstrate irreparable harm is 'grounds for refusing to issue a preliminary injunction, even if the other three factors entering the [preliminary injunction] calculus merit such relief.'" *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (observing that there is "a high standard for irreparable injury")). Although the factors relevant to a preliminary injunction "interrelate on a sliding scale … the movant must, at a minimum, demonstrate that irreparable injury is *likely* in the absence of an injunction." *Bill Barrett Corp. v. U.S. Dep't of Interior*, 601 F. Supp. 2d 331, 334-35 (D.D.C. 2009) (internal quotation marks and citations omitted) (emphasis in original).[17] "[P]roving irreparable injury is a considerable burden, requiring proof that the movant's injury is certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (internal citations and quotation marks omitted). If a party fails to make a sufficient showing of irreparable injury, a court may deny a motion for preliminary relief without considering the other factors. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Plaintiff notes that "[w]hen First Amendment rights are at stake, the likelihood of success will often be the determinative factor." Pl.'s Mem. at 18 (quotations omitted). But this is because the other three factors are usually satisfied in such a circumstance, not because they are irrelevant. Here, the Archdiocese has not satisfied those three other elements.

---

[17]   The D.C. Circuit has not "decide[d] whether the 'sliding scale' approach remains valid after *Winter*." *Archdiocese II*, 897 F.3d at 334.

As discussed in detail above, on the record now before the Court, the Archdiocese has been fully engaged in its religious practices for months. *See* Section I.A. So the Archdiocese has not demonstrated that the restrictions it challenges have prevented it from conducting the services it would if the restrictions were removed. *See* Subsection I.A.1. Plaintiff has not provided the Court with evidence of discriminatory intent or effect in the District's restrictions. *See* Subsection I.A.2. Plaintiff's conclusory allegations that its Freedom to Exercise its religion has been infringed upon is not adequately pled to support its motion for preliminary, injunctive relief. *See* Subsection I.B.

## III.   The Balance of Equities and Public Interest Weigh Against Granting Plaintiff's Motion for Injunctive Relief.

Even if a movant demonstrates a likelihood of success *and* irreparable injury, the Court still "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987). In addition to considering the merits of the Archdiocese's argument and its alleged injury, the Court must also balance the equities between the parties and consider the public interest. *Open Tech. Fund v. Pack*, 2020 U.S. Dist. LEXIS 116376, \*45 (D.D.C. July 2, 2020) (Howell, C.J.). Those two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

As the Archdiocese states in its motion:

> In *Diocese of Brooklyn*, these factors favored the houses of worship because "the State has not claimed that attendance at the applicants' services has resulted in the spread of the disease," and "the State has not shown that public health would be imperiled if less restrictive measures were imposed." 141 S.Ct. at 67-68.

Pl.'s Mem. at 37. But the same is not so here. The District's first case of COVID-19 was the rector of Christ Church Georgetown, whose attendance at Episcopal Mass was connected to multiple other cases. Jenna Portnoy, Fenit Nirappil and Antonio Olivo, *Three coronavirus cases linked to D.C. church; Colleges cancel in-person classes*, WASH. POST (Mar. 10, 2020),

https://www.washingtonpost.com/local/dc-maryland-virginia-coronavirus-latest-news/2020/03/10/88eb6de4-62d6-11ea-acca-80c22bbee96f_story.html. If the infections at Holy Comforter-Saint Cyprian Roman Catholic Church and Blessed Sacrament did not lead to spread of COVID-19, it was only a combination of luck and because stricter provisions were imposed to prevent it. First Nesbitt Decl. ¶¶ 22-23; Second Nesbitt Decl. ¶ 33. Dr. Nesbitt has always been quite clear that attendance at services under less restrictive measures poses a distinct and real peril to the health of Washingtonians. First Nesbitt Decl. ¶ 26.

Further, the District faces "irreparable harm because '[a]ny time [it] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 571 U.S. 1061, 1062 (2013) (Scalia, J., concurring in denial of application to vacate stay) (quoting *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C. J., in chambers) (in turn quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U. S. 1345, 1351 (1977) (Rehnquist, J., in chambers)) (alterations original). The restrictions the Archdiocese challenges were enacted pursuant to Mayor's Orders that were specifically and repeatedly authorized by statutes duly enacted without opposing vote by the D.C. Council including, recently, A23-524, *Coronavirus Public Health Extension Emergency Amendment Act of 2020*, 67 D.C.R. 14747 (Dec. 18, 2020), and A24-7, *Protecting Businesses and Workers from COVID-19 Congressional Review Emergency Amendment Act of 2021*, 68 D.C.R. 1822 (Feb. 1, 2021).

