UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**ROMAN CATHOLIC ARCHBISHOP OF WASHINGTON,**

                    Plaintiff,

         v.

**MURIEL BOWSER,**
*In her personal capacity and in her official capacity as Mayor of the District of Columbia,*

**DISTRICT OF COLUMBIA,**

                    Defendants.

Case No. 20-cv-03625 (TNM)

---

## MEMORANDUM OPINION

The Basilica of the Shrine of the Immaculate Conception is the largest Catholic church in the United States and among the largest in the world. It can seat at least 3,000 people and is so vast that the Statue of Liberty could lie beneath its luminescent dome. But under restrictions on houses of worship currently imposed by the District of Columbia and Mayor Muriel Bowser (collectively, "the District"), the Basilica may admit no more than 250—about eight percent of its capacity. It and the other 38 Catholic churches in the Archdiocese of Washington can host only the lesser of 25 percent capacity or 250 people at their Masses.

With Holy Week and Easter approaching, the Roman Catholic Archbishop of Washington ("Archdiocese") seeks emergency relief from these regulations under the First Amendment and the Religious Freedom Restoration Act ("RFRA"). Both provide robust protections for religious exercises and require courts to view restrictions on religion skeptically. The District contends that its restrictions on houses of worship are lawful and indeed necessary

to fight the COVID-19 pandemic. Though the Court acknowledges the District's interest in stemming the spread of the virus, it finds that the Archdiocese is entitled to relief. The Court will therefore grant the Archdiocese's motion for a preliminary injunction.

## I.

## A.

The Archdiocese is one of the largest Catholic dioceses in the country. Statement of P. & A. in Supp. of Pl.'s Second Appl. for TRO and Prelim. Inj. ("Pl.'s Mem.") at 8, ECF No. 33-2.[1] His Eminence Wilton Gregory, the first African American cardinal, leads the Archdiocese. Compl. ¶ 21, ECF No. 1. Its activities include administering various charities and social programs around the District for Catholics and non-Catholics alike. Pl.'s Mem. at 8. But also central to its mission is "meet[ing] the religious needs" of the 655,000 Catholics living in the city and the five Maryland counties it serves. Id. It does so by "providing opportunities for religious worship and ensuring the availability of Mass and the sacraments to all Catholics in the D.C. area." Id.

As part of the Roman Catholic Church, the Archdiocese "shares the Church's sincere belief that '[t]he Sunday celebration of the Lord's Day and his Eucharist is at the heart of the Church's life.'" Decl. of Very Reverend Daniel B. Carson ("Carson Decl.") ¶ 9, ECF No. 33-3 (quoting Catechism of the Catholic Church § 2177). The practice of assembling in worship harkens back to the earliest days of the Church and the teaching of the Old Testament, which directs adherents "not to neglect to meet together." Id. ¶ 11 (quoting Catechism of the Catholic Church § 2178 and Hebrews 10:25). From this understanding flows the Archdiocese's commitment to holding Mass. Id. ¶ 12. It "sincerely believes that it has a religious duty to make

---

[1] All citations are to the page numbers generated by this Court's CM/ECF system.

the celebration of the Mass and the Eucharist available to its parishioners to the greatest extent possible when it believes it can safely do so." *Id.* ¶ 12. Indeed, the Archdiocese's churches offer Mass every day of the year. *Id.* ¶ 13. And Catholics attend special Masses on certain holy days of obligation, such as Easter. *Id.* ¶¶ 13–14.

The Archdiocese sees "Sunday Mass in person [as] 'the foremost holy day of obligation in the universal Church.'" Pl.'s Mem. at 9 (quoting Carson Decl. ¶ 12 and Catechism of the Catholic Church § 2177). It believes that its faithful "cannot pray at home as at church, where there is a great multitude, where exclamations are cried out to God as from one great heart, and where there is something more: the union of minds, the accord of souls, the bond of charity, the prayers of the priests." Carson Decl. ¶ 11 (quoting Catechism of the Catholic Church § 2179). And some aspects of Mass—such as receiving the Eucharist—must occur in person. *Id.* ¶ 10

To host worship services and other religious activities, the Archdiocese operates over three dozen churches in the District. *See* Pl.'s Ex. A-1 at 2, ECF No. 33-4. They vary in size, but over half of them can accommodate 500 or more worshippers at capacity. *Id.*

The COVID-19 virus has affected the Archdiocese, as it has all of us. When the pandemic swept into the city a year ago, the Archdiocese canceled public Mass and suspended its parishioners' obligation to attend in person. Carson Decl. ¶ 17. This voluntary decision, *see id.*, predated regulations issued by the Mayor that closed all "non-Essential Business" and prohibited gatherings of ten or more people, including in churches. Pl.'s Ex. B-3 ("Mayor's Order 2020-053") at 4–9, ECF No. 33-8; Ex. B-7 at 12, ECF No. 33-12 (explaining that "large gatherings of ten or more people are prohibited, so as a practical matter, most churches are not holding services"). The Mayor's restrictions carved out a class of "Essential Businesses," which were "strongly encouraged to remain open" with no capacity limitations. Mayor's Order 2020-053 at

4–5. "Essential Businesses" were defined to include many entities, from hospitals and grocery stores to dry cleaners, liquor stores, and medical marijuana dispensaries. *Id.* at 5–8. Religious services were excluded. *Id.*

In May and June, after weeks of being unable to hold Masses, the Archdiocese sought waivers for several of its churches. Carson Decl. ¶ 34. The District denied the requests. *Id.* The Archdiocese also requested a one-time waiver for the Basilica to host an ordination ceremony for a group of priests, which would have filled the church to no more than ten percent of its capacity. *Id.* ¶ 35. That request was also denied. *Id.*

Restrictions loosened, though, when "Phase Two" of the Mayor's reopening plan came in late June. Places of worship could hold services with attendance capped at the lesser of 50 percent capacity or 100 persons. Pl.'s Ex. B-4 ("Mayor's Order 2020-075") at 7, ECF No. 33-9. The Archdiocese immediately resumed holding public Mass. Carson Decl. ¶ 19. When it did so, it "instituted rigorous social distancing and hygiene measures," including:

> reconfigur[ing] worship spaces to use every other pew and requir[ing] 6 feet of space between individuals or groups who did not arrive together; mandat[ing] the use of masks or face coverings during worship services; curtail[ing] singing during worship services; creat[ing] indoor traffic plans and entry and exit plans to maintain social distancing before, during, and after Mass—including during the distribution of Holy Communion; sanitiz[ing] and disinfect[ing] worship spaces after each liturgy; and encourag[ing] the use of reservation systems for scheduling attendance at each Mass.

*Id.* ¶ 21; *see also* Pl.'s Ex. C-1, ECF No. 37-1 (Archdiocese's guidance document on "Public Celebration of Mass and Holy Communion Outside of Mass").

The District's relaxed restrictions were short-lived. Citing "escalating" community transmission of COVID-19, the Mayor issued a new order in November limiting "[i]ndoor services in Houses of Worship" to the lesser of 50 percent occupancy or 50 persons. Pl.'s Ex. B-5 ("Mayor's Order 2020-119") at 2, 4, ECF No. 33-10. All "Essential Businesses" continued to

face no capacity limitations.  *See* Mayor's Order 2020-053 at 4–5.

**B.**

As Christmas approached, the Archdiocese asked the District to lift the numerical cap on Mass attendance.  *See* Carson Decl. ¶¶ 40–42; Pl.'s Ex. B-9 at 2–3, ECF No. 33-14.  The District refused, and the Archdiocese sued.  *See* Carson Decl. ¶ 43; Compl.  Along with its complaint, the Archdiocese applied for a temporary restraining order and preliminary injunction, seeking relief under the First Amendment and RFRA.  Pl.'s Statement of P. & A. in Supp. of Pl.'s Appl. for TRO and Prelim. Inj. at 6–8, ECF No. 11-2.

During briefing on the Archdiocese's initial motion, the District modified its restrictions on worship.  Pl.'s Ex. B-13 ("Mayor's Order 2020-126"), ECF No. 33-18.  It noted that although "[l]arge gatherings remain discouraged," "[a] recent lawsuit appears to insist on a constitutional right to hold indoor worship services."  *Id.* at 3.  "In order to resolve litigation," the order stated, the numerical cap would increase from 50 to 250.  *Id.*  The order explained how the District devised the cap:

> The lawsuit argues that houses of worship and restaurants should be treated the same, or the same as other activities where the large gatherings limits are not imposed.  Our review indicates that the maximum number of persons at the largest restaurant, based on twenty-five percent (25%) of their Certificates of Occupancy, is approximately two hundred fifty (250) persons.  This Order ensures parity in terms of capacity limits—both as a percentage and a cap on attendance—among more activities.