More than 1,000 Washingtonians and more than 500,000 other Americans have died of COVID-19 and the rate of new cases in the District of Columbia is still well above where it was for most of 2020. Ex. F, *Community Spread Table and Chart*. Failing to bring the virus under control now would increase the risk that new and deadly variants, perhaps even ones for which

existing vaccines are ineffective, will spread throughout our community. Second Nesbitt Decl. ¶¶ 12-17. As President Biden just said, "We've made so much progress. This is not the time to let up." *Remarks by President Biden on the Anniversary of the COVID-19 Shutdown*, WHITEHOUSE.GOV (Mar. 11, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/03/11/remarks-by-president-biden-on-the-anniversary-of-the-covid-19-shutdown/. The potential to end this pandemic with one last push over the next two months, versus the threat that relaxing too much will bring on a fourth wave of unknowable magnitude, puts the balance of equities against enjoining the current, reasonable restrictions.

The District shares the Archdiocese's concern that religious freedom should not be restricted and it has carefully crafted its regulations to minimize their interference with the rights of anyone. And the District has imposed looser restrictions than those the Supreme Court rejected in *Diocese of Brooklyn*—restrictions quite similar to those the Supreme Court implicitly endorsed in *Calvary Chapel* and other courts and states have adopted. *See* above at, *e.g.*, 25. Even if the Archdiocese can ultimately prevail, the balance of equities and public interest weigh against granting the Archdiocese's motion for preliminary, injunctive relief on the record now before the Court.

## IV.    **If the Court Is Inclined To Provide Plaintiff Any Relief, It Should Be More Limited Than Plaintiff Seeks.**

Even if the court were to disagree with the District, any preliminary injunctive relief should not extend beyond plaintiff.  Plaintiff's proposed order [33-1] asks the Court to enjoin "the enforcement of the 250-person limit and the 25% capacity limit on attendance at indoor worship services" for any place of worship.  It thus seeks to preclude the District from imposing *any* restriction on the number of people who can attend *any* type of worship for *any* religion. "In awarding a preliminary injunction," however, "a court 'need not grant the total relief sought by

the applicant but may mold its decree to meet the exigencies of the particular case.'" *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2947, at 115 (3d ed. 2013)). Indeed, the Supreme Court has "caution[ed]" against granting statewide injunctions that extend beyond "the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). Exceptions can be made but only where the plaintiff represents the rights of third-parties, which plaintiff here does not. *See Whitman-Walker Clinic, Inc. v. United States HHS*, Civil Action No. 20-1630, 2020 U.S. Dist. LEXIS 159951, at *142 (D.D.C. Sep. 2, 2020) (Boasberg, J.) (discussing *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) and *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). The relief plaintiff seeks would be dangerous and unwarranted, and contravene established Article III principles, even if the Court agrees with the Archdiocese's factual assertions and legal analyses.

First, the Archdiocese's arguments address only services and facts specific to its churches. It makes no effort to address the different facts around any other religious organization or place of worship, and has done nothing to establish standing to assert the rights of any third-party. *See Ctr. for Democracy & Tech. v. Trump*, Civil Act. No. 20-01456 (TNM), 2020 U.S. Dist. LEXIS 232972, at *19 (D.D.C. Dec. 11, 2020). And many of the Archdiocese's arguments apply only to its churches. For example, it has offered no evidence and no argument that the District's attendance restrictions substantially burden *other* religious institutions, many of which do not offer communion and may well be able to provide sufficient services while complying with the Mayor's Orders. Moreover, the Archdiocese has urged this Court to trust its promise to voluntarily impose critically important safety measures, including reducing capacity to the extent necessary for social distancing, requiring masks at all times, and ensuring distancing. Pl.'s Mem. at, *e.g.*, 10, It cannot, however, make that promise for other religious institutions, who may well construe an injunction

as lifting all social distancing requirements. Any relief the Court may grant should therefore be limited to the District's enforcement of the attendance restrictions against the churches of the Archdiocese.

Second, having assumed voluntary limits of 30-40% of occupancy, the Archdiocese's dispute lies not with the idea of a percentage base capacity, but only with the District's decision to draw the line at 25%. But the Archdiocese does not point to a single case in which a 25% capacity restriction has been stayed or overturned on the merits by any court. Or to one in which a 5-15% difference in capacity was found material. The Supreme Court has consistently indicated that capacity-based restrictions are reasonable, *see Diocese of Brooklyn*, 141 S. Ct. at 67 (suggesting that "the maximum attendance … could be tied to the size of the church"), and has refused to stay 25% capacity restrictions. *South Bay II*, 209 L.Ed.2d at 22. Thus, the Archdiocese has not made an adequate showing regarding the 25% capacity restriction.

Third, the Archdiocese alleges that only the Basilica is affected by the 250-person cap, *see* above at 9, 17, and that has since been waived for it, at least during Holy Week. Ex. G. Thus, the Archdiocese does not need relief from that cap at this time.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiff's Second Motion for Temporary Restraining Order and Preliminary Injunction.

Dated:  March 15, 2021.          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

JASON DOWNS
Chief Deputy Attorney General

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Chief, Equity Section

*/s/ Conrad Z. Risher*
CONRAD Z. RISHER [1044678]
HONEY MORTON [1019878]
Assistant Attorneys General
400 Sixth Street, N.W., Suite 10100
Washington, D.C. 20001
(202) 442-5868
conrad.risher@dc.gov

*Counsel for the District of Columbia*