*Id.*  The new 25 percent/250-person restrictions applied broadly to restaurants, fitness and recreation facilities, retail food sellers, and "[o]ther essential and non-essential retail businesses." *Id.* at 4–6.  As with prior orders, those who "knowingly violate[]" the District's restrictions "may be subject to civil and administrative penalties authorized by law, including sanctions or penalties for violating D.C. Official Code § 7-2307, including civil fines or summary suspension or revocation of licenses."  *Id.* at 6; *see also* D.C. Code § 7-2307 (allowing the Mayor to, among

other things, "provide for a fine of not more than $1,000 for each violation" of emergency executive orders).

Two days later, the District changed gears. It issued another order, which "immediately repealed" the 25 percent/250-person restrictions as to "[f]ood sellers and big box stores selling a range of essential and non-essential goods." Pl.'s Ex. B-14 ("Mayor's Order 2020-127") at 4, ECF No. 33-19. It stated that these "[s]tores must make plans that provide for safe social distancing between persons and limit occupancy to the extent necessary for safety." *Id.* Houses of worship, however, remained bound by the earlier order.

The parties then resolved their initial dispute. Among other terms, their agreement provided that the Archdiocese would "presumptively be entitled" to hold Masses at the 25 percent/250-person limits and that the District would give 36 hours' notice before tightening the restrictions. Joint Stipulation & Agreement at 2, ECF No. 28-1. The Archdiocese withdrew its emergency motion "without prejudice" to later seeking injunctive relief. *Id.* at 4. On the parties' request, the Court held the case in abeyance. *See* Min. Order (Dec. 22, 2020).

In mid-February, with Holy Week and Easter on the horizon and COVID-19 rates dropping, the Archdiocese asked the District to loosen restrictions "in time to allow more worshippers to attend Mass." Carson Decl. ¶ 45; Pl.'s Mem. at 17. The District declined but told the Archdiocese that it would reevaluate around March 15. Pl.'s Mem. at 17.

Soon after, the Archdiocese filed the current motion. As before, it argues that the District's restrictions on religious worship violate the Free Exercise Clause and RFRA. Pl.'s Mem. at 6–7. Several days later, the District granted a waiver permitting the Basilica to hold Masses at 25 percent capacity (without the 250-person cap) during Holy Week. *See* Defs.' Opp'n to Pl.'s Second Appl. for a TRO and Prelim. Inj. ("Defs.' Opp'n") at 9 n.1, ECF No. 34;

Defs.' Ex. G, ECF No. 34-4.[2]  The Archdiocese maintains its challenge to the 250-person cap, notwithstanding the waiver.  *See* Pl.'s Reply in Supp. of Second Appl. for TRO and Prelim. Inj. ("Pl.'s Reply") at 30, ECF No. 35.

Based on the parties' briefs and arguments presented at the hearing, the Archdiocese's motion for injunctive relief is ripe for decision.[3]

## II.

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A Court should grant the remedy only if the moving party makes a showing that "four factors, taken together, warrant relief": (1) the party is likely to succeed on the merits; (2) it will likely suffer irreparable harm absent preliminary relief; (3) the balance of the equities tips in its favor; and (4) an injunction serves the public interest.  *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016).  And this remedy "may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

A court can grant a preliminary injunction "based on less formal procedures and on less extensive evidence than in a trial on the merits, but if there are genuine issues of material fact raised in opposition to a motion for a preliminary injunction, an evidentiary hearing is required."  *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) (cleaned up).  The parties here waived an

---

[2] By its terms, the waiver does not cover Palm Sunday, which begins Holy Week.  *See* Defs.' Ex. G (granting the waiver "from Monday, March 29 through Monday, April 5").  But the District clarified at oral argument that this was a clerical oversight and that the waiver indeed applies to Palm Sunday.  Hr'g Tr. at 21–22.

[3] This Court has jurisdiction under the federal question statute, 28 U.S.C. § 1331.

evidentiary hearing and stand solely on their written submissions. *See* Hr'g Tr. at 2. And the Court finds that there are no factual disputes inhibiting adjudication.

## III.

For starters, the Court must clarify which restrictions are at issue. Given the District's temporary waiver of the 250-person cap for the Basilica, *see* Defs.' Ex. G, the question arises whether the Archdiocese's challenge to it is moot. Practically, the Basilica is the only Catholic church subject to the 250-person hard cap because it could seat 750 parishioners if only the District's 25 percent limit applied.[4] *See* Pl.'s Ex. A-1 at 2. The Archdiocese's next largest church, the Cathedral of St. Matthew, would run right up to the 250-person cap at 25 percent capacity because it can normally hold 1,000 congregants. *Id*.

Facing similar circumstances, the Supreme Court and lower courts have concluded that challenges to worship restrictions were not moot. In *Roman Catholic Diocese of Brooklyn v. Cuomo*, the Supreme Court recently considered whether New York's restrictions on houses of worship were moot because the State had "reclassified the areas in question." 141 S. Ct. 63, 68 (2020). The Court decided that there was "no justification" for denying relief to the applicants because "[i]t [was] clear that th[e] matter [was] not moot." *Id*. The Court reasoned that "the applicants remain[ed] under a constant threat that the area in question will be reclassified" because the State "regularly changes the classification of particular areas without prior notice." *Id*. If that were to occur, the Court explained, "the reclassification will almost certainly bar

---

[4] The District contends that the Basilica can seat 3,500 persons at capacity, not 3,000 as the Archdiocese says. *See* Defs.' Opp'n at 35 n.15. Any difference is immaterial here. The Court will assume the accuracy of the Archdiocese's representation, which allows for fewer total congregants under the Court's ruling.

individuals in the affected area from attending services before judicial relief can be obtained"—especially because (as relevant here) "[a]t most Catholic churches, Mass is celebrated daily." *Id.*

The Ninth Circuit followed suit. It determined that a First Amendment case before it was "not moot" even though the restrictions at issue were "no longer in effect." *Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228, 1230 n.1 (9th Cir. 2020). As in *Diocese of Brooklyn*, the court explained that the Governor "could restore the Directive's restrictions just as easily as he replaced them, or impose even more severe restrictions." *Id.*

So too here. Despite the waiver, the Archdiocese's challenge to the 250-person restriction remains live. The waiver is set to expire by its own terms on Easter Monday, making enforcement of the 250-person cap not just likely, but *certain*. *Cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice [to prove an Article III injury] if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." (cleaned up)). The District will impose the 250-person cap after Easter unless it changes course, making this an easier case from a mootness perspective than either *Diocese of Brooklyn* or *Calvary Chapel*.

The Court will thus consider the Archdiocese's request for an injunction as to both the 250-person cap and the 25 percent capacity limit. Each of the preliminary injunction factors will be taken in turn: (A) likelihood of success on the merits; (B) irreparable harm; and (C) the balance of the equities and the public interest.

### A.

The Court begins with whether the Archdiocese will likely succeed on the merits. The Court finds: (1) that both the First Amendment and RFRA trigger strict scrutiny; and (2) that the District's restrictions cannot survive that demanding test.

1.

The Archdiocese contends that both (a) the First Amendment and (b) RFRA require the Court to apply strict scrutiny to the District's restrictions. *See* Pl.'s Mem. at 18. The Court agrees.

a.

Under the First Amendment, the government "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. "Th[e] instinct to protect religious freedom has roots that predate the Constitution." *Capitol Hill Baptist Church v. Bowser*, --- F. Supp. 3d ---, No. 20-cv-02710-TNM, 2020 WL 5995126, at *4 (D.D.C. Oct. 9, 2020); *see also* James Madison, *Memorial and Remonstrance Against Religious Assessments* (June 20, 1785), *in* Selected Writings of James Madison 21, 22 (Ralph Ketcham ed., 2006) ("The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate."). Indeed, the lack of an explicit protection for religious freedom in the Constitution itself was a major impetus for the Bill of Rights. *See, e.g.*, Letters of Centinel II, *in* 2 The Complete Anti-Federalist 143, 152 (Herbert J. Storing ed., 1981) (stating that, in "[t]he new plan," "there is no declaration, that all men have a natural and unalienable right to worship Almighty God, according to the dictates of their own consciences and understanding"); Letters from the Federal Farmer IV (Oct. 12, 1787), *in* 2 The Complete Anti-Federalist, *supra*, at 245, 249 (stating that "when we are making a constitution . . . why not establish the free exercise of religion, as part of the national compact"); *see also* Letter of Richard Henry Lee to Governor Edmund Randolph (Oct. 16, 1787), *in* 5 The Complete Anti-Federalist, *supra*, at 112, 116 (same); Address of the Albany Antifederal Committee (Apr. 10, 1788), *in* 6 The Complete Anti-Federalist, *supra*, at 122, 124 (same).

The free exercise of religion in the United States has long been a distinctive characteristic of personal liberty more broadly too—prompting Alexis De Tocqueville to comment that "[t]he Americans combine the notions of Christianity and of liberty so intimately in their minds, that it is impossible to make them conceive the one without the other." Alexis De Tocqueville, *Democracy in America* 364 (Simon & Brown ed., 2013); *see also id.* at 366 ("Upon my arrival in the United States, the religious aspect of the country was the first thing that struck my attention; and the longer I stayed there the more did I perceive the great political consequences resulting from this state of things, to which I was unaccustomed.").

Restrictions on attending religious services "strike at the very heart of the First Amendment's guarantee of religious liberty." *Diocese of Brooklyn*, 141 S. Ct. at 68.[5] So strict scrutiny applies when "challenged restrictions are not 'neutral' and of 'general applicability.'"

---

[5] To be clear at the outset, the Supreme Court's decisions granting injunctive relief, such as *Diocese of Brooklyn*, bind this Court. When a "majority of the Court makes clear that it believes the movant has shown a strong possibility of prevailing on the merits," that decision "should be treated as precedential by the lower courts until the Court tells them otherwise." Trevor N. McFadden & Vetan Kapoor, *The Precedential Effects of the Supreme Court's Emergency Stays* 44 Harv. J. L. & Pub. Pol'y --- (forthcoming 2021) (manuscript at 32), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3726262. The Supreme Court confirmed as much in its recent grant of injunctive relief in *Gateway City Church v. Newsom*, where it explained that "[t]he Ninth Circuit's failure to grant relief was erroneous" and that the "outcome [was] *clearly dictated* by this Court's decision in" *South Bay II*. *Gateway City Church v. Newsom*, No. 20A138, 2021 WL 753575, at *1 (U.S. Feb. 26, 2021) (emphasis added); *see also S. Bay United Pentecostal Church v. Newsom* (*S. Bay II*), 141 S. Ct. 716, 719 (2021) (statement of Gorsuch, J.) ("Today's order should have been needless; the lower courts in these cases should have followed the extensive guidance this Court already gave."). In contrast, when the Supreme Court *denies* a stay, as was the case respecting worship restrictions in *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603 (2020), that decision is *not* binding precedent. *See Capitol Hill Baptist*, 2020 WL 5995126, at *7 n.9. There are any number of reasons why the Court might *deny* relief—for example, there may not be a chance that four Justices would later grant certiorari. *Id.* In-chambers opinions written by a single Justice and separate statements respecting stay decisions are also not binding but can serve as persuasive authority. "After all, if the rulings of a single district judge can have persuasive value in subsequent cases, so too can the considered opinion of a sitting Justice of the Supreme Court." McFadden & Kapoor, *The Precedential Effects of the Supreme Court's Emergency Stays*, *supra*, at 13 (cleaned up).

*Id.* at 67 (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)). Laws burdening religious practice must be neutral because "[a]t a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye*, 508 U.S. at 532. Such laws must also be generally applicable because "[t]he principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Id.* at 543.

In *Diocese of Brooklyn*, the Supreme Court held that New York's restrictions on houses of worship triggered strict scrutiny because they were not neutral and generally applicable. 141 S. Ct. at 67. Although synagogues and churches could admit no more than ten persons in a "red zone," "essential" businesses could "admit as many people as they wish[ed]." *Id.* at 66. The Court suggested that the class of "essential" businesses was especially broad, "includ[ing] things such as acupuncture facilities, camp grounds, garages, as well as many whose services are not limited to those that can be regarded as essential, such as all plants manufacturing chemicals and microelectronics and all transportation facilities." *Id.* "The disparate treatment is even more striking in an orange zone," the Court said, where places of worship were limited to admitting 25 persons even though "non-essential businesses may decide for themselves how many persons to admit." *Id.*

The Court reasoned that "[t]hese categorizations lead to troubling results." *Id.* Specifically, "a large store . . . could literally have hundreds of people shopping there on any given day," while "a nearby church or synagogue would be prohibited from allowing more than 10 or 25 people inside for a worship service." *Id.* at 67 (cleaned up). New York's regulations

could not "be viewed as neutral because they single[d] out houses of worship for especially harsh treatment." *Id.* at 66.

Under *Diocese of Brooklyn*, strict scrutiny applies here. Although the District's capacity restrictions are not as harsh as New York's were, they still discriminate against houses of worship. The District's order states that "houses of worship may admit no more than" the lesser of 25 percent of their capacity or 250 persons. Mayor's Order 2020-126 at 4. Yet, after the District's repeal of the same limit on "[f]ood sellers and big box stores selling a range of essential and non-essential goods," those entities are subject to *no* maximum-capacity limitations. Mayor's Order 2020-127 at 4. They need only "limit occupancy to the extent necessary for safety" and "make plans that provide for safe social distancing between persons." *Id.* So "while a synagogue or church may not admit more than [25 percent capacity or 250] persons," more favored businesses "may admit as many people as they wish." *Diocese of Brooklyn*, 141 S. Ct. at 66. In practical terms, this means that the Archdiocese's churches must stop admitting parishioners once they become a quarter full, but Whole Foods or Target can take in as many customers as they wish while complying with social-distancing requirements. "[O]nce a State creates a favored class of businesses, as [the District] has done in this case, [it] must justify why houses of worship are excluded from that favored class." *Id.* at 73 (Kavanaugh, J., concurring).

The District's restrictions are also problematic because the 250-person cap uniquely burdens churches. The Mayor's order explained that the District set the hard cap at 250 based on the number of persons that "the largest restaurant" could serve at 25 percent capacity. Mayor's Order 2020-126 at 3. But as the District admits, "no restaurant in the District *has* a room that can hold 1,000 people." Defs.' Opp'n at 25 n.11. So this cap is meaningless as applied to them.

*See* Pl.'s Mem. at 25–26. Even assuming that the District was only striving to achieve "parity" between restaurants and churches, Mayor's Order 2020-126 at 3, its restrictions "cannot be viewed as neutral because they single out houses of worship for especially harsh treatment," *Diocese of Brooklyn*, 141 S. Ct. at 66.[6]

The District's arguments do not persuade the Court otherwise.[7] It first says that the Archdiocese "does not name [a secular establishment] that can even allegedly hold 250 or more people." Defs.' Opp'n at 20. But as the Archdiocese says, if these stores cannot hold 250 people, "there would have been no need" for the District to repeal the 250-person cap (along with the 25 percent capacity limit). Pl.'s Reply at 16. In any event, the District cannot dispute that it swiftly changed its restrictions to repeal *any limit* on how many patrons "[f]ood sellers and big box stores selling a range of essential and non-essential goods" could admit. Mayor's Order 2020-127 at 4; Defs.' Opp'n at 21. It does not matter whether these entities could hold 250 people. They are subject to no maximum-capacity restriction, percentage-based or otherwise.

The District next asserts that its "restrictions do not discriminate against religious institutions" because "secular facilities are subject to" other "operational restrictions that further limit their capacity." Defs.' Opp'n at 19. It cites a section of the D.C. Building Code and says that certain stores "must allow 60 square feet per person" and that fitness centers and libraries

---

[6] The District says that, unlike in *Diocese of Brooklyn*, there are no allegations that the District's restrictions target Catholics. *See* Defs.' Opp'n at 33. This may be true, but it is not dispositive. Although the Supreme Court acknowledged that Governor Cuomo's "statements made in connection with the challenged rules can be viewed as targeting the ultra-Orthodox Jewish community," it explicitly "put those comments aside" to find that the regulations still "single[d] out houses of worship." *Diocese of Brooklyn*, 141 S. Ct. at 66 (cleaned up).

[7] The District's brief mentions that strict scrutiny is unwarranted under several other constitutional provisions. *See* Defs.' Opp'n at 19. But the Court construes the Archdiocese's motion as alleging a constitutional violation under only the First Amendment's Free Exercise Clause. *See, e.g.*, Pl.'s Reply at 14–16 (focusing only on the Free Exercise Clause).

"must provide 50 square feet" of space per person. *Id.* at 21–22 (citing 12-A D.C.M.R. § 1004). But this is a pre-COVID-19 regulation. *See* Hr'g Tr. at 28–29. And churches are subject to various pre-COVID-19 regulatory frameworks, too, including the fire code. *See id.*

Even taking the District's argument as true—that some of the Archdiocese's secular comparators are subject to more onerous commercial regulations generally—that does not make the District's harsher COVID-19-related capacity limits on houses of worship nondiscriminatory. As the Archdiocese points out, what is important is that the District's 25 percent and 250-person restrictions would not apply to its churches if they hawked wares instead of proclaimed the Gospel. *See* Pl.'s Reply at 16.

Despite the District's arguments that big-box stores or other businesses with no capacity restrictions are not appropriate comparators, *see* Defs.' Opp'n at 19–23, the Supreme Court has ruled otherwise. In *Diocese of Brooklyn*, the Court characterized New York's restrictions as discriminatory because they treated houses of worship differently than a wide range of "essential" and "non-essential" businesses—including "large store[s]." 141 S. Ct. at 66–67. Other lower courts have had no trouble deciding that *Diocese of Brooklyn* compels the conclusion that these comparators are appropriate and that such disparate treatment triggers strict scrutiny. *See, e.g.*, *Calvary Chapel*, 982 F.3d at 1233 (holding that restrictions treating "[c]asinos, bowling alleys, retail businesses, restaurants, arcades, and other similar secular entities" more favorably than houses of worship, "although not identical to New York's [in *Diocese of Brooklyn*], require attendance limitations that create the same 'disparate treatment' of religion" (quoting *Diocese of Brooklyn*, 141 S. Ct. at 66)).

In sum, the District's disparate treatment of houses of worship triggers strict scrutiny

under the First Amendment.[8]

b.

Even if the First Amendment did not trigger strict scrutiny, RFRA would.  "A near-unanimous Congress enacted [RFRA] to bolster protections for religious liberty." *Capitol Hill Baptist Church*, 2020 WL 5995126, at *4.  The statute "provide[s] greater protection for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 357 (2015).  Under RFRA, the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless "it demonstrates that application of the burden to the person" furthers "a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)–(b); *id.* § 2000bb-2(2) (listing the District as a "covered entity").[9]

RFRA protects a broad array of religious conduct.  The statute defines "exercise of religion" as "includ[ing] any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* §§ 2000bb-2(4), 2000cc-5(7)(A).  Courts thus "focus not on the centrality of the particular activity to the adherent's religion but rather on whether the adherent's sincere religious exercise is substantially burdened." *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008).  A "substantial burden" exists when government action rises above *de minimis* inconveniences and puts "substantial pressure on an adherent to modify his behavior and

---

[8] The Archdiocese also argues that strict scrutiny applies because the Mayor's orders "threaten penalties for holding religious worship services, an activity that lies at the very core of the free exercise of religion." Pl.'s Mem. at 26.  Because the Court finds that the District's unequal treatment of houses of worship triggers strict scrutiny, it need not reach this argument.

[9] While RFRA refers to a "person," the Supreme Court has held that the statute covers entities like the Archdiocese.  *See Burwell v. Hobby Lobby*, 573 U.S. 682, 707–08 (2014).  The statute applies to the D.C. government as well as the federal government.  *See Potter v. District of Columbia*, 558 F.3d 542, 546 (D.C. Cir. 2009).

16

to violate his beliefs." *Id.* (cleaned up).

Catholics believe that Sunday Mass is "the foremost holy day of obligation in the universal Church" and that they "cannot pray at home as at church, where there is a great multitude." Carson Decl. ¶¶ 11–12 (quoting Catechism of the Catholic Church §§ 2177, 2179). And it is impossible for Catholics to receive the Eucharist without attending Mass in person. *Id.* ¶ 10; *see also Diocese of Brooklyn*, 141 S. Ct. at 68 (pointing out that "Catholics who watch a Mass at home cannot receive communion"). It is the Archdiocese's "sincere[] belie[f]" that "it has a religious duty" to provide the Mass and Eucharist for its faithful "to the greatest extent possible when it believes it can safely do so."[10] Carson Decl. ¶ 12.

The Court finds that the Archdiocese's belief is sincere and that the District's restrictions substantially burden the Archdiocese's religious exercise. True, the District has not regulated "the *content* or *substance* of a Mass" and has not "complete[ly] bar[red]" Masses. Defs.' Opp'n at 14, 34 (emphasis in original). But that does not mean its actions have not burdened religion. The District's restrictions have "caused multiple Catholic churches in the District to reach the maximum limit, for Ash Wednesday and regular Sunday Masses," as well as "for funerals." Carson Decl. ¶ 27. The Archdiocese says that "it is impossible for [it] to avoid turning away worshippers, especially on Holy Days." *Id.* The District's actions thus put "substantial pressure" on the Archdiocese "to modify [its] behavior and to violate [its] beliefs" by preventing

---

[10] The District contended at oral argument that if the Archdiocese admits it would be legitimate to limit the number of persons inside its churches based on the fire code, then it cannot sincerely believe that it has a duty to admit congregants above the District's COVID-19 capacity limits. *See* Hr'g Tr. at 24–25. That the Archdiocese does not sincerely believe it must admit parishioners past the fire code limit does not prevent it from challenging the District's pandemic-related restrictions, which are much stricter than any fire code. Acknowledging that one government regulation accommodates its religious belief does not bar the Archdiocese from challenging *any* government regulation without question. *Cf. Hobby Lobby*, 573 U.S. at 703–04 (challenging coverage mandate as to only four of 20 contraceptive methods).

it from offering Mass to as many as it believes it safely can.[11]  *Kaemmerling*, 553 F.3d at 678

(cleaned up).  This burden is not "inconsequential or *de minimis*."  *Id.*

    The District acknowledges that forcing the Archdiocese to turn away worshippers is a

"claim of actual interference with religious practice," but contends that it "is so broadly set forth

that it is impossible to determine whether it represents a substantial burden."  Defs.' Opp'n at 18.

For example, the District questions whether the Archdiocese "could have accommodated

[rejected] worshipers without appreciable burden at another of its churches or by holding

additional services at the same church."  *Id.*  It also cites the Catholic Church's "willingness to

waive certain restrictions and obligations when there is need," including allowing priests to

celebrate more Masses and "urg[ing] parishioners" to watch Mass online.  *Id.* at 34–35.

    But "[t]here are religious and practical" problems with the District's argument.  Carson

Decl. ¶ 50.  Catholic priests cannot offer an unlimited number of Masses, and churches are

constrained by the money and support staff it would take to provide even more Masses.  *See id.*

¶¶ 51–53; Pl.'s Reply at 12.  And that the Archdiocese has been flexible in some respects does

not mean the District can compel it to be flexible in others.  It is up to the Archdiocese, not the

District or this Court, to define the boundaries of its flexibility.  *Cf. Our Lady of Guadalupe Sch.*

*v. Morrissey-Berru*,  140 S. Ct. 2049, 2055 (2020) ("The First Amendment protects the right of

religious institutions to decide for themselves, free from state interference, matters of church

government as well as those of faith and doctrine." (cleaned up)); *On Fire Christian Ctr., Inc. v.*

---

[11]  The Court therefore rejects the District's attempt to distinguish this case from *Capitol Hill Baptist*.  It is irrelevant that the "Archdiocese's many churches have always held multiple Masses daily" and that "it alleges no minimum participation requirement."  Defs.' Opp'n at 35.  The Archdiocese faces a substantial burden under RFRA because, just as in *Capitol Hill Baptist*, "[g]iven the District's restrictions, the [Archdiocese] now must choose between violating the law or violating its religious convictions" in providing the Mass for as many as it believes it safely can.  *Capitol Hill Baptist*, 2020 WL 5995126, at *6.

*Fischer*, 453 F. Supp. 3d 901, 911 (W.D. Ky. 2020) (Walker, J.) ("It is not the role of a court to tell religious believers what is and isn't important to their religion, so long as their belief in the religious importance is sincere."). The Court will also not fault the Archdiocese for providing a virtual, second-best alternative to its parishioners who cannot attend Mass. This does not undermine the sincerity of the Archdiocese's belief that it must provide in-person Masses for those who wish to attend. *See* Carson Decl. ⁋ 12.

While the District is concerned that the Archdiocese has not shown with enough specificity "how many worshipers were affected by [its] restrictions," Defs.' Opp'n at 18, church attendance in neighboring jurisdictions suggests that churches in the District would exceed the 25 percent capacity limit if permitted to do so. The Archdiocese has parishes in Maryland and, although some Maryland counties impose additional restrictions, there is a 50 percent capacity restriction statewide. Carson Decl. ⁋ 31. The Archdiocese says, and the District does not appear to dispute, that "Maryland parishes in areas with looser restrictions generally have higher Mass attendance than the District" and that "[w]here allowed, Mass attendance in Maryland frequently exceeds 25% capacity." *Id.* The same is true for sister Catholic parishes across the river in Northern Virginia, which are not subject to any capacity restrictions. *Id.* ⁋ 32.

The District also claims that its restrictions do not substantially burden the Archdiocese because the Archdiocese's own safety protocols would limit its churches to "roughly 30-40% capacity" anyway. Defs.' Opp'n at 18 (citing Carson Decl. ⁋ 30). But the Archdiocese sincerely believes that it must welcome *all* its faithful who seek Mass and the sacraments. *See* Carson Decl. ⁋ 12. Its religious exercise of providing Mass to every parishioner, as much as it believes it can safely, is substantially burdened when it cannot do so even for another 5 to 15 percent under the pain of penalty. *See* Mayor's Order 2020-126 at 6.

The District also minimizes the difference between its current restrictions and a church filled to 30–40 percent capacity.  The Court is unconvinced.  Just to take two examples, the 25 percent/250-person restrictions cause the Archdiocese to turn away 50–150 parishioners from the Cathedral of St. Matthew that it could otherwise seat at 30–40 percent capacity.  *See* Pl.'s Ex. A-1 at 2; Carson Decl. ¶ 30.  And the Archdiocese says that the 250-person limit requires the Basilica to turn away approximately 750 worshippers that it could otherwise hold under its own protocols.  *See* Carson Decl. ¶ 30.  Anyone who has attended or performed in a concert knows instinctively that a largely empty hall and full house provide two very different experiences.

In the end, part of the free exercise of religion that the First Amendment protects is a church's ability to exercise it in the manner it sincerely believes its religion compels.  "[I]t is not for [the District or this Court] to say that" the Archdiocese can provide the same religious experience for its parishioners at a Mass with 25 people rather than 30, 40, or 100.  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014).  Indeed, the "narrow function" of the Court is "to determine whether the line drawn reflects an honest conviction."  *Id.* (cleaned up).  And it does here, especially given the longstanding Christian tradition of assembling together.  *See* Carson Decl. ¶ 11.

The Court therefore determines that RFRA provides a separate basis to apply strict scrutiny here.

### 2.

The Court next considers whether the District's restrictions withstand strict scrutiny.  Under both the First Amendment and RFRA, this is not easy.  The First Amendment requires that "[a] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny," meaning that it "must advance interests of the highest

order and must be narrowly tailored in pursuit of those interests." *Church of the Lukumi Babalu Aye*, 508 U.S. at 546 (cleaned up). The "compelling interest standard" is "not watered down but really means what it says." *Id.* (cleaned up). The Court is mindful that "[a] law that targets religious conduct for distinctive treatment . . . will survive strict scrutiny only in rare cases." *Id.*

RFRA too requires the District to show that applying its restrictions to the Archdiocese "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). The District must "demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006) (citing 42 U.S.C. § 2000bb-1(b)). Courts thus "look[] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 431. "The least-restrictive-means standard is exceptionally demanding." *Hobby Lobby*, 573 U.S. at 728.

The Court finds that "[s]temming the spread of COVID-19 is unquestionably a compelling interest" and assumes that the District has met this prong of the strict scrutiny test.[12]

---

[12] The compelling interest inquiry under RFRA would likely be more searching. *See, e.g.*, *Capitol Hill Baptist*, 2020 WL 5995126, at *8 (explaining that "[t]he District cannot rely on its generalized interests in protecting public health or combating the COVID-19 pandemic, critical though they may be" because "RFRA requires the District to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person" (cleaned up)). But the Court does not engage in it here considering the need to promptly resolve the Archdiocese's motion and because it makes no difference to the ultimate outcome. Many of the Archdiocese's arguments contending that the District does not have a compelling interest in applying its restrictions specifically to the Archdiocese also go to whether the restrictions are narrowly tailored. *Compare* Pl.'s Mem. at 30–33, *with id.* at 33–36.

*Diocese of Brooklyn*, 141 S. Ct. at 67.  The Court does not doubt the District's representations about the threat of the virus—including the potential for new and dangerous variants.  *See* Defs.' Opp'n at 26–31.  But this risk, though great, does not give the District carte blanche to restrict religious worship.

Rather, it must show that its restrictions on houses of worship—and on the Archdiocese in particular—are narrowly tailored, or the least-restrictive means of achieving its interest.  *See Diocese of Brooklyn*, 141 S. Ct. at 67.  To be clear, it is on the *District* to show a compelling interest and narrowly tailored restrictions.  Even though some statements in its brief suggest otherwise, *see, e.g.*, Defs.' Opp'n at 31 ("Although the Archdiocese may be able to convince the Court that some alternative restriction would be more narrowly tailored, it has not done so here . . . ."), the burdens at the preliminary injunction stage track those at trial, *see O Centro*, 546 U.S. at 429–30.

### a.

The District has not carried its burden.  As to the restrictions on the whole—the 250-person cap and the 25 percent capacity limit—two factors in particular convince the Court that the District has not pursued the least-restrictive means.

*First*, when compared with other jurisdictions, the District's restrictions are an outlier.  The Archdiocese points out—and the District did not dispute, *see* Hr'g Tr. at 42—that no state imposes a numerical cap on attendance at worship services, *see* Pl.'s Mem. at 35.  And apparently only two states impose a 25 percent limit like the District's.  *See* Pl.'s Reply at 18–19; Hr'g Tr. at 42–43.  Indeed, states that had 25 percent limits appear to be jettisoning them.  *See* Pl.'s Reply at 18–19.

Granted, the District is not a state and could be compared to localities that have, in some

instances at least, imposed more onerous restrictions than those at the state level.  *See* Hr'g Tr. at 22–23. The practice of other states is also not dispositive.  That one jurisdiction is stricter than another does not mean it is automatically problematic.  *Cf. Holt*, 574 U.S. at 369 ("We do not suggest that RLUIPA requires a prison to grant a particular religious exemption as soon as a few other jurisdictions do so."). Most tellingly, though, neighboring jurisdictions with similar population densities and COVID-19 experiences have not imposed restrictions like the District's. Nearby Maryland counties allow houses of worship to fill up to 50 percent capacity, while Northern Virginia localities impose no restrictions.  *See* Pl.'s Mem. at 35; Carson Decl. ¶¶ 25, 32. In response, the District argues that less-onerous restrictions could also turn out to be less effective at stopping the spread of COVID-19.  *See* Defs.' Opp'n at 28 ("Although many states have *tried* less restrictive means, it remains unclear how much this has protected public health." (emphasis in original)).

That may well be true. But the practice of other jurisdictions is still a data point—indeed, one the Supreme Court has looked to when examining burdens on religious practice.  *Cf. Holt*, 574 U.S. at 368–69 ("That so many other prisons allow inmates to grow beards while ensuring prison safety and security suggests that the Department could satisfy its security concerns through a means less restrictive than denying petitioner the exemption he seeks."). So the regulations in other jurisdictions—especially neighboring ones—make it harder for the District to meet its burden to show that the means it has chosen are the least restrictive.  It "must, at a minimum, offer persuasive reasons why it believes that it must take a different course."  *Id.* at 369. That "it remains unclear" whether less-restrictive means would be just as effective is not enough for the District to clear that hurdle.  Defs.' Opp'n at 28.

*Second*, assuming that the District's restrictions on houses of worship are necessary to

achieve its interest in fighting the pandemic, they are underinclusive.  In *Holt*, for example, the Supreme Court held that a prison's "grooming policy [was] substantially underinclusive" because it prohibited half-inch beards for religious reasons but allowed quarter-inch beards for dermatological conditions "even though both beards pose similar risks."[13]  *Holt*, 574 U.S. at 367; *see also Church of the Lukumi Babalu Aye*, 508 U.S. at 543 (explaining that the city ordinances were "underinclusive" because "[t]hey fail[ed] to prohibit nonreligious conduct that endanger[ed] [the government's] interests in a similar or greater degree" than the religious practice).

The same principle applies here.  The strict capacity limits applicable to houses of worship do not apply to "[f]ood sellers and big box stores selling a range of essential and non-essential goods," Mayor's Order 2020-127 at 4, even though these entities "pose similar risks" of spreading the virus, *Holt*, 574 U.S. at 367.  The District instead relies on less-restrictive means to regulate these entities.  These stores must only "make plans that provide for safe social distancing between persons and limit occupancy to the extent necessary for safety."  Mayor's Order 2020-127 at 4.  That is all the Archdiocese requests for its churches.  *See* Pl.'s Mem. at 33–34.  It accepts the District's rules on masking, social distancing, and cleaning that (along with the Archdiocese's own self-imposed restrictions) "functionally limit churches [to] under 50% capacity anyway."  Pl.'s Reply at 20; *see also* Pl.'s Mem. at 32 (citing Pl.'s Ex. B-6 (the District's "Guidance for Places of Worship"), ECF No. 33-11).

---

[13] The District sought to distinguish *Holt* at oral argument by suggesting that there was no concern about the safety of third parties in that case, unlike here.  *See* Hr'g Tr. at 39–40.  Not so.  In *Holt*, the Court considered the prison's argument that the no-beard policy was necessary to "prevent[] prisoners from hiding contraband," including razors, *Holt*, 574 U.S. at 363, which would have implicated the safety of corrections officers and other inmates.  Even so, the Court held that the prison did not pursue that interest through the least-restrictive means.  *See id.* at 364.

The Court rejects the District's suggestion that houses of worship are actually treated more favorably than their secular comparators, despite the capacity restrictions. The District emphasizes the "direct forms of regulatory interference" imposed on commercial businesses, Defs.' Opp'n at 22, and mentioned at oral argument that they must have "extensive plans" to comply with the District's COVID-19 safety protocols, Hr'g Tr. at 29–30. But under the Mayor's order, houses of worship too must have written "[s]afety protocols . . . available to DC Health officials upon reasonable request"; and they must include "mandatory masking, plans for ingress and egress of worshippers, hygiene and airflow, and wellness checks." Mayor's Order 2020-126 at 4. It also provides that "each group [*i.e.*, household] must be seated at least six (6) feet in all directions from each other group." *Id.*

The District's contention that it "has closed fitness centers and even *outdoor* retail food sellers" for failing to adhere to social-distancing and masking requirements is likewise beside the point. Defs.' Opp'n at 22 (emphasis in original). That gyms and fish markets, but not the Archdiocese's churches, have faced enforcement actions could merely suggest that the churches are complying with the Mayor's edicts. Perhaps one reason that houses of worship face more onerous restrictions up front is because the District is understandably less comfortable shutting down churches than fish markets. *See* Hr'g Tr. at 36. But that cannot justify more extreme measures on the Archdiocese in the first instance.

The Court finds the 250-person cap particularly troubling. It does not appear that this restriction was narrowly tailored to stem the spread of the virus. As the District's order shows, it was designed simply to ensure "parity" between houses of worship and restaurants. Mayor's Order 2020-126 at 3. This limit was carefully calculated to restrict houses of worship while leaving even the city's largest restaurants untouched. Although perhaps well-meaning, it is still

suggestive of a "religious gerrymander, an impermissible attempt to target" religious practice. *Church of the Lukumi Babalu Aye*, 508 U.S. at 535 (cleaned up). This cannot satisfy strict scrutiny's high bar. *See id.* at 546 ("A law burdening religious practice that is not neutral or not of general application . . . must be narrowly tailored in pursuit of those interests.").

Recall that the 250-person cap, in effect, applies only to the Basilica. The District's Director of Health, Dr. LaQuandra Nesbitt, acknowledged "the Archdiocese's argument that the Basilica . . . because of its massive size, presents somewhat different circumstances than most places of worship." First Decl. of Dr. LaQuandra S. Nesbitt ("First Nesbitt Decl.") ⁋ 18, ECF No. 34-1. But she explained that "[w]hen crafting a generally applicable rule, however, it is not feasible or proper to consider the outliers." *Id.*; *see also* Second Decl. of LaQuandra Nesbitt ("Second Nesbitt Decl.") at 1, ECF No. 34-2 (standing by assertions in the first declaration, stating that the second declaration was intended "to supplement" the first). This represents a fundamental misunderstanding of the government's role in crafting public health restrictions that infringe on constitutionally protected rights. Broad brush strokes are fine for business regulations, but not for restricting the free exercise of religion. The Court acknowledges that it is harder for the District to consider restrictions case by case, but that is what narrow tailoring requires. *Cf. Diocese of Brooklyn*, 141 S. Ct. at 67; *Hobby Lobby*, 573 U.S. at 728.

More, *Diocese of Brooklyn* held that, among the "many other less restrictive rules" available to the State in that case, an obvious alternative existed to a hard numerical cap: "the maximum attendance at a religious service could be tied to the size of the church" because "[a]lmost all of the 26 Diocese churches immediately affected by the Executive Order can seat at least 500 people" and many could hold more than that. 141 S. Ct. at 67. Following *Diocese of Brooklyn*, the Ninth Circuit enjoined Nevada's numerical cap on houses of worship because it

was not "narrowly tailored to serve" the State's compelling interest in "slowing the spread of COVID-19." *Calvary Chapel*, 982 F.3d at 1234. Likewise here. The 250-person cap— "although less restrictive in some respects than the New York regulations reviewed in [*Diocese of Brooklyn*]—is not narrowly tailored because, for example, maximum attendance at a religious service could be tied to the size of the house of worship." *Id.* (cleaned up).

Even faced with the Archdiocese's assertions about its safety practices and the size of its churches, the District emphasized at oral argument that it is "not possible for the District or any government in generating general guidance that is likely applicable to all places of worship to examine any specific differences in practice." Hr'g Tr. at 38. It contends that its restrictions are lawful because it provides the possibility of case-by-case waivers for houses of worship that show they can operate safely. *See id.*

But the record shows that the Archdiocese has tried to work with the District outside of litigation to no avail. *See, e.g.*, Carson Decl. ¶¶ 34–48. Indeed, it was not until *after* the Archdiocese filed this emergency motion that the District granted a limited waiver for the Basilica. *See* Defs.' Ex. G (waiver letter dated March 11, 2021). Although the District has a waiver procedure on paper, it appears not to be using it in practice—at least as to the churches that have come before this Court seeking relief. *See Capitol Hill Baptist*, 2020 WL 5995126, at *3 (recounting that the District had denied the church's waiver request with the explanation that "[w]aivers for places of worship above that expanded capacity [50 percent or 100 persons] are not being granted at this time").

Thus, the Court finds that the 250-person cap on the Basilica and the 25 percent capacity limit, as applied to the Archdiocese's churches, are not narrowly tailored.[14]

---

[14] The District's suggestion that courts have upheld similar restrictions appears misplaced. The

**b.**

The District's proffered justifications do not persuade the Court otherwise. It argues that religious worship merits disparate treatment for essentially four reasons: (1) the largeness of religious gatherings; (2) how long worshippers are in one space; (3) the nature of religious gatherings; and (4) Masses in particular have contributed to the spread of the virus. *See* Defs.' Opp'n at 23–26, 28–29. The Court will consider each.

*First*, on the 250-person cap specifically, the District asserts that "increasing the number of people increases the likelihood someone has COVID-19." Defs.' Opp'n at 24. Fair enough. But largeness of a gathering alone shows nothing about the likelihood that the virus will *spread* more in churches that are not subject to the District's maximum-capacity restrictions and that take the precautions that the Archdiocese's churches do.

Relatedly, the District also contends that "the larger a gathering, the harder it becomes to conduct adequate contact tracing." *Id.* at 25. But this problem is moot if there is no actual increase in the risk of spread. And in some ways, it would be much easier to contract trace an

---

Ninth Circuit's decision in *Calvary Chapel* did not uphold a 25 percent capacity limit or suggest that such a limit "appeared proper." Defs.' Opp'n at 33. The court did "preliminarily enjoin the State from imposing attendance limitations on in-person services in houses of worship that are less favorable than 25% of the fire-code capacity." *Calvary Chapel*, 982 F.3d at 1234. But the court was apparently referencing the percentage limit, which applied to both houses of worship and commercial entities, in the State's *newly enacted* order that was not at issue in the case. *See id.* at 1230 n.1. The District also misreads the Ninth Circuit and Supreme Court decisions in *South Bay*. *See* Defs.' Opp'n at 32–33. The primary issue before the Ninth Circuit was California's "Tier 1" total ban on indoor worship. *See S. Bay United Pentecostal Church v. Newsom*, 985 F.3d 1128, 1132 (9th Cir. 2021). The court did not consider the church's purported challenge to the "Tier 2" 25 percent limit because the district court had not ruled on it below. *See id.* at 1151 n.38. The 25 percent limit was therefore not before the Supreme Court either. *See S. Bay II*, 141 S. Ct. at 719 n.1 (statement of Gorsuch, J.) ("While today's case concerns the total ban on indoor worship found in 'Tier 1,' nothing in our order precludes future challenges to the other disparate occupancy caps applicable to places of worship, particularly in 'Tiers' 2 through 4.").

outbreak from a Mass. Parishioners are more likely to remain with family members, register to attend in advance, and sit in one place during Mass. Compare this to an infected person rubbing shoulders with many strangers over the course of a trip to the grocery store. All that said, these concerns are not unique to the Archdiocese's churches. "[S]cores might . . . wait in long checkout lines in the businesses" on which the District sets no capacity limits. *S. Bay United Pentecostal Church v. Newsom* (*S. Bay II*), 141 S. Ct. 716, 718 (2021) (statement of Gorsuch, J.).[15]

*Second*, the District cites the time worshippers are in a confined indoor space. The District states that "the most common way to catch COVID-19 is from 'close contact' with other people," meaning "being within 6 feet of another person for 15 minutes or more, direct physical contact for any period of time, or exposure to respiratory aerosols and droplets from coughing or sneezing." Second Nesbitt Decl. ¶ 2. It also says that its restrictions prevent people from "being seated in one room for an extended period, producing clouds of droplets or aerosol particulates as they participate in Mass." Defs.' Opp'n at 24; *see also* Second Nesbitt Decl. ¶ 5 ("When the air around [a] person is not constantly being replenished, the viral load in the air increases over time, and will become heavy enough to infect another person, even if that person is wearing a mask."). This risk is even greater, the District says, because "particularly large numbers of different households gather" at worship services. Defs.' Opp'n at 26.

This justification ignores the Archdiocese's efforts to ensure social distancing throughout services. *See* Carson Decl. ¶ 21; *see also* Pl.'s Ex. C-1 (providing more guidance). Compare this

---

[15] Four other Justices agreed with this portion of Justice Gorsuch's statement. *See S. Bay II*, 141 S. Ct. at 717 (statement of Gorsuch, J.) (joined by Justices Thomas and Alito); *id.* (Barrett, J., concurring) (joined by Justice Kavanaugh, stating that "I agree with Justice Gorsuch's statement, save its contention that the Court should enjoin California's prohibition on singing and chanting during indoor services").

to a grocery store, where the space that each person or family unit occupies is not clearly defined. Restrictions on numbers of customers per overall floor space mean little for customers crowding in the milk-and-cheese aisle. And as for the length of exposure, churches are not the only entities in which people are in close proximity for more than 15 minutes. In grocery stores, people cluster in long checkout lines. At big-box stores, people may linger when deciding what to purchase. Yet the District places no limit on how long people can tarry in these places. *Cf. S. Bay II*, 141 S. Ct. at 719 (statement of Gorsuch, J.) ("California worries that worship brings people together for too much time. Yet, California does not limit its citizens to running in and out of other establishments; no one is barred from lingering in shopping malls, salons, or bus terminals."). There are also likely more last names present for every 100 grocery shoppers than 100 parishioners based on the simple fact that households are more likely to attend Mass together than shop for groceries together. Presumably, this raises the risk of COVID-19 contamination too.

*Third*, the District suggests that it must regulate worship more strictly because of the behavior of churchgoers. It argues that "[s]peaking" and "participat[ing] in Mass" are problematic. Defs.' Opp'n at 24. But speaking is not unique to the Archdiocese's churches. The District has not shown that Catholics speak any more at Mass than people normally speak— to store clerks, family, or neighbors—in the big-box stores or retail establishments subject to no maximum-capacity limits.

The District's church rules seem especially driven by a concern that "the traditional activities that occur in places of worship such as singing, communion, and other rituals, pose a particular risk that must be taken into account when determining the size of mass gatherings." First Nesbitt Decl. ¶ 8b. The declaration contrasts shopping with worship and states that "people

who are shopping do not need to speak to each other, chant, pray aloud, or sing in unison." *Id.*
¶ 15; *see also* Defs.' Opp'n at 24 (citing these paragraphs for support). At the hearing, the
District's counsel agreed that "singing is a particular area of concern." Hr'g Tr. at 37.

But this ignores the reality of worship in a COVID-19 world. The District's declaration
relies on studies from the early days of the pandemic, when congregations were still singing and
performing ordinary rituals and when people might not have been wearing masks. *See, e.g.*,
Allison James, et al., *High COVID-19 Attack Rate Among Attendees at Events at a Church –
Arkansas, March 2020*, 69 Morbidity & Mortality Wkly. Rep. 632, 634 (May 22, 2020)
(explaining that the report's findings were limited because the "risk of exposure likely varied
among attendees but could not be characterized because data regarding individual behaviors
(e.g., shaking hands or hugging) were not collected"); *see also* First Nesbitt Decl. ¶ 8b (relying
on this report). And one source cites an outbreak stemming from a church in South Korea that
"had insisted on in-person meetings, banning health masks, praying while touching others, and
refusing to turn over its membership list to health officials." Wesley J. Wildman, et al., *Religion
and the COVID-19 pandemic*, 10 Religion, Brain & Behav. 115, 115 (2020); *see also* First
Nesbitt Decl. ¶ 9 (citing this article).

Here, though, the Archdiocese represents that it has (among other precautions) "required
6 feet of space" between families, "mandated the use of masks," and "curtailed singing." Carson
Decl. ¶ 21. The Archdiocese has self-imposed restrictions beyond what the District has required,
as well. *See, e.g.*, Pl.'s Ex. C-1 at 8, 11 (stating that "[h]ymnals, missalettes, and other worship
aids are to be removed from pews," that "[t]he practice of holding hands during the Lord's
Prayer is strictly prohibited," and that the "sign of peace" will be "omitted until further notice").
If rational basis review applied, the District's generalized assertion that churches are more

dangerous because of singing or speaking would likely pass constitutional muster. *Cf. FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.").

But that is not the standard here. The District cannot rely on hypothetical risks untethered to individual circumstances.[16] While it is more time consuming for the District to narrowly tailor its restrictions, that is what the Constitution and RFRA require. *Cf. Diocese of Brooklyn*, 141 S. Ct. at 67 (stating that New York's restrictions were not narrowly tailored in part because they were "far more severe than has been shown to be required to prevent the spread of the virus *at the applicants' services*" (emphasis added)); *Hobby Lobby*, 573 U.S. at 728 (finding the government "ha[d] not shown that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion *by the objecting parties in these cases*" (emphasis added)). When the government hinders religious worship, it owes more than generalized justifications to those turned away.

*Finally*, the District contends that Masses have contributed to the spread of the virus. *See* Defs.' Opp'n at 29. It says that "[t]here have been multiple potential infections at Masses in the

---

[16] The same goes for the District's contention that physical interaction is more likely at churches because "[h]umans are naturally drawn toward physical closeness and contact with other people" and "this is part of why religious institutions place such an importance on gathering together physically to worship." Second Nesbitt Decl. ¶ 9. This risk is not unique to churches. In any public place, a person could see friends and "greet [them] with [a] hug[]." *Id.* Human interaction is human interaction no matter if it takes place at a grocery store, a backyard barbecue, or in the parking lot of a Catholic church. And "the narrower options [the District] thinks adequate in many secular settings—such as social distancing requirements, masks, cleaning, plexiglass barriers, and the like" could address the District's concern. *S. Bay II*, 141 S. Ct. at 718–19 (statement of Gorsuch, J.).

District," including "when an infected priest led services" and "later when several people who attended Christmas Mass" at the Shrine of the Most Blessed Sacrament tested positive. *Id.* Citing an email sent to Blessed Sacrament's parishioners, the District says that "[t]he Archdiocese was sufficiently concerned that it cancelled all public Masses" at that church. *Id.*

But it would be incredible if no priests or worshippers ever contracted the virus. This evidence about isolated cases also says nothing about the *spread* of the virus. The District admitted at oral argument that there have been no reported outbreaks from attendance at the Archdiocese's Masses. *See* Hr'g Tr. at 43–44. It referenced only outbreaks in a church in South Korea (apparently referring to the same article mentioned above, where participants did not wear masks and touched each other while praying) and in the Diocese of West Virginia. *See id.* at 44.

The District's declaration seemingly confirms that its restrictions do not hinge on any finding that the Archdiocese's churches have led to the spread of the virus—it states that "*[m]ore importantly . . .* [p]eople can engage in risky behavior multiple times *without incident*." Second Nesbitt Decl. ¶ 34 (emphasis added). So the District appears to assume that worship services present inherently "risky behavior." Even if spread does not actually result, it could. For the reasons already explained, that assumption is problematic because worship now is significantly different than it was in a pre-COVID-19 world and because other secular activities present similar risks. And that the Archdiocese canceled Masses at Blessed Sacrament does not count against it as the District might suggest. *See* Defs.' Opp'n at 29. It instead shows that the Archdiocese takes its commitment to protecting its parishioners seriously.

Notably, many of the District's arguments here were raised and rejected in *Diocese of Brooklyn*. There, New York argued that "large indoor gatherings of extended duration present a significant risk" and that "[t]he larger the gathering, the more likely it is that some attendees are

already infected and capable of transmitting the virus." Opp'n to Appl. for Writ of Inj. at 4,

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (No. 20A87). Its brief also

referred to the district court's findings:

> As the district court accepted, indoor religious gatherings commonly possess "problematic features" from an epidemiological perspective that create an outsized risk of COVID-19 spread. They tend to involve large numbers of people from different households arriving simultaneously; congregating as an audience for an extended period of time to talk, sing, or chant; and then leaving simultaneously— as well as the possibility that participants will mingle in close proximity throughout.

*Id.* at 22 (cleaned up); *see also Roman Catholic Diocese of Brooklyn v. Cuomo*, --- F. Supp. 3d

---, No. 20-cv-4844-NGG-CLP, 2020 WL 6120167, at *6 (E.D.N.Y. Oct. 16, 2020) ("Among the

other problematic features of religious gatherings, congregants arrive and leave at the same time,

physically greet one another, sit or stand close together, share or pass objects, and sing or chant

in a way that allows for airborne transmission of the virus."), *rev'd and remanded sub*

*nom. Agudath Israel of Am. v. Cuomo*, 983 F.3d 620 (2d Cir. 2020). Even faced with these

assertions, though, the Supreme Court held that the applicants "ha[d] shown that their First

Amendment claims [were] likely to prevail."[17]  *Diocese of Brooklyn*, 141 S. Ct. at 66. Just so

here.

*     *     *

Both parties here want to ensure congregants can worship *safely*. Their disagreement lies

in the limits of what constitutes "safe" worship. If the District believes it must be more

restrictive of free exercise based on its own best safety judgment, it must meet strict scrutiny's

demanding test. This it has not done.

---

[17]  The Court is thus unpersuaded by the District's argument that this case is different from *Diocese of Brooklyn* because New York did not provide evidence to justify treating houses of worship more harshly. *See* Defs.' Opp'n at 32.

To sum up the likelihood-of-success-on-the-merits factor, strict scrutiny applies to the District's capacity limits because they restrict religious worship and are not neutral and generally applicable (under the First Amendment) and because they place a substantial burden on the Archdiocese's religious exercise (under RFRA). The Court also concludes that the District has not shown—under either the First Amendment or RFRA—that it has pursued the least-restrictive means to achieve its compelling interest in fighting the virus. The Archdiocese is thus likely to succeed on the merits of its claims. *Cf. Church of the Lukumi Babalu Aye*, 508 U.S. at 546 ("The absence of narrow tailoring suffices to establish the invalidity of the ordinances.").

## B.

The Archdiocese must also show that it will suffer irreparable harm to obtain relief. *See League of Women Voters*, 838 F.3d at 6. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Diocese of Brooklyn*, 141 S. Ct. at 67 (cleaned up). And "the same is true of rights afforded under the RFRA, which covers the same types of rights as those protected under the Free Exercise Clause." *Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 129 (D.D.C. 2012). Because the Archdiocese has shown it is likely to succeed on the merits of its First Amendment and RFRA claims, it has shown that it will be irreparably injured absent injunctive relief. *See id.*

"Even if irreparable injury did not automatically follow from the likelihood-of-success-on-the-merits factor," though, "the Court would have no trouble concluding that the [Archdiocese] has made a showing adequate to obtain injunctive relief." *Capitol Hill Baptist*, 2020 WL 5995126, at *11. The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). As the party seeking relief, the Archdiocese must show: (1) that the harm is "certain and great, actual

and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm"; and (2) that the harm is "beyond remediation." *League of Women Voters*, 838 F.3d at 7–8 (cleaned up).

The first requirement is met here because the Archdiocese has been and will continue to be required to turn away parishioners, who it believes it could otherwise safely admit, unless it chooses to violate the law. Each time that the Archdiocese must turn away its faithful, it violates its sincere conviction that it must minister to the spiritual needs of the community by providing Mass. *See* Carson Decl. ¶ 12. Especially during the upcoming Holy Week when attendance is expected to rise, this harm is imminent. *See id.* ¶¶ 27, 30. While some worshippers might be able to watch Mass at home, "such remote viewing is not the same as personal attendance" because, among other reasons, "Catholics who watch a Mass at home cannot receive communion." *Diocese of Brooklyn*, 141 S. Ct. at 68.

The District seeks to minimize this harm by arguing that "the Archdiocese has been fully engaged in its religious practices for months." Defs.' Opp'n at 42. While the Archdiocese might be harmed *less* under the District's current restrictions than if it could not hold Mass at all, that makes no difference. The Archdiocese experiences a constitutional and statutory injury— "certain and great," "actual," and "imminent"—when it turns away parishioners. *League of Women Voters*, 838 F.3d at 7–8 (cleaned up).

The second requirement is also met because it is not as if "adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98 (cleaned up). The Archdiocese cannot be compensated with damages for each parishioner it has (or will have to) turn away from Mass. "Missing a chance to gather on Sunday is not a mere injury in terms of money, time and energy,

but instead a harm for which there can be no do over and no redress." *Capitol Hill Baptist*, 2020 WL 5995126, at *11 (cleaned up).

**C.**

The Court lastly considers whether the Archdiocese has made a showing that the balance of the equities and the public interest favor relief. *See League of Women Voters*, 838 F.3d at 6. Courts consider these two factors together when, as here, the government opposes an injunction. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

There is a strong public interest in controlling the virus. *See* Defs.' Opp'n at 43–44. The Court does not doubt that the virus still poses great risks to us all. But there is also a vital public interest in safeguarding religious freedoms protected by the Constitution and by statutes enacted by Congress. *Diocese of Brooklyn*, 141 S.Ct. at 68 ("The restrictions at issue here, by effectively barring many from attending religious services, strike at the very heart of the First Amendment's guarantee of religious liberty.").

The District argues that the restrictions at issue "were enacted pursuant to Mayor's Orders that were specifically and repeatedly authorized by statutes duly enacted without opposing vote by the D.C. Council." Defs.' Opp'n at 43. But even the most popular or persuasive ordinances cannot stand when they violate the Constitution or laws enacted by the people's representatives in Congress—especially when less-restrictive means are available. *Accord Agudath Israel*, 983 F.3d at 637 ("No public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal.").

The District has not shown that the Archdiocese's Masses have led to rampant community spread, and the Archdiocese has represented to the Court that it will continue to adhere to the extensive precautions it has been taking already and limit the number of

parishioners at gatherings in accordance with the size of its churches, *see* Carson Decl. ¶ 30; Hr'g Tr. at 10–12, 53–54—exactly what the District has held is safe enough for many businesses to do across the city, *cf. Diocese of Brooklyn*, 141 S. Ct. at 68 ("[T]he State has not shown that public health would be imperiled if less restrictive measures were imposed.").

## IV.

Faced with the seriousness of the COVID-19 pandemic, the Mayor and her staff face the difficult and often thankless job of balancing public health and personal liberties. While these officials deserve wide latitude to protect the public, certain lines cannot be crossed. "[E]ven in a pandemic, the Constitution cannot be put away and forgotten." *Diocese of Brooklyn*, 141 S. Ct. at 68. There is no suggestion that the District acted with animus toward the Archdiocese or its parishioners. But the Archdiocese has still shown that it is likely to succeed on its claims under the First Amendment and RFRA and that it will be irreparably harmed absent relief. While the District has an undoubted interest in curbing the spread of a deadly pandemic, it has not shown that it has pursued the least-restrictive means of doing so. The Archdiocese is therefore entitled to a preliminary injunction.

Two final points. *First*, a word on what this injunction is *not*. The District suggested at oral argument that if the Court were to find for the Archdiocese, it would be granting a free license for the Archdiocese to disregard all the District's COVID-19 restrictions. *See* Hr'g Tr. at 26–27. Not so. The Archdiocese does not challenge the District's requirements of masking, social distancing, cleaning, or other restrictions that it applies to churches and businesses alike. *See* Pl.'s Mem. at 32. Indeed, the Archdiocese said that it would abide by them, as well as its own additional protocols, even if they were not required. Hr'g Tr. at 10–12, 53–54; *see also* Pl.'s Ex. C-1 (additional guidelines). The Court takes the Archdiocese at its word.

More, the Archdiocese has asserted—and the District does not dispute—that when it follows these guidelines, it can fill its churches to no more than 30–40 percent capacity. *See* Carson Decl. ¶ 30; Hr'g Tr. at 10–12. The District cannot assume that the Archdiocese will not comply with these measures. *Cf. Agudath Israel*, 983 F.3d at 634 ("The Governor may not, of course, presume that religious communities will not comply with such generally applicable regulations."); *Roberts v. Neace*, 958 F.3d 409, 414 (6th Cir. 2020) ("What [the Governor] can't do is assume the worst when people go to worship but assume the best when people go to work or go about the rest of their daily lives in permitted social settings."). The Court determines that the District's restrictions violate the First Amendment and RFRA only when they prevent the Archdiocese from filling its churches in accordance with the District's other restrictions and the Archdiocese's self-imposed guidelines. *Cf. Holt*, 574 U.S. at 369 ("[W]e hold that the Department's grooming policy violates RLUIPA insofar as it prevents petitioner from growing a ½-inch beard in accordance with his religious beliefs."). In essence, then, the effect of this Court's relief is raising the limitation on the Archdiocese's churches from 25 to no more than 40 percent.

*Second*, the District acknowledges that its restrictions are "tighter than those found in other states and jurisdictions" and points out that "[w]e do not know the full impact of those decisions." Second Nesbitt Decl. ¶ 31. The Court is mindful that courts "are not public health experts" and "should respect the judgment of those with special expertise and responsibility in this area." *Diocese of Brooklyn*, 141 S. Ct. at 68. In many ways, Dr. Nesbitt's cautious approach reflects the role of public health officials to avoid risks. While the District's risk averseness is laudable overall, it is not enough to survive strict scrutiny here.

The District's approach to regulating houses of worship reflects a lack of adequate

consideration for constitutional rights. The District would no doubt acknowledge that there is risk attendant in many activities it has classified as "essential," such as picking up a bottle of wine or takeout from a local restaurant. *See* Mayor's Order 2020-053 at 5–6. But the District has permitted essential businesses to stay open (often with less-onerous restrictions) because the public's need for those things apparently outweighs the risk.

On the other hand, the District's restrictions have not recognized religious exercise as essential in the same way. *Cf. On Fire Christian Ctr.*, 453 F. Supp. 3d at 911 ("[I]f beer is 'essential,' so is Easter."). "The Free Exercise Clause commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from . . . distrust of [religious] practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *Church of the Lukumi Babalu Aye*, 508 U.S. at 547. The District must be equally solicitous of allowing for risks when it comes to religious worship that might not be permitted when constitutional rights are not at stake.

For all these reasons, the Court will grant the Archdiocese's motion for a preliminary injunction.[18] A separate Order will issue.

Dated: March 25, 2021                                   _____
                                                        TREVOR N. McFADDEN, U.S.D.J.

---

[18] The District contends, *see* Defs.' Opp'n at 44, and the Archdiocese does not dispute, *see* Pl.'s Reply at 30, that the relief granted runs only to the Archdiocese as the plaintiff in this case, *see, e.g.*, *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) (explaining that "neither declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs").